UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> MATTHEW BROWN and <br> MATTHEW BROWN COMPANIES, LLC, <br><br> Defendants. | Civ. Action No. 4:24-cv-00558 |

## DEFENDANTS' MOTION TO DISMISS THE PLAINTIFF'S COMPLAINT WITH PREJUDICE

Defendants Matthew Brown and Matthew Brown Companies, LLC ("**Defendant**" or "**Defendants**") hereby move this Honorable Court to dismiss with prejudice, the Complaint filed by the Securities and Exchange Commission ("**SEC**" or "**Commission**") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The SEC's Complaint ("**Complaint**") fails to state a claim upon which relief can be granted with the particularity required by law and does not present any triable fact regarding securities fraud.

## I.  SUMMARY

The SEC's Complaint is fundamentally flawed, lacking the specificity mandated by Rule 9(b) of the Federal Rules of Civil Procedure. It fails to demonstrate any actionable misrepresentations or omissions by Defendants, nor does it allege ill-gotten gains. This motion is

supported by precedent including *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) [1], *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) [2]. The SEC's investigation has been egregiously mismanaged and suggests a shotgun pleading, resulting in substantial prejudice and procedural injustice (*See Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1321-23 (11th Cir. 2015) [3]; *Byrne v. Nezhat*, 261 F.3d 1075, 1129-31 (11th Cir. 2001) [4]).

## II.  LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face" (*See Twombly*, 550 U.S. at 570). Additionally, under Rule 9(b), allegations of fraud must be stated with particularity, specifying the "who, what, when, where, and how" of the alleged fraudulent conduct (*See DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990) [5]).

## III.  ARGUMENT

### A.  The SEC's Complaint is Woefully Inadequate.

The SEC's Complaint does not meet Rule 9(b)'s heightened pleading standards for fraud. It lacks concrete facts showing Defendants' intent to deceive or defraud, as required by

---

[1] The Court avers surviving a motion to dismiss for failure to state a claim, a plaintiff must plead facts that make the claim plausible on its face, not just rely on conclusory statements or a formulaic recitation of the cause of action.

[2] The Court avers to avoid dismissal, a complaint must allege enough facts to make the claim plausible, raising it above mere speculation.

[3] The Court emphasized that clear and concise pleadings are crucial to avoid prejudice and procedural injustice, ensuring the defendant can understand and respond to the claims.

[4] The Court stressed that poorly managed pleadings can lead to procedural unfairness, requiring sufficient detail to avoid prejudice and allow proper addressing of claims.

[5] The Court ruled that fraud claims must be stated with particularity under Rule 9(b), requiring specific details about the fraud's who, what, when, where, and how.

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976) [6] and *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) [7], as such attempts to commit fraud do not exist.

### B.   The SEC's Singular Count is Insufficient and Baseless.

The SEC's Complaint is predicated on a solitary, unsubstantiated count, which it has failed to support with the required particularity. The absence of allegations of financial benefit to the Defendants undermines the plausibility of the SEC's allegations (*See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017) [8]). Moreover, the Complaint lacks the necessary specificity and does not sufficiently allege facts that give rise to a strong inference of scienter, as required by *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) [9], and fails to meet the particularity requirements outlined in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), where the Court a) clarified that plaintiffs must also plead and prove that the fraud directly caused the loss they [in this case, either the SEC, Virgin Orbit, or shareholders] claim; b) emphasized that to state a claim for securities fraud under Rule 10b-5, plaintiffs must meet the heightened pleading standards set by the PSLRA and Rule 9(b), specifying the details of the alleged fraudulent conduct with particularity; and c) satisfy the requirement of pleading fraud with particularity, plaintiffs must

---

[6] The Court found the complaint failed to meet the heightened pleading standards for fraud, lacking specificity and intent.

[7] The Court held the complaint did not satisfy the heightened pleading standards, failing to show a strong inference of scienter or provide necessary details.

[8] The Court noted that the absence of allegations showing financial benefit to the defendants undermines the plausibility of the SEC's allegations. The decision highlighted that without such allegations, the claims lacked the necessary detail to support a plausible inference of wrongdoing.

