## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

MATTHEW BROWN and
MATTHEW BROWN COMPANIES, LLC,

Defendants.

Civ. Action No. 4:24-cv-00558

**JURY TRIAL DEMANDED**

## PLAINTIFF'S BRIEF IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANTS

Dated:  May 30, 2025

Respectfully submitted,

*/s/ Patrick Disbennett*
Patrick Disbennett
Texas Bar No. 24094629
United States Securities and Exchange Commission
Fort Worth Regional Office
Burnett Plaza, Suite 1900
801 Cherry Street, Unit 18
Fort Worth, TX  76102
Telephone: (817) 266-9633 (Disbennett)
Facsimile: (817) 978-4927
disbennettpa@sec.gov

*ATTORNEY FOR PLAINTIFF SECURITIES AND EXCHANGE COMMISSION*

i

## TABLE OF CONTENTS

I.    SUMMARY ................................................................................................................1

II.    STATEMENT OF MATERIAL FACTS ................................................................2

    A.  Matthew Brown Companies and Virgin Orbit ......................................................2

    B.  Brown's Initial Misrepresentations to Virgin Orbit's CEO .................................3

    C.  Brown Sent a Fabricated Screenshot of His Company's Bank Account to Virgin ............4

    D.  Virgin Orbit Signed a Term Sheet With Defendants Following Brown's
        Misrepresentations and Fabricated Screenshot ....................................................6

    E.  Virgin Orbit's Stock Price Increased After the Term Sheet was Leaked ............8

    F.  Defendants' False and Misleading Statements and Omissions on CNBC ...........8

    G.   Virgin Orbit's Stock Price Decreased After Negotiations With Defendants Collapsed .....9

III.    LEGAL STANDARD ..............................................................................................11

IV.    ARGUMENT AND AUTHORITIES .....................................................................11

    A.  The Court Should Grant Summary Judgment Because the Defendants Violated Section
        10(b) of the Exchange Act and Rule 10b-5 Thereunder ...................................11

       i.  Defendants Made Material Misrepresentations and Omissions ..............................12

           1.  Defendants Repeatedly Lied to Virgin Orbit ........................................12

           2.  Defendants Misled the Investing Public in a Televised Interview .........13

           3.  Defendants' Misstatements and Omissions Were Material ...................14

       ii.  Defendants Engaged in Fraudulent or Deceptive Conduct .......................................17

       iii.  Defendants Acted with Scienter ...............................................................................17

       iv.  Defendants' Misstatements, Omissions, and Fraudulent Activities Occurred "In
          Connection With" the Purchase or Sale of Virgin Orbit Securities .........................19

v.  Defendants' Fraud Occurred in Interstate Commerce ...............................................20

B.  The Court Should Grant the SEC Summary Judgment on Defendants' Defenses ............21

i.  At least Five Defenses (#9, 10, 11, 14, and 19) Fail as a Matter of Law, Because They Merely Deny the Existence of an Element of the SEC's Claim ....................21

ii.  At Least Sex Defenses (#12, 15, 16, 17, 21, 23) Are Contrary to Governing Law 23

iii.  Eight Defenses (#1, 2, 3, 4, 13, 18, 20, 22) Are Completely Inapplicable ............24

iv.  Defendants' Equitable Defenses (#5, 6, 7, 8) Fail as a Matter of Law ..................25

V.  CONCLUSION.................................................................................................................25

# TABLE OF AUTHORITIES

**<u>Federal Cases</u>**

*Aaron v. SEC,*
  446 U.S. 680 (1980) ........................................................... 11

*Airlines for Am. v. Dep't Transport.,*
  127 F.4th 563 (5th Cir. 2025) ........................................... 24

*Alaska Elec. Pension Fund v. Flotek Indus., Inc.,*
  915 F.3d 975 (5th Cir. 2019) ............................................ 17

*Am. Gooseneck, Inc. v. Watts Trucking Serv., Inc.,*
  159 F.3d 1355 (5th Cir. 1998) .......................................... 21

*Anderson v. Libby Lobby, Inc.,*
  477 U.S. 242 (1986) ..................................................... 10-11

*Basic, Inc. v. Levinson,*
  485 U.S. 224–32 (1988) .................................................. 14

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ........................................................ 11

*Clark v. City of Alexandria,*
  116 F.4th 472 (5th Cir. 2024) ........................................... 11

*F.D.I.C. v. Niblo,*
  821 F. Supp. 441 (N.D. Tex. 1993) ................................... 23

*Illinois, ex rel. Madigan v. Telemarketing Associates, Inc.,*
  538 U.S. 600 (2003) ........................................................ 25

*Janus Capital Group, Inc. v. First Derivative Traders,*
  564 U.S. 135 (2011) ......................................................... 12

*Kovac v. Wray,*
  660 F. Supp. 3d 555 (N.D. Tex. 2023) ............................... 24

*Kuehnert v. Texstar Corp.,*
  412 F.2d 700 (5th Cir. 1969) ............................................ 23

*Lorenzo v. SEC,*
  587 U.S. 71 (2019) .......................................................... 17

*Maverick Int'l, Ltd. v. Performance Contractors, Inc., No. 1:22-CV-559-CLS,*
  2024 WL 5446743 (E.D. Tex. Nov. 20, 2024) ..................... 21

*Morris v. Covan World Wide Moving, Inc.,*
  144 F.3d 377 (5th Cir. 1998) ............................................ 20

*Oklahoma Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
  58 F.4th 195 (5th Cir. 2023) ........................................................................ 22

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015) ..................................................................................... 22

*Salinas v. State Farm Fire & Cas. Co., No. CV B-10-194*,
  2011 WL 13254062 (S.D. Tex. Dec. 27, 2011) ...........................................21

*SEC v. Alternative Green Techs., Inc., No. 11 CIV. 9056 SAS*,
  2012 WL 4763094 (S.D.N.Y. Sept. 24, 2012) ............................................17

*SEC v. Blackburn*,
  15 F.4th 676 (5th Cir. 2021) ......................................................... 15, 17, 18

*SEC v. Bowen, No. 3:22-CV-1415-S*,
  2024 WL 3462359 (N.D. Tex. July 17, 2024) ............................................14

*SEC v. Collector's Coffee, Inc., No. 19 Civ. 4355*
  (VM) (GWG), 2023 WL 6453709 (S.D.N.Y. Oct. 4, 2023) ....................... 18

*SEC v. Constantin*,
  939 F. Supp. 2d 288 (S.D.N.Y. 2013) ........................................................ 15

*SEC v. Couch, No. 3:14-CV-1747-D*,
  2014 WL 7404127 (N.D. Tex. Dec. 31, 2014) ........................................... 23

*SEC v. Cuban*,
  798 F. Supp. 2d 783 (N.D. Tex. 2011) ....................................................... 25

*SEC v. Czarnik, No. 10 CIV. 745 PKC*,
  2010 WL 4860678 (S.D.N.Y. Nov. 29, 2010) ............................................ 20

*SEC v. Druffner*,
  353 F. Supp. 2d 141 (D. Mass. 2005) ........................................................ 24

*SEC v. Farmer, No. 4:14-CV-2345*,
  2015 WL 5838867 (S.D. Tex. Oct. 7, 2015) .......................................... 16-17

*SEC v. Felton, No. 3:20-CV-0822-G*,
  2021 WL 2376722 (N.D. Tex. June 10, 2021) ........................................... 14

*SEC v. Fox*,
  855 F.2d 247 (5th Cir. 1988) ..................................................................... 17

*SEC v. Gallagher, No. 21-CV-8739*
  (PKC), 2023 WL 6276688 (S.D.N.Y. Sept. 26, 2023) .............................. 25

*SEC v. Gann*,
  656 F. 3d 932 (5th Cir. 2009) .................................................................... 11

*SEC v. Greenstone Holdings, Inc., No. 10 CIV. 1302 MGC*,
2012 WL 1038570 (S.D.N.Y. Mar. 28, 2012) ....................................................... 14

*SEC v. Helms, No. A-13-CV-01036 ML*,
2015 WL 5010298 (W.D. Tex. Aug. 21, 2015) ..................................................... 15

*SEC v. Jankovic, No. CV15CIV1248KPF*,
2017 WL 1067788 (S.D.N.Y. Mar. 21, 2017) ....................................................... 22