[9] *Tellabs* requires that a complaint must allege facts giving rise to a "strong inference" of scienter, meaning that the allegations must be such that they make the inference of fraudulent intent at least as strong as any opposing inference.

detail the "who, what, when, where, and how" of the fraudulent conduct. The SEC fails to meet these requirements. Furthermore, without allegations of a financial benefit or motive, the Complaint does not satisfy the standards set forth in *Silicon Graphics Inc. Securities Litigation*, 183 F.3d 970 (9th Cir. 1999), therefore, it fails to align with the legal thresholds established by the Ninth Circuit [10], which require either direct evidence of a wrongful motive and opportunity or compelling circumstantial evidence of deliberate misconduct or recklessness.

**C. The SEC's Allegations Present No Triable Issues of Fact Regarding Securities Law.**

The SEC's allegations, even if accepted as true, do not establish a plausible claim for relief as such actions alleged do not amount to securities fraud as a matter of law. The SEC has not demonstrated material misrepresentations or omissions causing intentional or actual harm to investors, ill-gotten gains by the Defendants, or harm to Virgin Orbit Holdings, Inc. ("**Virgin Orbit**"), which was already undergoing bankruptcy proceedings prior to engaging Defendants [11] [12] (*See Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970 (9th Cir. 1999) [13]).

**D. The Term Sheet's Non-Binding Nature and Alleged Breach of the Non-Disclosure Agreement Invalidates the SEC's Allegations.**

---

[10] The Ninth Circuit held that lacking allegations of financial benefit or motive undermines the plausibility of a fraud claim, failing to meet the required legal standards.

[11] *See How Virgin Orbit spiraled into bankruptcy protection*, The Seattle Times (last accessed August 15, 2024), https://www.seattletimes.com/business/how-long-beachs-virgin-orbit-spiraled-into-bankruptcy-protection/

[12] *VORBQ Historical Data*, Investing.com (last accessed August 15, 2024), https://www.investing.com/equities/nextgen-acquisition-ii-historical-data

[13] The Court acknowledges to establish a claim for securities fraud, the plaintiff must prove that the alleged misrepresentations or omissions caused actual harm. This requires showing that the fraud was a substantial factor in the decline in the value of the investment. Further, the Court acknowledges general or conclusory allegations are insufficient.

The SEC's Complaint, and its solitary, unsubstantiated count, focuses largely on a Non-Binding Indicative Term Sheet ("**Term Sheet**") provided by Virgin Orbit, to Defendant's counsel, in conjunction with a Non-Disclosure Agreement ("**NDA**"), is fundamentally flawed. The SEC advances unprecedented and ill-conceived legal theories in their Complaint alleging transgressions by the Defendants regarding the Term Sheet.

The SEC, whether due to oversight or carelessness, has omitted from, and greatly distorted, the allegations in their Complaint. Specifically, an omitted iMessage from March 22, 2023, in which the Defendant, after Defendants's previously demanding strict confidentiality of Virgin Orbit, communicated concerns about the Term Sheet "hitting the press" (the "**Leak**") to Mr. Stephen Zhang, then-Senior Vice President of Investor Relations ("**VP**"). VP's response to Defendant included, in part, "I'm going to ring Dan [Hart]" ("**Hart**," then-Chief Executive Officer of Virgin Orbit) and VP continuing "I'm sorry [sic] I know. I'm in the same way and have felt this before at Raytheon[.]" VP further commented, "I just don't understand how these media folks get these [sic] tentacles in… it's insane. We're talking maybe 15-20 people and all are in."

Furthermore, VP communicated with the Defendants on the morning of March 23, 2023, stating: "Reviewed the interview, looked good, no disclosure issues, simply support of the company" as well as "And 100% better than anything that would come from an employee-sourced article." Given VP's and Virgin Orbit's statements of encouragement, as well as Hart's recommendation to proceed with the television interview—referring to what the SEC falsely described as a *See* Compl. ¶ 29 ("live") interview on CNBC in their Complaint, and unknown to Defendants as a recording, but rather a "dress rehearsal" for an interview later that afternoon—

regardless, the Defendants acted appropriately and in compliance with proper conduct (*See WorldCom, Inc. Securities Litigation*, 346 F. Supp. 2d 628 (S.D.N.Y. 2004); *Enron Corp. Securities, Derivative & "ERISA" Litigation*, 529 F. Supp. 2d 644 (S.D. Tex. 2006) [14])—Virgin Orbit leaked the Term Sheet. The SEC's sweeping and incorrect allegations that the Defendants violated the NDA through this interview, subsequent to the Leak, are contradicted by Virgin Orbit's own admissions. These admissions highlight the SEC's significant and pervasive misrepresentations in their Complaint. This goes beyond mere misconduct by the SEC; it constitutes a falsehood.