*SEC v. Jantzen, No. A-*
10-CA-740-JRN, 2011 WL 250322 (W.D. Tex. Jan. 25, 2011) ............................ 21

*SEC v. Johnson, No. 2:20-CV-08985-FWS-DFM*,
2023 WL 2628678 (C.D. Cal. Feb. 17, 2023) .................................................. 18, 19

*SEC v. Life Partners Holdings, Inc.*,
854 F.3d 765 (5th Cir. 2017) ............................................................................... 23

*SEC v. Monterosso*,
756 F.3d 1326 (11th Cir. 2014) ............................................................................19

*SEC v. Rana Research Inc.*,
8 F.3d 1358 (9th Cir. 1993) ............................................................................ 19, 20

*SEC v. Sayid, No. 17 CIV. 2630*
(JFK), 2019 WL 6307367 (S.D.N.Y. Nov. 25, 2019) .......................................... 14

*SEC v. Sethi*,
910 F.3d 198 (5th Cir. 2018) ......................................................................... 15, 19

*SEC v. Stanford Int'l Bank, Ltd., No. 3:09-CV-0298-N*,
2011 WL 13160374 (N.D. Tex. Nov. 30, 2011) .................................................... 18

*SEC v. Terraform Labs Pte. Ltd.*,
684 F. Supp. 3d 170 (S.D.N.Y. 2023) .................................................................. 24

*SEC v. Torchia*,
183 F. Supp. 3d 1291 (N.D. Ga. 2016) ................................................................ 15

*SEC v. Verges*,
716 F. Supp. 3d 456 (N.D. Tex. 2024) ........................................................... 12, 16

*SEC v. World Tree Fin., L.L.C.*,
43 F.4th 448–60 (5th Cir. 2022) ............................................................... 17, 19, 20

*SEC v. Zandford*,
535 U.S. 813 (2002) ............................................................................................. 19

*SEC v. Zouvas, No. 316CV0998CABDHB*,
2016 WL 6834028 (S.D. Cal. Nov. 21, 2016) ...................................................... 19

*Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*,
    365 F.3d 353 (5th Cir. 2004) ................................................ 17

*Taylor v. HD & Assocs., LLC*,
    45 F.4th 833 (5th Cir. 2022) ................................................ 20

*TSC Indus., Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976) ................................................ 14

*United States v. Peterson*,
    101 F.3d 375 (5th Cir. 1996) ................................................ 22

*Valicenti Advisory Services, Inc. v. SEC*,
    198 F.3d 62 (2d Cir. 1999) ................................................ 24

**Federal Statutes**

Securities Act of 1933
Section 17(a)
    [15 U.S.C. § 77q(a)] ................................................20

Securities Exchange Act of 1934
Section 10(b)
    [15 U.S.C. § 78j(b)] ................................................ 1, 2, 11, 19, 20
Section 21(d)
    [15 U.S.C. §§ 78u(d)] ................................................ 24
Section 21(e)
    [15 U.S.C. §§ 78u(e)] ................................................ 24

Securities Exchange Act of 1934 Rules
Rule 10b-5
    [17 C.F.R. § 240.10b-5]................................................1, 2, 11, 12, 16, 19, 23, 24

**Federal Rules of Civil Procedure**

FED. R. CIV. P. 56(a)................................................11

The Securities and Exchange Commission ("**SEC**") files this brief in support of its Motion for Partial Summary Judgment against Defendants Matthew Brown ("**Brown**") and Matthew Brown Companies, LLC ("**Matthew Brown Companies**") (together, "**Defendants**"). For the following reasons, the SEC asks the Court to grant the SEC's Motion for Partial Summary Judgment and find there is no genuine dispute of material fact that Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("**Exchange Act**") and Rule 10b-5 thereunder.[1]

## I.      SUMMARY

In March 2023, Defendants engaged in a fraudulent scheme to submit and publicly tout a bogus offer to purchase $200 million of stock from Virgin Orbit Holdings, Inc. ("**Virgin Orbit**").

In furtherance of that scheme, Brown sent unsolicited messages to Virgin Orbit's executives asking to discuss a proposed capital injection from Brown shortly after Virgin Orbit, whose stock was publicly traded on the Nasdaq, announced it was pausing operations to conserve capital and pursue potential funding sources. In subsequent calls and written communications, Brown made several misrepresentations and misleading omissions to Virgin Orbit about his purported investing experience and "personal capital" available to quickly close and fund a $200 million transaction. When Virgin Orbit asked for proof of his bona fides, Brown sent Virgin Orbit a fake screenshot of his company's bank account purporting to show the account had over $182 million in available funds, when in fact the account had less than $1.00 at the time.

Based on Brown's misrepresentations and deceptive acts, Virgin Orbit prepared and executed a term sheet with Brown for his proposed $200 million purchase. When that term sheet leaked to the media, Virgin Orbit's stock price increased by 33.1% on the false hope that Brown—who, in reality, had a negative net worth and, at most, $50,000 in total assets at the time—would

---

[1] If the Court grants the SEC's Motion for Partial Summary Judgment, the only remaining issue would be the remedies to be imposed against Defendants, which the Court would decide upon motion by the SEC.

invest $200 million into the company within days. The next day, Brown appeared on CNBC, where he touted his bogus offer and made misrepresentations to the investing public about Defendants' purported investment experience and ability to close the $200 million purchase within 24 hours, while also failing to disclose that Defendants had obtained the term sheet from Virgin Orbit by using a fabricated bank document and misrepresenting their financial wherewithal and experience.

After achieving notoriety from his CNBC appearance, Brown tried to profit from his scheme by requesting that Virgin Orbit agree to pay him a "break-up" fee in the event the $200 million transaction did not close. But Virgin Orbit refused to consider any such fee unless and until Brown placed the $200 million (which Brown did not have) into escrow. When Brown failed to do so, the deal collapsed and Virgin Orbit's stock price dropped significantly as a result.

Based on these undisputed facts and those discussed below, there is no genuine dispute of material fact that Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. Further, Defendants cannot create a triable issue of fact on any of their 23 "affirmative defenses," each of which fails as a matter of law. Thus, the SEC is entitled to summary judgment.

## II.    STATEMENT OF MATERIAL FACTS[2]

### A.  Matthew Brown Companies and Virgin Orbit

1.    Matthew Brown Companies is an entity formed by Brown. Brown has been the sole owner, member, and manager of Matthew Brown Companies throughout its existence.[3]

2.    Virgin Orbit was a publicly traded company that provided commercial satellite launch services.[4] Its common stock traded on the Nasdaq under the Ticker Symbol: VORB.[5]

---

[2] All evidentiary citations in this Statement of Material Facts are to Plaintiff's Appendix in Support of its Motion for Partial Summary Judgment ("**App.**") filed concurrently with this Motion and fully incorporated herein.

[3] (App.284-285 [Brown Dep. at 14:22-15:5]).

[4] (App. 200 [Ex. 31]).

[5] (App. 201 [Ex. 31]). Virgin Orbit's Ticker Symbol became VORBQ when it filed bankruptcy.

3.      On March 15, 2023, Virgin Orbit filed a Form 8-K with the SEC, disclosing that it would initiate a company-wide operational pause "beginning on March 16, 2023, in order to conserve capital while the Company conducts discussions with potential funding sources and explores strategic opportunities." Virgin Orbit further stated that it did not "intend to disclose further developments with respect to these discussions, unless and until its Board of Directors approves a specific transaction or other course of action requiring disclosure."[6]

4.      After markets opened the next day, on March 16, 2023, Virgin Orbit's stock price fell from $1.01 per share to $0.71 per share.[7]

**B. Brown's Initial Misrepresentations to Virgin Orbit's CEO**

5.      On March 18, 2023, Brown sent an unsolicited message via LinkedIn to Virgin Orbit's CEO, Dan Hart. Brown wrote Mr. Hart: "Have a few mins Re: Cap injection from me?"[8]

6.      Before this message, Mr. Hart attests that, to the best of his knowledge, he "had never previously met or spoken with Brown and had never previously heard of Brown or his company." Mr. Hart asked other Virgin Orbit executives and consultants, and no one indicated "that they had knew or heard of [Defendants] before [Brown] contacted [Mr. Hart] on LinkedIn."[9]

7.      On March 19, 2023, Mr. Hart responded and asked if Brown was "familiar" with Virgin Orbit. That same day, Brown replied: "I am quite familiar with Virgin Orbit and certainly well acquainted with the 'space vertical.' I have invested over $750mm of my ***personal capital***, largely in this [space] vertical, and largely in stealth mode…. ***I have the bandwidth to write the $200mm***." Brown emphasized: "I want to reiterate this [sic] ***my capital not…anyone else's***."[10]

---

[6] (App. 270-272 [Ex. 32, Virgin Orbit Form 8-K filed March 15, 2023]).