The Term Sheet, along with the discussions, ideas, representations, and hyperbolic scenarios surrounding it, from both parties—which constitute the bulk of the SEC's Complaint—was not intended to be relied upon. Moreover, the Term Sheet, again provided by Virgin Orbit with little to no changes by Defendants or Defendants' counsel, explicitly states that it is "not an agreement, offer, or solicitation of an offer," and its purpose was merely "to facilitate ongoing discussions." As a matter of law, it is irrelevant to securities fraud (*See Sun Microsystems, Inc. v. Hynix Semiconductor, Inc.*, 2008 WL 7448314 (N.D. Cal. 2008) [15]; *Oasis West Realty, LLC v. Goldman*, 51 Cal. 4th 811 (2011) [16]; *In re: A-1 Nursing Services, Inc.*, 2018 WL 1475281 (Bankr. W.D. Pa. 2018) [17]).

---

[14] The Court noted the defendants' cooperation and good behavior in their efforts to address the litigation issues and work with investigations.

[15] The Court found that preliminary documents, like term sheets intended to facilitate discussions, are not binding agreements and do not constitute evidence of fraud.

[16] The California Supreme Court held that documents merely facilitating negotiations and not intended as formal offers or agreements cannot be used to establish fraudulent intent.

[17] The Court ruled that preliminary and non-binding documents, such as term sheets, are not relevant for establishing fraud claims.

The SEC's misunderstanding and overemphasis on the nature of the Term Sheet, including the underlying allegations and implications of attaching the Term Sheet to the majority of their allegations in the Complaint, are evident and pertinent to this motion (See *SEC v. McGinn, Smith & Co.*, (2010) [18]; *SEC v. Morelli,* (2009) [19]).

### E.  Procedural Misconduct and Obstruction by the SEC, Despite Defendant's Best Efforts to Cooperate.

The SEC's investigation has been marred by procedural misconduct and obstruction, undermining the legitimacy of the allegations in their Complaint. For example, despite the Defendant's consistent efforts to comply with the SEC's demands following a "Voluntary Request" for production request dated June 27, 2023, while Defendant was out of the country, served to Defendant's counsel, the SEC did not provide a sufficient—or in most cases, any—response to Defendant's, or Defendant's counsel's, efforts to assist in producing the demanded production. However, despite the SEC's procedural negligence, Defendants made no fewer than eleven ignored attempts, both in writing and telephonically, to provide the SEC with production during their investigation, specifically on July 6, 2023, July 16, 2023, July 18, 2023, July 24, 2023, July 26, 2023, July 27, 2023, and August 1, 2023. On August 3, 2023, nearly a month later from the original production attempt by the Defendants, Assistant Regional Director, Jim Etri ("**Etri**") of the SEC, responded via email that Enforcement Attorney of the SEC, Melanie Good ("**Good**" or collectively with Etri, "**Staff**") "was out of the office" and on a recorded line, told Defendants, regarding the production of documents, "not to worry about it" and "[Good] was on

---

[18] The Court found that the SEC had misrepresented certain facts in its allegations and interpretations.

[19] The court found that the SEC had misrepresented certain facts about allegations of securities fraud and the SEC's interpretation of financial activities.

vacation" (*See SEC v. KPMG LLP* (2004) [20]; *SEC v. Poseidon Asset Management, LLC* (2004) [21]), and instead insisted on in-person testimony, also requested via email by Etri. Defendants agreed to meet at the Fort Worth Regional Office on August 29, 2023, and made accommodations to do so, *absent counsel* (italicized for emphasis), despite Defendants then-residing in North Shore, Oahu, Hawaii, and further made reaccommodations to September 7, 2023 after the SEC notified Defendants of a "scheduling conflict."