[7] (App. 145-167 [Martynova Report ¶ 26]).

[8] (App. 372 [Ex.14, Brown's LinkedIn messages with Dan Hart]); (*see also* App.366 [Ex.9 at VIRGINORBIT_SEC0000225]).

[9] (App. 401 [Hart Decl. ¶ 4]); (*see also* App. 286 [Brown Dep. at 24:16-20] (Brown claiming he met Mr. Hart "in passing" in 2022 but had otherwise never met or spoken with him prior to his March 18, 2023 LinkedIn message)).

[10] (App 372 (emphasis added)).

8.      Brown had never invested over $750 million of his personal capital in the space industry.[11] He had never invested any of his personal capital in any space companies.[12]

9.      Brown did not have the bandwidth to invest $200 million of his own personal capital.[13] As of March 2023, Brown estimated that the sum total value of his cash and other assets was somewhere between $10,000 and $50,000, and that he had a "negative" net worth.[14]

10.      At no point did Brown ever have a written commitment or specific oral commitment from any third-party investor or other funding source to invest anything towards the $200 million.[15]

**C.  Brown Sent a Fabricated Screenshot of His Company's Bank Account to Virgin Orbit**

11.      On March 18, 2023, Brown also sent an unsolicited email to Virgin Orbit's Vice President of Investor Relations, Stephen Zhang, with the subject "Can you call me re: financing."[16]

12.      On March 19, 2023, Mr. Zhang and Brown had a telephone call, wherein Brown repeated his false claims about being an investor in space companies and the "private wealth" he purportedly held.[17] Mr. Zhang pressed Brown for proof to verify that Brown had the personal capital and investment experience that he claimed.[18]

---

[11] (App. 327 [Brown Inv. Test. at 127:4-9] ("Q. You write, I have invested over $750 million of my personal capital, largely in this vertical. Is that accurate? A. Of my personal capital, no, that's not accurate.")).

[12] (App. 325 [Brown Inv. Test. at 120:16-22] ("Q. Within the space industry – how much money would you say have you invested personally in any space industry companies? … A.…I would say relatively – relatively none personally.")); (App. 324, 325 [Brown Inv. Test. at 117:4-25, 120:3-22]).

[13] (App. 329, 331 [Brown Inv. Test. at 129:4-17, 131:4-18] (admitting the statement "I want to reiterate this my capital, not…anyone else's" was inaccurate and that Brown did not "personally have $200 million in liquid assets in March of 2023")); (App. 311-312 [Brown Dep. Tr. at 122:22-123:17]).

[14] (App. 322, 336 [Brown Inv. Test. at 67:4-7, 136:14-17]); (*see also* App. 331-337 [Brown Inv. Test. at 131:19-137:4]; App.288-289 [Brown Dep. Tr. at 41:2-42:5]).

[15] (App. 308, 309, 313-314 [Brown Dep. at 118:10-15, 120:23-121:8, 124:18-125:10]).

[16] (App. 368 [Ex. 10 at VIRGINORBIT_SEC0000291]).

[17] (App. 373 [Ex. 15] (Zhang summarizing call with Brown)); (App. 287, 289, 290, 291 [Brown Dep. at 28:17-20, 42:13-22, 43:11-17, 45:2-15] (Brown confirming his multiple phone calls with Stephen Zhang).

[18] (App. 373 [Ex. 15] (Zhang summarizing call with Brown, noting: "To continue the conversation, [Zhang] pressed if there was a way to verify if [Zhang] was speaking to the appropriate person")).

13.    Later that day, Brown emailed Mr. Zhang and wrote: "I hope this can get the ball rolling. I do not have access to my [JPMorgan] brokerage acct but this should hopefully paint a decent picture until we get further down the road."[19] Brown attached to his email a screenshot of a bank account in the name of Matthew Brown Companies purporting to show a "current" and "accessible" balance, as of March 19, 2023, of $182,383,991.26, as depicted below:[20]



14.    The bank account depicted in the above screenshot—a CrossFirst Bank account ending in 5225 in the name of Matthew Brown Companies—corresponds to a real bank account that Brown opened, controlled, and had online access to.[21] However, the bank statements for this bank account, produced by CrossFirst Bank, show that the actual balance of the bank account was less than $1.00 throughout the month of March 2023.[22] Brown opened the bank account in April

---

[19] (App. 367 [Ex. 10]).

[20] (App. 369 [Ex. 10]); (*see also* (App. 188 [Ex. 15A] (same screenshot attached to Zhang's internal email in Ex. 15)).

[21] (App. 338, 339, 339-340 [Brown Inv. Test. at 143:13-15, 144:1-11, 144:24-145:8]); (*see also* App. 341 [Brown Inv. Test. at 163:12-22]; App. 294-295, 297, 299 [Brown Dep. at 51:15-52:6, 54:19-23, 57:14-24]).

[22] (App. 121-123 [Ex. 16] (indicating that account balance did not exceed $.094 between February 28, 2023 through March 31, 2023)); (*see also* App. 298, 299 [Brown Dep. Tr. at 55:6-19, 57:14-24]).

2020, and the account had less than $100 for 31 of the 35 months preceding March 2023.[23] Prior to March 2023, the account's balance never exceeded $42,000.[24] Brown admitted in his sworn testimony that the screenshot depicted above was "false."[25]

15.    Brown testified that he "may have consumed alcohol and quite possibly have…could have" fabricated the screenshot sent to Virgin Orbit.[26] He has also admitted that he emailed the screenshot to Virgin Orbit from his personal email address and reviewed it prior to sending.[27] When asked why he would do such a thing, Brown testified: "[t]o get in the door [with Virgin Orbit], I would assume .…"[28]

### D. Virgin Orbit Signed a Term Sheet With Defendants Following Brown's Misrepresentations and Fabricated Screenshot

16.    Following Brown's misrepresentations and other misconduct discussed above, Virgin Orbit sent Brown a non-disclosure agreement ("**NDA**") requiring each side to not disclose any confidential information exchanged during discussions surrounding Defendants' proposed investment.[29] Both sides executed the NDA on or around March 19 or 20, 2023.[30]

17.    On March 19 and 20, 2023, Brown had additional calls and emails with representatives of Virgin Orbit where he repeated the same or similar false and misleading

---

[23] (*See* App. 3-138 [Ex. 16]).

[24] (*Id.*). Prior to March 2023, the account's highest balance was $41,671.54 in April 2021, which were the proceeds received from two Paycheck Protection Program (PPP) loans. (App. 42-43).

[25]  (App. 343 [Brown Inv. Test. at 165:18-20]).

[26] (App. 342-343 [Brown Inv. Test. at 164:20-165:6]). After this lawsuit was filed, Brown claimed that he did not fabricate the screenshot and that he does not know who did. However, he could not name a single other person who may have fabricated the screenshot, and he has no written evidence that he received the screenshot from someone else before sending it to Virgin Orbit. (App. 301-303 [Brown Dep. at 71:9-73:23]).

[27] (App. 292-293, 296, 300, 302 [Brown Dep. at 49:11-50:7, 50:22-51:14, 53:1-10, 58:2-14, 72:13-19]).

[28] (App. 343 [Brown Inv. Test. at 165:13-24]).

[29] (App. 346-352 (Virgin Orbit sending NDA to Brown)); (App. 365-366 (Virgin Orbit's CEO, Dan Hart, discussing "[s]ending an NDA tonight" to Brown after initial call with Brown and Stephen Zhang)).