However, to date, not a single document has been produced by the Defendants due to the SEC's misconduct, despite attempts to produce before and after the Wells Notice was delivered to Defendants on January 30, 2024, up to and including the filing of this motion. The SEC's conduct exhibits extraordinary degrees of complicity in blatant irresponsibility. For instance, the SEC bizarrely asserts that the Defendant resides at his parents' residence in Tarrant County, Texas. However, the Defendant has not lived in Tarrant County, Texas, let alone at his parents' residence, for nearly 15 years. The SEC's failure to consult even basic public records, such as driver's license and property records, reflects a level of negligence that ranges from sloppy at best to prejudicial at worst. This failure undermines the credibility of the SEC's claims and may impact the fairness of the proceedings. (*See Enron Corp. Securities, Derivative & "ERISA" Litigation*, 235 F. Supp. 2d 549 (S.D. Tex. 2002) [22]).

Further, also omitted to benefit the Staff's narrative in the Complaint, during the testimony before the SEC, when asked by Staff, "[sic] What went wrong [?]" the Defendant

---

[20] The Court criticized the SEC for how it handled the investigation and discovery process.

[21] The Court addressed issues related to the SEC's procedural handling of evidence and discovery disputes

[22] The Court emphasized the importance of thorough and accurate fact-finding in securities cases and how failures in investigation and due diligence can impact the credibility of a plaintiff's claims.

offered, among other remarks, an industry-prevailing theory about Virgin Orbit's mismanagement, stating that Hart, a 34-year veteran of Boeing, "singlehandedly 'Boeing-ed' Virgin Orbit into the ground," while also acknowledging "he is probably a decent guy [sic]." Defendant's testimony of Virgin Orbit's mismanagement is corroborated by then-Chief Operating Officer Tony Gingiss. [23] The Defendant further testified that, following the Leak, he was contacted by former executives of Virgin Orbit and Virgin Galactic, as well as dozens of employees, urging him to reconsider his intentions as Virgin Orbit management was "only concerned about their golden parachutes." The Defendants provided this testimony to the SEC to underscore the significant mismanagement by Virgin Orbit, as further evidenced by its nose-dive in market decline since its public listing on December 30, 2021, well prior to the Defendant's involvement in the purported transaction. The Defendants illuminated these facts to the SEC as an insider having witnessed severe securities incompetence by Virgin Orbit. Despite this, the SEC has consistently and egregiously disregarded this testimony and evidence, both at the time and in the present, and thus to this Honorable Court to fit their Complaint's false narrative (*See WorldCom, Inc. Securities Litigation*, 308 F. Supp. 2d 236 (S.D.N.Y. 2004) [24].

The SEC, seeking media attention, cites *See* Compl. ¶ 24 ("he had a law degree from Southern Methodist University in Dallas"), despite Defendants clarifying this was a "running joke" with Virgin Orbit. Given the tens of millions spent on legal counsel throughout his career, the Defendant humorously referred to his accumulated knowledge as an "honorary" degree. Hart acknowledged this joke on March 20, 2023, via phone and email, stating, "'Honorary' should

---

[23] *See Virgin Orbit COO calls out company leadership for failures in goodbye memo*, CNBC (last accessed August 15, 2024), https://www.cnbc.com/2023/04/04/virgin-orbit-coo-goodbye-email.html

[24] The Court notes that inadequate investigations could lead to prejudicial outcomes., affect the integrity of the case, highlights the significance of proper due diligence and investigation by regulatory bodies

work! Sounds good." The SEC conveniently omits this correspondence and the fact that the "honorary degree" comment was made in response to Hart's inquiry about involving Skadden, one of Defendant's counsel, in the Term Sheet discussion.

Further, instead of focusing on the facts of the Defendant's funding ("**Funding Partners**"), or more importantly, why Virgin Orbit failed, the SEC goes on to egregiously mischaracterized Defendant's investment abilities based on the single term, *See* Compl. ¶ 31 ("negative[,]") from the September 7, 2023 testimony, regarding Defendant's net worth. Accurately calculating net worth, on the spot, is inherently challenging and, at best, highlights the SEC's distortion of the Defendant's financial status and capabilities, further misleading this Honorable Court in their Complaint. Defendant's net worth, which, by textbook finance, is most certainly not "negative," despite Defendant's on the spot testimony, and, more importantly, has little to do with Defendant's funding capabilities. Further, when Defendants offered to present said capabilities to the SEC Staff, specifically Etri, on a recorded line, Etri passively dismissed such for the record.