[30] (App. 276-280 [Ex.34, Executed NDA]).

statements and omissions discussed above.[31] In one such call with Dan Hart, Brown represented himself as a high net worth individual and an experienced investor in the space industry; that Brown had heard Virgin Orbit needed $200 million; and that Brown wanted to invest and could move very fast on a deal.[32] In emails on March 19 and 20, 2023 with Virgin Orbit's executives, Brown represented that he had a law degree from Southern Methodist University in Dallas.[33] Yet, Brown had never actually graduated college, let alone law school.[34]

18.    At Brown's request, Virgin Orbit prepared and sent Brown a term sheet for the proposed $200 million investment on March 20, 2023.[35] The term sheet provided for Brown to purchase $200 million of Virgin Orbit preferred stock, convertible to common stock following stockholder and regulatory approval, in exchange for Brown's $200 million investment.[36]

19.    Brown never disclosed to Virgin Orbit that the bank screenshot he sent did not accurately reflect the balance of Brown's company's bank account, that Brown's company's bank account had less than $1.00 at the time, that Brown was not a high net worth individual and did not have millions of dollars in personal capital, that Brown did not personally have $200 million, that Brown would need to raise capital from other investors or outside sources to fund the $200 million proposed investment, or that Brown had not invested his own personal capital in other space companies.[37] Virgin Orbit's former CEO, Dan Hart, attests that he "would have found the

---

[31] (*See* App. 373 (Virgin Orbit's Stephen Zhang call with Brown); (App. 402 [Hart Decl. ¶ 8]).

[32] (App. 401 [Hart Decl. ¶ 6]); (*see also* App. 375 (Hart's contemporaneous summary of call with Brown)).

[33] (App. 359 [Ex. 7] (Brown mentioning his "'honorary' (aka barely passed) SMU J.D." in email with Virgin Orbit); (App. 361 [Ex. 8] (Brown referring to "[t]he non-practicing JD in me" in email with Virgin Orbit)).

[34] (App. 318-319, 323 [Brown Inv. Test. at 19:20-20:11, 106:18-24]).

[35] (App. 378-381 [Ex. 17, Term Sheet]); (App. [Ex. 6] (Virgin Orbit's Chief Legal Officer stating that "Matthew asked us to prepare a term sheet for the proposed investment")); (App.402 [Hart Decl. ¶ 9]).

[36] (App. 378-381 [Ex. 17, Term Sheet]).

[37] (App. 403-404 [Hart Decl. ¶¶ 10, 11]).

foregoing information important in deciding whether to recommend that [Virgin Orbit] continue discussions with Brown or sign the Term Sheet."[38] In fact, Mr. Hart attests:

> If I had known that Brown sent an inaccurate screenshot of his company's bank account, or that he did not personally have $200 million and needed to raise the funds from outside sources, or that Brown had never personally invested in any other space companies, [Virgin Orbit] would have ended discussions with Brown immediately. [Virgin Orbit] had limited time to consider potential funding sources…, and it would not have spent that limited time on discussions with an individual who did not personally have the funding to close a deal.[39]

20.    Brown also engaged in deceptive behavior when Virgin Orbit attempted to vet his claims. As Virgin Orbit's Dan Hart avers:

> In an effort to vet Brown's claims, I asked Brown during a phone call, to provide me with the contact information for two references [] who could vouch for his experience. Brown put the call on hold and then connected an individual who Brown claimed could vouch for him. During the call I asked the party for his email address which he quickly communicated before the call was ended by Brown. After the call the individual and I traded emails and arranged a phone call. On the call, the individual stated he had known Brown for only a week and had not yet conducted a know-your-customer ("KYC").[40]

### E. Virgin Orbit's Stock Price Increased After the Term Sheet was Leaked

21.    On March 22, 2023, before the markets opened, Reuters reported that Virgin Orbit was near a deal to raise $200 million from Matthew Brown Companies, "according to a term sheet seen by Reuters," and that the deal aimed to close on Friday, March 24, 2023.[41]

22.    Shortly after the Reuters article, on March 22, 2023, Virgin Orbit filed a Form 8-K with the SEC announcing it would immediately resume operations to prepare for its next mission while it sought new funding.[42]

---

[38] (*Id.*)

[39] (App. 403 [Hart Decl. ¶ 12]).

[40] (App. 403-404 [Hart Decl. ¶ 13]).

[41] (App. 168-172 (Reuters article)); (App. 155 [Martynova Report ¶¶ 29-30 & n.29]).

[42] (App. 273-275 [Ex. 33, Virgin Orbit 8-K, 3/22/2023]).

23.    These public reports following the bogus offer—including Virgin Orbit's March 22, 2023 Form 8-K and the Reuters report published the same day—artificially inflated Virgin Orbit's stock price. Following Virgin Orbit's Form 8-K filing and the publication of the Reuters article, Virgin Orbit's stock price rose 33.1% on March 22, 2023, from $0.44 per share to $0.59 per share, a statistically significant price increase.[43]

## F. Defendants' False and Misleading Statements and Omissions on CNBC

24.    On March 23, 2023, Brown appeared on CNBC, where he participated in a live, nationally televised interview that was broadcast to the investing public.[44]

25.    During that interview, Brown represented that he and his company were in "final discussions" with Virgin Orbit regarding the reported investment transaction and that they "fully plan" on closing the transaction "in the next 24 hours." Although he suggested that he could not get into the details of the discussions, he confirmed Defendants' proposed investment (which Reuters had already reported would be $200 million) would "make [Virgin Orbit] cash flow positive" and that he would "basically be the owner" of Virgin Orbit as a result of the transaction.[45]

26.    During his CNBC interview, Brown also falsely portrayed himself and Matthew Brown Companies as successful, experienced venture capitalists within the space industry. He even claimed that he and his company held investments "in over 13 space companies."[46]

27.    As discussed, Brown and his company had never invested in "over 13 space companies."[47] Brown lacked the capital needed to close on the $200 million investment, his net

---

[43] (App. 143 [Martynova Decl. ¶ 3]); (App. 155 [Martynova Report ¶¶ 29-31, 38]).

[44] (App. 304 [Brown Dep. at 88:19-22]; App. 382-385 (indicating Brown's CNBC interview was posted on March 23, 2023)). The video of Brown's interview was introduced and discussed in Brown's deposition as Exhibit 19, a true and correct copy of which will be provided to the Court. (App. 305-307 [Brown Dep. at 91:14-93:20]).

[45] (App. 306 [Brown Dep. at 92:14-93:10]); (*see also* Ex. 19 (video of CNBC interview) at 0:00-0:48).

[46] (App. 307 [Brown Dep. at 93:7-20]); (*see also* Ex. 19 (video of CNBC interview at 0:00–1:42).

[47] (App. 325 [Brown Inv. Test. at 120:16-22]).

worth was "negative" at the time, and he had no written commitments from any other investors to invest anything towards the $200 million offer that he claimed would close in the next 24 hours.[48]

### G. Virgin Orbit's Stock Price Decreased After Negotiations With Defendants Collapsed

28.    On March 24, 2023, and after he went on CNBC to tout the bogus offer, Brown wrote to Virgin Orbit, lamenting that he "wish[ed] [his] name was never made public," and that he had supposedly "been on the phone nonstop since the leak" of his offer (i.e., the Reuters article). Thus, Brown proposed that Virgin Orbit agree to "break up fee of 3%" to be paid to him if the investment transaction did not close.[49]

29.    Virgin Orbit refused Brown's break-up fee proposal and responded on March 24, 2023: "[i]f you have funds and can place them in a verifiable escrow account with the appropriate agreement and can send to us [then] we can discuss." Brown responded by again asking for Virgin Orbit to agree to a break-up fee, to which Virgin Orbit again reiterated that Brown needed to first place the necessary funds in escrow and respond to Virgin Orbit's due diligence requests.[50]

30.    Brown never placed the funds in escrow and never fully responded to Virgin Orbit's due diligence requests.[51] Consequently, negotiations quickly broke down. By March 24, 2023, Brown conceded to Virgin Orbit that "[i]t looks like the deal will not consummate…."[52]

31.    On March 25, 2023, Virgin Orbit's counsel sent Brown a cease-and-desist letter, claiming that Brown's appearance on CNBC violated the NDA.[53]

---

[48] (App 322,329,331-7 [Brown Inv. Test. at 67:4-7,129:4-17,131:4-137:4]); (App.288,311-312 [Brown Dep.at 41:2-42:5,122:22-123:17]).

[49] (App. 392-395 [Ex. 20]).