The SEC has once again failed Virgin Orbit shareholders, the public, the Defendants, and this Honorable Court by not providing a true and accurate account of what could have been factual evidence, demonstrating a lack of due-diligence in fulfilling its responsibilities in conducting a proper and fair investigation.

In addition, and notably, the Defendant was served the Complaint as a gesture of good-faith cooperation and for the convenience of the SEC, and at the request and arrangement with the SEC's trial counsel, at a private terminal at Dallas Love Field, located at Signature 1 Terminal, 8001 Lemmon Avenue, Dallas, Texas 75209, while the Defendant was en route from

his residence in Hawaii on June 21, 2024. Defendant accommodated this extra stop, at his own expense, as serving Defendant in Dallas was "more convenient" for the SEC than Defendant's offers of "Ko Olina Golf Club in Ko Olina, Oahu, Hawaii or Pelican Hill Golf Club in Newport Beach, California[,]" near where Defendant resides. During the investigation and up to this motion, Defendants have made all best efforts to cooperate, often exceeding the standard expectations of cooperation (*See SEC v. Johnson*, 2008 WL 281677 (N.D. Tex. 2008) [25]; *SEC v. Ingoldsby*, 1990 WL 120731 (D. Mass. 1990)).

Had the SEC fulfilled its basic, fundamental legal obligations by accepting just one of the eleven production attempts by the Defendants, it should have uncovered elements that further undermine the false allegations in their Complaint and, consequently, the misrepresentations made to this Honorable Court. For example, a crucial piece of evidence—an iMessage from Hart to the Defendants—clearly supports the Defendants' compliance with Virgin Orbit's due-diligence process. In this message, Hart states, "Board is fully supportive. Should have the docs over [sic] next 2-3 hrs." Hart also promised a phone call with "members of the Board" and asserted, "we have everything we need."

Despite these assurances to the Defendants regarding satisfactory due-diligence, on multiple occasions via telephone, iMessage, and email, the SEC has repeatedly misled this Honorable Court in its Complaint, intentionally or otherwise, that due-diligence by the Defendant was, in fact, not met *See* Compl. ¶ 34 ("[Defendant] continued to refuse [...] [to] respond to Virgin Orbit's basic due-diligence requests."). Whereas, Defendants never received "docs" nor a data room as promised by Virgin Orbit, never received a phone call with "members

---

[25] The Court noted that exceeding standard expectations of cooperation could influence the Court's assessment of the defendants' overall conduct and their commitment to the process.

of the Board," and instead was met with Virgin Orbit's executive's excuses of "lack of sleep" and "being sick," all of which were either documents produced by Virgin Orbit or, had the SEC exercised proper due diligence in its' investigation, would have been produced by the Defendants.

The SEC goes on to grossly mischaracterize the idea of a proposed "break-up" fee as though Defendants tried *See* Compl. ¶ 33 ("to profit from his deceptive conduct") from the Leak. The SEC's allegations are patently untrue, misleading, and a deliberate falsehood. Defendants simply wanted to ensure Virgin Orbit was serious about consummating a transaction, after the Leak. The SEC, mistakenly or otherwise, though certainly carelessly, omits the written and well documented truth to shareholders, the public, the Defendants, and this Honorable Court, especially when it pertains to the escrow demands by Virgin Orbit, which were made material by Virgin Orbit only after the Leak.

Defendants, frustrated with the Leak, stifling expenses and resources as well as not receiving a single due-diligence deliverable from Virgin Orbit, even after signing the NDA and satisfying due-diligence requirements, wrote Hart via iMessage on March 23, 2023 and March 24, 2024, suggesting a revised proposal benefiting both Defendants and Virgin Orbit:

"I know you have acknowledged other interested parties and I know of at least who one is [...] which, obviously, makes me a stalking horse [...] I would propose that we both throw all our cards up at once by signing a stalking horse Term Sheet [...] It requires me to produce everything to the satisfaction of you and the team and binds you to the sale upon receiving that information. If I produce everything and you do not close then, I

propose a break up fee of 3%. It gives me the confidence we are both

serious and if you find a partner with a better offer [...] then the only

exposure you have is that 3%. […] If this is palatable please let me know,

and if it is not, we can shake hands and walk, but that does not change my

opinion and my affinity for Virgin Orbit."