[50] (*Id.*)

[51] (App. 404 [Hart Decl. ¶ 15]).

[52] (App. 396-399 [Ex. 21]).

[53] (App. 281-282); (ECF No. 61-1 [Hart Decl. ¶ 6] (Brown's "statements made on CNBC regarding discussions being active for a potential funding deal…violated a Non-Disclosure Agreement [] between Mr. Brown and the Company.")).

32.     On March 27, 2023—after the markets closed—CNBC reported that Virgin Orbit had failed to obtain new funding, noting that Brown's offer had collapsed.[54] When markets reopened the next day, on March 28, 2023, Virgin Orbit's stock price dropped approximately 28.4%, from approximately $0.54 per share to $0.38 per share.[55]

33.     A week later, on April 4, 2023, Virgin Orbit filed for bankruptcy.[56]

### III.    LEGAL STANDARD

Summary judgment on a claim is appropriate where there is no genuine dispute as to any material fact regarding that claim. FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The movant bears the initial burden of presenting evidence that shows the absence of any material fact. *See Celotex*, 477 U.S. at 323. Once that burden is met, the burden shifts to the non-movant to show that material, triable issues of fact remain. *See Anderson v. Libby Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). Importantly, "conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden in a motion for summary judgment." *Clark v. City of Alexandria*, 116 F.4th 472, 480 (5th Cir. 2024).

### IV.    ARGUMENT AND AUTHORITIES

#### A. The Court Should Grant Summary Judgment Because the Defendants Violated Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

Section 10(b) of the Exchange Act and Rule 10b-5 thereunder prohibit fraud in connection with the purchase or sale of any security. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. To establish its claim under Section 10(b) and Rule 10b-5, the SEC must prove by a preponderance of the evidence: (1) a material misrepresentation or misleading omission, or a fraudulent device, scheme, or act, practice, or course of business that would operate as a fraud or deceit on any person; (2) in

---

[54] (App. 173-184 (CNBC article, March 27, 2023)).

[55] (App. 157 [Martynova Report ¶ 36]).

[56] *See In re Virgin Orbit Holdings, Inc.*, Case No. 23-10405-KBO (D. Del.).

connection with the purchase or sale of a security; (3) with scienter: (4) by the use of any means or instrumentality of interstate commerce. *Aaron v. SEC,* 446 U.S. 680, 695 (1980); *SEC v. Gann,* 656 F. 3d 932, 936 (5th Cir. 2009); 17 C.F.R. § 240.10b-5. Because there is no genuine issue of material fact as to these elements, the Court should grant summary judgment in the SEC's favor.

### i.    Defendants Made Material Misrepresentations and Omissions

Brown made several material misrepresentations and omissions to Virgin Orbit and the investing public. Brown is unquestionably the "maker" of his own misstatements and omissions under *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011). Brown's misrepresentations and omissions are also imputed to Matthew Brown Companies—of which he was the sole member and manager—including misrepresentations about the company's bank account, its ability to fund the $200 million offer per the term sheet (which Brown signed on the company's behalf), and its investment history and plans to close the deal during Brown's CNBC interview. (*See supra* section II, "Statement of Material Facts" ("**SOF**") ¶¶ 1, 13-14, 16-18, 21, 24-28); *SEC v. Verges*, 716 F. Supp. 3d 456, 467 (N.D. Tex. 2024) ("The knowledge and actions of a corporation's employees and agents are generally imputed to the corporation where the acts are performed on behalf of the corporation and are within the scope of their authority.").

### 1.    *Defendants Repeatedly Lied to Virgin Orbit*

On March 18-19, 2023, after Virgin Orbit had announced an operational pause to conserve capital and look for funding sources, Brown made unsolicited contact with Virgin Orbit's CEO and represented: "I have invested over $750mm of my personal capital, largely in this [space] vertical, and largely in stealth mode…I have the bandwidth to write the $200mm." (SOF ¶¶ 5-7). Brown emphasized, "I want to reiterate this [*sic*] my capital not…anyone else's." (*Id.* ¶ 7). In reality, as he admitted during sworn testimony, Brown had not invested $750 million of his personal capital in the space industry. (*Id.* ¶ 8). And not only did Brown not "have the bandwidth"

to invest $200 million, but the sum total of his cash and other assets did not exceed $50,000 and he had a negative net worth. (*Id.* ¶ 9).

In addition to repeating these falsehoods to Virgin Orbit on March 19 and 20, 2023 (*id.* ¶¶ 11-12), Brown also claimed to hold a law degree from Southern Methodist University in Dallas. (*Id.* ¶ 17). In reality, Brown did not finish college, much less attend law school. (*Id.*)

Also on March 19, 2023, Brown claimed to Virgin Orbit's Vice President of Investor Relations that Brown was an investor in other space companies and held significant "private wealth." (*Id.* ¶¶ 11-12). Attempting to vet Brown's representations before entering into a term sheet with Brown's company, the vice president asked Brown for proof of his personal capital and investment experience. (*Id.* ¶¶ 12, 19). In response, Brown emailed Virgin Orbit a doctored screenshot purporting to show that an account belonging to Matthew Brown Companies had an "available balance" of $182,383,991.26. (*Id.* ¶ 13). In fact, this bank account held less than $1.00 and Brown admitted the screenshot was "false." (*Id.* ¶ 14). Brown also never disclosed to Virgin Orbit, among other things, his lack of personal capital, his inability to fund the $200 million investment, or his lack of experience personally investing in space companies. (*Id.* ¶ 19).

## 2. *Defendants Misled the Investing Public in a Televised Interview*

On March 23, 2023, Brown appeared on CNBC and participated in a nationally televised interview in which he discussed his bogus investment in Virgin Orbit, among other things. (SOF ¶¶ 24-27). During the interview, Brown again claimed to hold investments in over 13 space companies. As noted above, Brown had not invested in any space companies. (*Id.* ¶¶ 8, 27). He also represented that his company and Virgin Orbit were in final discussions and planned on closing a transaction in the next 24 hours and that his proposed investment would "make [Virgin Orbit] cash flow positive." But in fact, Brown lacked the funding to close on any transaction with

Virgin Orbit, much less do so in 24 hours or make it cash flow positive, which he did not disclose. (*Id.* ¶¶ 19, 24-27). Brown likewise did not disclose during the CNBC interview (or elsewhere) that Defendants had obtained the term sheet from Virgin Orbit by sending the company a fabricated bank record and misrepresenting their financial wherewithal and investment experience in the space industry. *See SEC v. Bowen*, No. 3:22-CV-1415-S, 2024 WL 3462359, at *6 (N.D. Tex. July 17, 2024) ("a duty to speak the full truth on a particular subject arises when a defendant undertakes to say anything on that particular subject.") (citation and italics omitted).

### 3. *Defendants' Misstatements and Omissions Were Material*

A misrepresentation or omission is material if a reasonable investor would likely have viewed the information misrepresented or omitted "as having significantly altered the 'total mix' of information made available." (ECF No. 23, Order at 12 (citing *SEC v. Felton*, No. 3:20-CV-0822-G, 2021 WL 2376722, at *10 (N.D. Tex. June 10, 2021); *Basic, Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)). "The fact that a statement is made in private…rather than to the public does not foreclose a statement's materiality." *SEC v. Sayid*, No. 17 CIV. 2630 (JFK), 2019 WL 6307367, at *7 (S.D.N.Y. Nov. 25, 2019), *aff'd*, 860 Fed. App'x 18 (2d Cir. 2021) (quoting *SEC v. Greenstone Holdings, Inc.*, No. 10 CIV. 1302 MGC, 2012 WL 1038570, at *5 (S.D.N.Y. Mar. 28, 2012)). Materiality can be "resolved as a matter of law by summary judgment" when the information is "so obviously important to an investor that reasonable minds cannot differ on the question of materiality." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976).