Defendants were clearly mitigating their downside risk while also seeking to ensure the transaction's completion. The "break-up" fee, particularly in the aftermath of the Leak, is a fundamental principle of transactional commercial terms (*See Talley Industries, Inc. Shareholders Litigation*, 1991 WL 46925 (Del. Ch. Apr. 2, 1991) [26]). Defendants, effectively negotiating against themselves, acted in good faith with this proposal and in the best interests of Virgin Orbit by offering, after the Leak, the newly-demanded escrow by Virgin Orbit, signed definitive documents, and other terms to Virgin Orbit's satisfaction, in exchange for a break-up fee. In no way, manner, or shape were Defendants attempting to hold Virgin Orbit hostage, making clear to Hart if the proposal was not palatable, "we can shake hands and walk."

This true and accurate narrative directly contradicts what the SEC presented to this Honorable Court in its' Complaint.

Defendants were more than willing to acquiesce this new escrow request after the Leak upon receiving diligence from Virgin Orbit, but such due-diligence was never produced, and Defendants aver placing funds in an escrow in any transaction without satisfactory due-diligence of both parties would be careless and reckless. The SEC's allegations reveal a

---

[26] The Delaware Chancery Court examined the role of a break-up fee within the framework of commercial transactions, particularly in the aftermath of a deal falling through. The case affirmed that such fees are within reasonable transactional commercial terms.

fundamental misunderstanding of the basics of an escrow arrangement, even menacing escrow and bank accounts for media headlines [27], and suggest a scattershot approach (*See Foman v. Davis*, 371 U.S. 178 (1962) [28].

Furthermore, as if the SEC's investigation were not already compromised, it is believed that Good has a less-than-arm's-length relationship with a witness, who is a close friend or family member of Good ("**Significant Witness**"). This Significant Witness provided testimony against the Defendants, creating additional grounds for an unclean hands argument, as if this has not already been established to this Honorable Court, and highlighting the SEC's mishandling of the investigation. Good should have recused herself from any interactions involving this Significant Witness and from interviewing witnesses related to the Significant Witness's testimony to avoid any appearance of impropriety and to maintain the integrity of the investigation. However, she did not.

Defendants became so perplexed as to the handling of the investigation that, on March 11, 2024, Defendants wrote to Staff, raising serious concerns about the legitimacy of the SEC's investigation against the Defendants and the SEC ignoring the Defendant's willingness, and eagerness, to produce production due to the SEC's obstruction. Furthermore, the Defendant noted that he had become "word on the street" in a securities investigation during lunch at [Shady Oaks Country Club], a local golf club the Defendant occasionally visits when

---

[27] *See A self-proclaimed venture capitalist offered $200 million to buy Virgin Orbit. But he actually had less than $1 and is now being sued by the SEC*, Fortune (last accessed August 15, 2024), https://fortune.com/2024/06/17/virgin-orbit-bogus-offer-200-million-sec-lawsuit-matthew-brown-richard-branson/

[28] The Supreme Court highlighted the importance of allowing amendments to pleadings to ensure justice, emphasizing flexibility and the need to avoid undue delay, prejudiced and its principles underscore the necessity for a coherent and well-founded approach in legal proceedings.

infrequently in Fort Worth, and a prominent social venue in the community, further evidencing the SEC's investigation had been compromised. Defendant wrote to Staff, referring to the existence of the investigation and perceived findings in the Fort Worth community:

> "I have always disliked proving the negative [sic] - it's a futile effort, but the frustration of not being able to assist on 'alleged' accusations, which then pour into the social circle in Fort Worth, is sometimes overpowering, thus the continued offer of cooperation."

Defendant's straightforward intention was to cooperate and produce production; however, these efforts were, again, ignored. Instead, the Defendant was informed by Etri, again on a recorded line, that even "affidavits from the Funding Partners [...] would likely not impact the SEC's decision [on the investigation]," thereby dismissing the significance of even submitting sworn affidavits, which are arguably one of the most credible forms of evidence available.

As established in *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991), the Supreme Court recognizes this Honorable Court's inherent power to impose sanctions for abusive litigation practices, which clearly have already marred this case, including the authority to dismiss a case for conduct that abuses the judicial process. The SEC's conduct falls significantly short of acceptable litigation practices. The misrepresentations, even in the simplest of allegations in the SEC's Complaint—illustrated here by just two of many instances that would likely emerge during discovery and supplemental motions—have provided this Honorable Court with an inaccurate and misleading account from the outset.