When Brown contacted Virgin Orbit, it was a distressed company in need of immediate funding with limited time to explore funding options. (SOF ¶¶ 3-4, 19). Under the circumstances, there is no reasonable dispute that Defendants' misrepresentations and omissions altered the total mix of information, and it was obviously important that: (1) Defendants had secured the term sheet announced to the investing public by sending Virgin Orbit a fabricated bank document that

overstated his company's account by over $182 million and by mispresenting Defendants' credentials, assets, and bona fides; (2) Defendants did not have the ability to fund the $200 million purchase, much less to do so within 24 hours or make Virgin Orbit cash flow positive; (3) Brown had a negative net worth and his total assets did not exceed $50,000; (4) Brown would need to raise the $200 million from other investors, but he had no commitments whatsoever; and (5) Brown had not made prior investments in the space industry. *See SEC v. Sethi*, 910 F.3d 198, 206-07 (5th Cir. 2018) (affirming summary judgment for SEC and reasoning that, as a matter of law, defendant made material misrepresentations about relationships with "major oil companies" that "did not exist"); *SEC v. Helms*, No. A-13-CV-01036 ML, 2015 WL 5010298, at *14 (W.D. Tex. Aug. 21, 2015) (granting SEC summary judgment and finding misrepresentations about defendants' experience and "rolodex of wealthy industry and business contacts" material as a matter of law).[57]

Indeed, Virgin Orbit's former CEO, Dan Hart, attests that he would have found the foregoing information that Brown failed to disclose important in deciding whether to recommend that Virgin Orbit enter into a term sheet with Brown, and that Virgin Orbit would have ceased discussions with Brown immediately had Brown disclosed such information. (SOF ¶ 19).

Additionally, when the term sheet for Brown's bogus investment was leaked to the media on March 22, 2023, Virgin Orbit's stock price rose 33.1%, from $0.44 per share to $0.59 per share. (*Id.* ¶ 23). This statistically significant price jump—and the statistically significant price drop of approximately 28.4% when the deal collapsed—further establishes that Defendants'

---

[57] *See also SEC v. Blackburn*, 15 F.4th 676, 681 (5th Cir. 2021) (affirming summary judgment for SEC and finding district court correctly concluded that failure to disclose an individual's involvement with company was material because investors would want to know who was leading company, along with his true experience and reputation); *SEC v. Constantin*, 939 F. Supp. 2d 288, 306 (S.D.N.Y. 2013) (granting summary judgment for SEC and finding misrepresentations about educational background and professional experience material); *SEC v. Torchia*, 183 F. Supp. 3d 1291, 1319 (N.D. Ga. 2016) ("Defendants made material omissions when they failed to disclose their…true financial circumstances to investors.").

misrepresentations and omissions were material to investors. (*Id.* ¶¶ 23, 32). While Brown disputes that he leaked the term sheet to the media, *who* leaked the term sheet is not relevant to the question of materiality. The market's reaction to the announcement of the term sheet—which Brown fraudulently procured and would not have existed but for the fraud—and its subsequent reaction when the deal collapsed, demonstrate that Brown's misrepresentations were material to investors.

### ii. Defendants Engaged in Fraudulent or Deceptive Conduct

There is no genuine dispute that Defendants also engaged in fraudulent or deceptive conduct in violation of Rule 10b-5(a) and (c). *See Verges*, 716 F. Supp. 3d at 466 ("Rule 10b-5(a) and (c) claims…are based on deceptive conduct," and require that the conduct had "the purpose and effect of creating a false appearance"). Specifically, Brown, in furtherance of Defendants' scheme: (1) sent unsolicited messages to Virgin Orbit misrepresenting his investment experience and ability to quickly fund a $200 million investment; (2) sent Virgin Orbit a false screenshot of Matthew Brown Companies' bank account to create the false appearance that Defendants had millions of dollars in the bank; (3) obtained a term sheet by using that fake bank document and related misrepresentations; (4) signed a term sheet with Virgin Orbit agreeing to deposit $200 million in escrow by the following day, despite lacking funds to do so; (5) appeared on national television to falsely tout the transaction, despite signing an NDA with Virgin Orbit; (6) falsely portrayed Defendants on national television as experienced investors capable of funding a $200 million transaction; (7) attempted to deceive and obstruct Virgin Orbit from vetting Brown's alleged experience and funding capabilities, including claiming Defendants' prior investments were made in "stealth mode," providing Virgin Orbit a reference who had only known Brown for a week, and abruptly ending a call with that reference when Virgin Orbit asked for the reference's contact information; and (8) attempted to procure a break-up fee from Virgin Orbit to profit from the scheme when they inevitably failed to fund the transaction. (SOF ¶¶ 5-20, 24-31).

There is no genuine dispute that these were deceptive acts that had the purpose and effect of falsely portraying Defendants as wealthy and experienced investors capable of quickly funding a $200 million securities transaction, in furtherance of Defendants' fraud. *See Lorenzo v. SEC,* 587 U.S. 71, 74 (2019) (holding that a defendant "who disseminate[s] false or misleading statements to potential investors with the intent to defraud, can be found to have violated…Rule 10b–5, subsections (a) and (c)…."); *SEC v. Alternative Green Techs., Inc.*, No. 11 CIV. 9056 SAS, 2012 WL 4763094, at *5 (S.D.N.Y. Sept. 24, 2012) ("fabrication and backdating of the Corporate Resolution…and the Convertible Note" constituted deceptive conduct to support claims under Rule 10b(a) and (c)); *SEC v. Farmer*, No. 4:14-CV-2345, 2015 WL 5838867, at *15 (S.D. Tex. Oct. 7, 2015) (granting SEC summary judgment and finding defendant engaged in deceptive conduct, including causing dissemination of "false information about [company's] business").

### iii. Defendants Acted with Scienter

In the Fifth Circuit, scienter is established by a showing that the defendants acted intentionally or with severe recklessness. *See Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 366 (5th Cir. 2004). "Severe recklessness" means "an extreme departure from the standards of ordinary care." *SEC v. World Tree Fin., L.L.C.*, 43 F.4th 448, 459–60 (5th Cir. 2022) (quoting *Alaska Elec. Pension Fund v. Flotek Indus., Inc.*, 915 F.3d 975, 981 (5th Cir. 2019)). In the Fifth Circuit, "it is well settled that 'scienter may be established by circumstantial evidence.'" *Id.* at 464 (quoting *SEC v. Fox*, 855 F.2d 247, 253 (5th Cir. 1988)). Summary judgment on the issue of scienter "is appropriate when the undisputed evidence removes any doubt on that issue." *Blackburn*, 15 F.4th at 681 (affirming summary judgment granted in favor of the SEC).

Brown sent Virgin Orbit a fabricated screenshot of his company's bank account purporting to show the account had over $182 million, when in fact, it had less than $1.00. (SOF ¶¶ 11-15). Brown reviewed the screenshot prior to sending it, and his accompanying email—"I hope this can

get the ball rolling. I do not have access to my [JPMorgan] brokerage acct but this should hopefully paint a decent picture until we get further down the road"—leaves no doubt that he knew what he was sending. (*Id.* ¶¶ 13-15). Moreover, as the sole manager of Matthew Brown Companies, Brown opened, controlled, and had access to his company's bank account, whose balance never exceeded $42,000. (*Id.* ¶¶ 1, 14). Thus, Brown knew, or was at least severely reckless in not knowing, that the screenshot was false and that his company's bank account did not have millions of dollars. This conclusion is further bolstered by Brown's sworn investigative testimony that he "may have consumed alcohol and quite possibly have…could have" fabricated the screenshot sent to Virgin Orbit and that he sent the false screenshot "[t]o get in the door" with Virgin Orbit. (*Id.* ¶ 15). These facts alone establish Defendants' scienter as a matter of law. *See SEC v. Collector's Coffee, Inc.*, No. 19 Civ. 4355 (VM) (GWG), 2023 WL 6453709, at *20 (S.D.N.Y. Oct. 4, 2023) ("The use of fabricated documents by itself shows that defendants acted with scienter").[58]

In addition, Brown knew he had not "personally" invested in any space companies, much less multiple space companies as represented to Virgin Orbit and the investing public. (SOF ¶¶ 6-8, 12, 17, 19, 26-27). He knew he had not actually gone to law school. (*Id.* ¶ 17). He knew, or was severely reckless in not knowing, that he did not have the bandwidth to invest $200 million of his own personal capital, as he had a "negative" net worth at the time. (*Id.* ¶ 9). And at the time of his CNBC interview, Brown knew, or was severely reckless in not knowing, that Defendants could not close on and fund the $200 million purchase "in the next 24 hours," given he had, at most, $50,000 in total assets and no commitments from any outside funding sources. (*Id.* ¶¶ 9-10, 25,

---

[58] *See also SEC v. Johnson*, No. 2:20-CV-08985-FWS-DFM, 2023 WL 2628678, at *15 (C.D. Cal. Feb. 17, 2023) (no genuine dispute "that Defendant acted with the requisite scienter by fabricating multiple invoices"); *SEC v. Stanford Int'l Bank, Ltd.*, No. 3:09-CV-0298-N, 2011 WL 13160374, at *5 (N.D. Tex. Nov. 30, 2011) (finding SEC "alleged numerous instances of Stanford acting with at least severe recklessness, if not entirely intentional conduct," including allegations "that Stanford fabricated the performance of the bank's investment portfolio").