These examples of disorganized and obstructive behavior—whether due to error or deliberate intent—demonstrate a fundamental lack of seriousness in conducting a fair

investigation. Though, Defendants would be remiss not to recognize the SEC approving two separate extensions of time and are grateful for such gestures, the SEC's misconduct has significantly prejudiced the Defendants, severely impeding their ability to adequately prepare their defense.(*See SEC v. Softpoint, Inc.*, 958 F. Supp. 846 (S.D.N.Y. 1997) [29]; *SEC v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477 (S.D.N.Y. 2007) [30]; *U.S. v. Noriega*, 117 F.3d 1206 (11th Cir. 1997) [31], 777 F.2d 1106 (5th Cir. 1985); *SEC v. Cuban*, 798 F. Supp. 2d 783 (N.D. Tex. 2011) [32]).

### F.   The SEC's Complaint Reflects a Broader Issue of Abuse of Power

The SEC's Complaint demonstrates a concerning pattern of overreach and misuse of authority, casting serious doubt on the agency's motives and integrity in its' investigation. This issue is emblematic of the broader problem of regulatory bodies exceeding their mandates, thereby compromising the fairness and objectivity essential to legal proceedings.

By overstepping its bounds, the SEC undermines the very principles of justice it is supposed to uphold. This overreach not only weakens the SEC's position in this specific matter but also erodes public trust in the agency's ability to conduct fair and impartial investigations. The need for rigorous judicial scrutiny and adherence to constitutional rights is paramount in ensuring that regulatory actions are both lawful and just. The SEC has overstepped its legal authority.

---

[29] The Court found that the SEC's actions were problematic, particularly in the context of how the investigation was handled. The case reflects issues of procedural misconduct and its impact on the defendants.

[30] The Court found issues related to the adequacy of disclosures and the SEC's investigation, including how the procedural conduct impacted the defendants' ability to respond.

[31] The court was concerned with ensuring that any actions taken by the Government during the investigation did not unfairly prejudice the defendant's ability to mount a future defense.

[32] The Court examined how the SEC's actions and the investigation process affected the defendants and the challenges faced by defendants in responding to the SEC's claims.

## IV.   <u>CONCLUSION</u>

For these compelling reasons, Defendants respectfully request that this Honorable Court dismiss the SEC's Complaint with prejudice and grant judgment in favor of Defendants. The Complaint fails to state a claim on the single unsubstantiated count, lacks the particularity required by Rule 9(b), does not present any triable issues of fact regarding securities fraud, is marred by procedural misconduct and obstruction, reflects a flex in abuse of power, and is fundamentally devoid of merit.

Defendants allege that the SEC is attempting to justify its investigation by filing the Complaint against them and seeking media attention, which they most certainly received. [33] [34] To further illustrate this point, Etri has engaged in a public spectacle by posting media coverage of this case on his personal social media accounts, boasting his involvement in the "investigation." Etri contacted the Defendant's, not engaged, counsel regarding the Defendant's response to Etri's LinkedIn post—something the Defendant was well within his rights to do, especially when Etri's colleagues, friends, and family congratulated him before the case was even adjudicated. Etri reached out to the Defendant's, not engaged, counsel to cover his tracks. He later deleted some, but not all, of these posts, presumably upon realizing the imprudence of his actions. [35] Etri, and Staff, appears more focused on gratifying his own ego than on performing his professional duties, celebrating perceived victories before adjudication—anyone placing their trust in him or

---

[33] *North Texas man is being charged by the SEC after he tried to buy Virgin Orbit for $200m but only had $1 in hs bank account*, Instagram (last accessed August 15, 2024), https://tinyurl.com/2pjcybw9

[34] *A Texas man tried to buy a rocket company for $200 million. The SEC claims he never had the money.*, Business Insider (last accessed August 15, 2024), https://www.businessinsider.com/man-accused-of-bogus-200-million-virgin-orbit-bailout-sec-2024-6

[35] *Jim Etri's LinkedIn Post*, LinkedIn (last accessed August 15, 2024), https://www.linkedin.com/feed/update/urn:li:activity:7209990438206803968/

Staff to conduct a fair and impartial investigation should be deeply concerned about his reckless, selfish behavior.