27). His deceptive behavior when Virgin Orbit sought to vet his representations—including, when asked for a reference who could vouch for him, providing Virgin Orbit a reference who had known Brown for only a week and abruptly ending a three-way call with that reference and Virgin Orbit's Dan Hart when Mr. Hart asked for that reference's contact information—further demonstrate Brown knew he was lying and acting deceptively. (*Id.* ¶ 20). Thus, there is no genuine dispute that the Defendants acted with scienter. *See, e.g.*, *Sethi*, 910 F.3d at 206–07 (affirming summary judgment for SEC and finding scienter established as a matter of law); *SEC v. Monterosso*, 756 F.3d 1326, 1335 (11th Cir. 2014) (affirming summary judgment for SEC and finding scienter established where defendants used fabricated documents to overstate revenue).

### iv. Defendants' Misstatements, Omissions, and Fraudulent Activities Occurred "In Connection With" the Purchase or Sale of Virgin Orbit Securities

"In its role enforcing [Section 10(b) of the Exchange Act], the SEC has consistently adopted a broad reading of the phrase 'in connection with the purchase or sale of any security'" and Section 10(b) "should be construed not technically and restrictively, but flexibly to effectuate its remedial purpose." *SEC v. Zandford*, 535 U.S. 813, 819 (2002). To that end, "[t]o satisfy the in-connection-with element, the fraudulent scheme [or misstatements] and sale of securities need only 'coincide.'" *World Tree Fin.*, 43 F.4th at 461; *SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1362 (9th Cir. 1993) ("in connection with" requirement "is met if the fraud alleged 'somehow touches upon' or has 'some nexus' with 'any securities transaction'").

Under this flexible standard, "[i]t is not necessary for a specific trade or a specific purchaser or seller to be identified to satisfy the in-connection-with element." *World Tree Fin.*, 43 F.4th at 461 (citation omitted). Likewise, the misstatements or fraud need not be "disseminated directly to

investors" to establish the "in connection with" requirement. *See SEC v. Zouvas*, No. 316CV0998CABDHB, 2016 WL 6834028, at *8 (S.D. Cal. Nov. 21, 2016).[59]

As discussed above, Brown appeared on CNBC and made misrepresentations and omissions directly to the investing public. Such misrepresentations and omissions clearly occurred in connection with the purchase and sale of Virgin Orbit's publicly traded stock. Defendants also made a bogus offer to purchase the securities of Virgin Orbit and, in connection with that securities transaction, made misstatements and omissions and engaged in deceptive acts. Further, Defendants' misstatements, omissions, and deceptive conduct led to a term sheet to purchase Virgin Orbit securities, which leaked to the public and impacted the sale and purchase of Virgin Orbit securities in the public market.[60] Thus, because the transaction fraudulently proposed by Defendants—and their misstatements, omissions, and misconduct in connection therewith—coincided, touched upon, and had some nexus with transactions in Virgin Orbit stock, there is no genuine dispute that Defendants acted "in connection with" the purchase or sale of securities. *World Tree Fin.*, 43 F.4th at 461; *Rana Research, Inc.*, 8 F.3d at 1362.

### v. Defendants' Fraud Occurred in Interstate Commerce

Finally, the interstate commerce element is also satisfied. *See* 15 U.S.C. § 78j(b). Specifically, there is no genuine dispute that Defendants' misrepresentations, omissions, and fraud occurred through a nationally televised interview, phone calls, emails, and LinkedIn messages transmitted using the internet, which constitute instrumentalities of interstate commerce. *See Taylor v. HD & Assocs., LLC*, 45 F.4th 833, 838 (5th Cir. 2022) ("instrumentalities of interstate

---

[59] *See SEC v. Johnson*, No. 2:20-CV-08985-FWS-DFM, 2023 WL 2628678, at *16 (C.D. Cal. Feb. 17, 2023) (defendant's use of fabricated invoices done "in connection with" securities transactions for Rule 10b-5 liability because invoices "ultimately enabled the stock to be publicly traded and induced the public purchase of securities," even if they were not disseminated to investors); *SEC v. Czarnik*, No. 10 CIV. 745 PKC, 2010 WL 4860678, at *4 (S.D.N.Y. Nov. 29, 2010) ("The fact that Czarnik's statements were not disseminated directly to investors does not foreclose liability under section 10(b), Rule 10b–5 and section 17(a).").

[60] (App. 143 [Martynova Decl. ¶ 3 & n.1, 3]); (App. 155-157 [Martynova Report ¶¶ 29-31, 34-36, 38]).

commerce" include "phone and internet service"). Accordingly, there is no genuine dispute of material fact as to any elements of the SEC's claims against Defendants, and the SEC is entitled to judgment as a matter of law thereon.

**B.  The Court Should Grant the SEC Summary Judgment on Defendants' Defenses**

Defendants assert 23 affirmative defenses to the SEC's claim. (ECF No. 25, hereafter "**Ans.**" at 5-8). Defendants "bea[r] the burden of proving any asserted affirmative defense." *Salinas v. State Farm Fire & Cas. Co.*, No. CV B-10-194, 2011 WL 13254062, at *3 (S.D. Tex. Dec. 27, 2011). Thus, the SEC "may demonstrate that it is entitled to summary judgment" on a defense by citing evidence challenging the defense or by merely "pointing out to the district court the absence of evidence necessary to support" the defense. *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998). As shown below, each "defense" fails as a matter of law.

**i.  At Least Five Defenses (#9, 10, 11, 14, and 19) Fail as a Matter of Law, Because They Merely Deny the Existence of an Element of the SEC's Claim.**

"An affirmative defense is a defendant's assertion of facts and argument that, if true, will defeat the plaintiff's claim, even if all the allegations in the plaintiff's complaint are true." *Salinas v. State Farm Fire & Cas. Co.*, No. CV B-10-194, 2011 WL 13254062, at *3 (S.D. Tex. Dec. 27, 2011). However, a mere "denial that an essential element of a claim exists is not the same as an affirmative defense to the claim ...." *Am. Gooseneck, Inc. v. Watts Trucking Serv., Inc.*, 159 F.3d 1355 (5th Cir. 1998). Such a denial is not a proper affirmative defense and fails as a matter of law. *See SEC v. Jantzen*, No. A-10-CA-740-JRN, 2011 WL 250322, at *2 (W.D. Tex. Jan. 25, 2011) (striking "affirmative defenses" from defendant's answer that amounted to mere "denials of what are elements of a prima facie case"); *Maverick Int'l, Ltd. v. Performance Contractors, Inc.*, No. 1:22-CV-559-CLS, 2024 WL 5446743, at *14 (E.D. Tex. Nov. 20, 2024) (granting summary judgment on "causation" defense that was "improperly denominated as an affirmative defense").

21

Defendants' 10th and 11th defenses—which assert there is no "scienter" and no "material misrepresentations or omissions" (Ans. at 6)—fail because they merely deny the existence of elements of the SEC's claim, which are established as a matter of law for reasons discussed above. Defendants' 14th defense—Defendants allegedly complied with "applicable laws and regulations" (*id.* at 7)—is a mere denial that they broke the securities laws that they undisputedly violated.

Similarly, Defendants' ninth defense—"good faith" (*id.* at 6)—"is not a defense to securities fraud," but merely "represents possible evidence of an absence of any intent to defraud." *United States v. Peterson*, 101 F.3d 375, 381 (5th Cir. 1996). As discussed above, there is no genuine dispute that Defendants acted with scienter. Also, there is no evidence that Defendants "sought the advice of a competent attorney *concerning the material fact allegedly omitted or misrepresented*" or gave such "attorney all the relevant facts known to [them] at the time" or that they "reasonably followed the opinion" of such attorney. *Id.* at 382 n.5 (discussing district court's "good faith" jury instruction, which Fifth Circuit found was proper) (emphasis in original).