The SEC has effectively granted Virgin Orbit a de facto "Get Out of Jail Free" card, potentially due to insufficient diligence in pursuing the management of a former multi-billion-dollar (at one point, ~$3.8B) NASDAQ-listed company—the same company abandoned by its own founder, Sir Richard Branson, after he invested over $1B USD. [36] SEC Staff, who largely "work from home"—a fact that in itself is troubling, especially in an investigative setting—has dropped the proverbial ball. Virgin Orbit has abused federal bankruptcy law, arguably even committing bankruptcy fraud, but, alas, has gone ignored by the SEC, despite Defendant's testimony trying to alarm them otherwise.

In closing, recognizing that the Defendant was not easily manipulated, Virgin Orbit disseminated false information to tabloid journalists in a deliberate attempt to discredit the Defendant, and the SEC mirrored as much in its' Complaint.

It should be said, the SEC's inaction may be due to apprehension regarding Virgin Orbit's representation by one of the nation's most esteemed law firms, which has a substantial legal defense funding package as part of the Virgin Orbit bankruptcy. Instead, the SEC chose to file a Complaint against their perceived "weakest link," in this case, the Defendant, an upstanding philanthropist and respected member of his communities in Hawaii and California, whose sole intention in this proposed transaction was to invest in, restructure, and reinvigorate Virgin Orbit alongside the Defendant's Funding Partners (*See SEC v. Goldman Sachs & Co.*, 903 F. Supp. 2d

---

[36] *Richard Branson's Virgin Orbit files for Chapter 11 bankruptcy*, CBC (last accessed August 15, 2024), https://www.cbc.ca/news/business/us-virgin-orbit-branson-bankruptcy-1.6800573

247 (S.D.N.Y. 2012) [37]; *SEC v. Cavanaugh*, 445 F.3d 105 (2d Cir. 2006) [38]).

The SEC, as much as or more than Virgin Orbit, has misled shareholders, the public, the Defendants, and this Honorable Court through reckless allegations in the Complaint, with the hope that the Defendants would concede to and settle these baseless claims.

### PRAYER FOR RELIEF

**WHEREFORE**, Defendants respectfully and assertively pray to this Honorable Court for relief as follows:

· Dismissing the Complaint with prejudice and granting judgment in favor of Defendants due to the SEC's failure to state a claim upon which relief can be granted with particularity, and the absence of any triable issues of fact regarding securities fraud, as detailed in Arguments A through C;

· This Honorable Court takes notice of the apparent lack of impartiality and diligence demonstrated by the SEC during its' investigation as argued in Arguments D through F, which has prejudiced the Defendants' ability to present a full and fair defense, prior to, during, and after the filing of the Complaint, despite the Defendants' attempts and best efforts to cooperate, among other alleged procedural misconduct by the Defendants;

· An injunction prohibiting the SEC from pursuing such unfounded claims in this Complaint in the future; and

· Granting such further relief as this Honorable Court may deem just and proper.

---

[37] The court evaluated the SEC's allegations of securities fraud involving misleading disclosures and conflicts of interest, and the case highlighted the SEC's approach in targeting financial institutions and the need for substantial evidence to support its claims.

[38] In this case, the Court acknowledges how the SEC's strategic choices in prosecuting cases can affect the perception of the defendants and the overall handling of the allegations.

Dated: August 15, 2024
Honolulu County, Hawaii

Respectfully submitted,

<u>/s/ Matthew R. Brown</u>

Matthew R. Brown
2211 Michelson Drive
Irvine, California 92612
(808) 755-0622
legal@matthewbrowncompanies.com
*Pro se Litigant for the Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 15, 2024, the foregoing was mailed by Federal Express and via electronic mail to the following Plaintiff's attorney of record, whether participants or non-participants in Electronic Case Filing:

**Patrick Disbennett**
US Securities and Exchange Commission
Trial Unit
801 Cherry Street
Suite 1900
Fort Worth, TX 76102
817-266-9633
disbennettpa@sec.gov
*Lead Attorney*

<u>/s/ Matthew R. Brown</u>

Matthew R. Brown
2211 Michelson Drive
Irvine, California 92612
(808) 755-0622
legal@matthewbrowncompanies.com
*Pro se Litigant for the Defendants*