Defendants' 19th defense ("puffery") also fails. "Statements are non-actionable puffery when they are of the vague and optimistic type and contain no concrete factual or material misrepresentation." *Oklahoma Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 220 (5th Cir. 2023) (alterations omitted). As discussed above, Brown's misrepresentations were material, specific, and concrete, including, among others, that Brown supposedly "invested over $750mm of [his] personal capital," that he had "the bandwidth to write the $200m" with his own funds, and that his company's bank account had $182,383,991.26. Such misrepresentations are specific and verifiable, rather than mere puffery. *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 184 (2015) ("The CEO's assertion…is not mere puffery, but a determinate, verifiable statement about her company's TVs[.]"); *SEC v. Jankovic*,

No. CV15CIV1248KPF, 2017 WL 1067788, at *11 (S.D.N.Y. Mar. 21, 2017) (finding misstatements that lent "an imprimatur of legitimacy" to company were material as a matter of law, not inactionable "puffery").

### ii. At Least Six Defenses (#12, 15, 16, 17, 21, 23) Are Contrary to Governing Law.

Defendants' 12th and 15th defenses allege the SEC cannot prove "reliance and causation" or "damage as a result of Defendants' actions." (Ans. at 6-7). Defendants' 17th defense asserts failure to mitigate damages. (*Id.*) These fail as a matter of law, because "the SEC, unlike private litigants, need not prove the elements of reliance, proximate causation, or harm."[61] *SEC v. Couch*, No. 3:14-CV-1747-D, 2014 WL 7404127, at *7 (N.D. Tex. Dec. 31, 2014) (Fitzwater, J.); *see also SEC v. Life Partners Holdings, Inc.*, 854 F.3d 765, 779 (5th Cir. 2017).

Likewise, Defendants' 21st defense (lack of personal benefit) fails, because Defendants' failure to profit off their fraud does not defeat the SEC's claim. *See Kuehnert v. Texstar Corp.*, 412 F.2d 700, 704 (5th Cir. 1969) ("[W]e are not convinced of any difference in substance between a successful fraud and an attempt" under Section 10(b) of the Exchange Act).

Defendants' 16th defense (contribution and indemnity) also fails. Contribution and indemnity are not affirmative defenses. *See F.D.I.C. v. Niblo*, 821 F. Supp. 441, 457 (N.D. Tex. 1993) ("Like contribution, indemnity is not an affirmative defense within the purview of Rule 8(c), but rather a claim for recovery which must be pled and proved."). Defendants cannot avoid liability for their securities law violations because some unidentified "others" purportedly owe them contribution or indemnity, and in any event, there is no evidence that either Defendant is owed contribution or indemnity from anyone for their own securities law violations.

---

[61] Nonetheless, the SEC's expert opined that Defendants' bogus $200 million offer artificially inflated Virgin Orbit's stock price and certain investors who purchased Virgin Orbit stock at inflated prices were harmed. (App. 143 [Martynova Decl. ¶ 3]); (App. 155, 157, 158 [Martynova Report ¶¶ 29-31, 38, 39-40]).

Defendants' 23rd defense fails because the SEC need not pierce the corporate veil of Matthew Brown Companies to hold Brown liable. *See* 17 CFR § 240.10b-5 (prohibiting "any person" from engaging in proscribed conduct).

### iii. Eight Defenses (#1, 2, 3, 4, 13, 18, 20, 22) Are Completely Inapplicable.

Defendants' first defense—"failure to state a claim"—is not an affirmative defense, but a challenge to the Complaint that this Court denied. (*See* ECF No. 23). Defendants' second and 20th defenses challenge this Court's jurisdiction, but the Court has subject-matter jurisdiction over the SEC's federal claim[62] and personal jurisdiction over Defendants, who were served with the Summons and Complaint in Texas. (ECF Nos. 6, 7). Defendants' 22nd defense—standing—fails, because the SEC has authority to bring the claims in this case. *See* 15 U.S.C. §§ 78u(d), 78u(e).

Defendants' 13th defense—statute of limitations—clearly does not apply, because there is no genuine dispute that the SEC's claim arises out of events in March 2023 and the SEC filed its Complaint in June 2024, well before the expiration of any applicable statute of limitations.

Defendants' third defense—major questions doctrine—fails, because Defendants cannot show that this enforcement action involves "decisions of vast economic and political significance" or a "transformative expansion" in the SEC's regulatory authority. *SEC v. Terraform Labs Pte. Ltd.*, 684 F. Supp. 3d 170, 190 (S.D.N.Y. 2023); *see also Kovac v. Wray*, 660 F. Supp. 3d 555, 564 (N.D. Tex. 2023); *Airlines for Am. v. Dep't Transport.*, 127 F.4th 563, 578 (5th Cir. 2025).

Defendants' fourth defense—lack of due process and fair notice—fails, because there is no genuine dispute that Defendants had fair notice of the anti-fraud provisions of the securities laws that they violated. *See Valicenti Advisory Services, Inc. v. SEC*, 198 F.3d 62, 66 (2d Cir. 1999) (rejecting due process claim and reasoning defendants cannot "credibly claim lack of fair notice

---

[62] *See* 15 U.S.C. § 78u(d), (e), and 78aa (providing federal district courts with jurisdiction over claims in this case and authority to grant relief requested in this case).

of the proscription against defrauding investors"); *SEC v. Druffner*, 353 F. Supp. 2d 141, 151 (D. Mass. 2005) ("defendants are charged with fraud and the violation of Rule 10b–5, no doubt the most frequently cited rule in securities law. The defendants…cannot claim that they had no notice of the illegality of defrauding mutual funds by making material misstatements or omissions.").

Defendants' 18th defense—First Amendment—also fails, because "the First Amendment does not shield fraud." *Illinois, ex rel. Madigan v. Telemarketing Associates, Inc.*, 538 U.S. 600, 612 (2003); *see also SEC v. Gallagher*, No. 21-CV-8739 (PKC), 2023 WL 6276688, at *16 (S.D.N.Y. Sept. 26, 2023) ("This case involves alleged violations of antifraud provisions of the securities laws and thus does not implicate Gallagher's First Amendment rights.").

### iv.  Defendants' Equitable Defenses (#5, 6, 7, 8) Fail as a Matter of Law.

Finally, Defendants' remaining defenses—including abuse of discretion, estoppel, unclean hands, and laches—are equitable defenses. To the extent such defenses are available in SEC enforcement actions, "it is in strictly limited circumstances." *SEC v. Cuban*, 798 F. Supp. 2d 783, 794 (N.D. Tex. 2011) (Fitzwater, J.). "The SEC's misconduct must be egregious, the misconduct must occur before the SEC files the enforcement action, and the misconduct must result in prejudice to the defense of the enforcement action that rises to a constitutional level and is established through a direct nexus between the misconduct and the constitutional injury." *Id.*

Simply put, Defendants cannot create a genuine dispute of material fact that (1) the SEC engaged in "egregious" misconduct, or (2) Defendants suffered prejudice in the defense of this enforcement actions that rises to a constitutional level and is established through a direct nexus between the misconduct and the constitutional injury. Thus, Defendants cannot carry their burden of establishing a genuine issue of material fact as to any of their conclusory and unsupported affirmative defenses. As such, summary judgment is warranted.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, the SEC respectfully requests that the Court grant the SEC's

Motion and grant the SEC such other and further relief to which it may be justly entitled.

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 30, 2025, the foregoing document was filed electronically via the Court's CM/ECF filing system, which will send a notice of electronic filing to all CM/ECF participants. I further certify that on May 30, 2025 a true and correct copy of the foregoing document was served via email as follows to Defendants, who have consented in writing to such service via email, pursuant to Rule 5(b)(2) of the Federal Rules of Civil Procedure:

Matthew Brown *(mbrown.kapolei@yahoo.com)*
Matthew Brown Companies, LLC *(mbrown.kapolei@yahoo.com)*
*(Pro Se Defendants)*


*/s/ Patrick Disbennett*_____
Patrick Disbennett