FORT WORTH DIVISION

SECURITIES AND EXCHANGE      )
COMMISSION,                  )
                             )
          Plaintiff,         )
                             ) Civil Action No.
    v.                       ) 4:24-cv-00558-O
                             )
MATTHEW BROWN and            )
MATTHEW BROWN COMPANIES,     )
LLC,                         )
                             )
          Defendants.        )
_____)


ORAL AND VIDEOTAPED DEPOSITION OF

MATTHEW BROWN

-----------------------------------------------------

    ORAL AND VIDEOTAPED DEPOSITION OF MATTHEW BROWN,

produced as a witness at the instance of the Plaintiff,

and duly sworn, was taken in the above-styled and

numbered cause on February 13, 2025, from 10:01 a.m.

to 2:20 p.m., before Kelly Bryant, CSR in and for the

State of Texas, reported by machine shorthand, at U.S.

Securities and Exchange Commission, 801 Cherry St.,

Suite 1900, Fort Worth, TX 76102, pursuant to the

Federal Rules of Civil Procedure and the provisions

stated on the record or attached hereto.

JOB NO. 250213KBR

1

10:12  1    2020.

10:12  2                    Does that sound generally right to you?

10:12  3        A.    In a filing, perhaps the -- the complaint, I

10:12  4    recall that that was mentioned.

10:12  5        Q.    Uh-huh.

10:12  6        A.    But I know that it was certainly in business

10:12  7    prior to that.  What state, what jurisdiction I can't

10:12  8    speak to today.

10:13  9        Q.    Okay.  So you have since converted Matthew

10:13 10    Brown Companies, LLC to a sole proprietorship; is that

10:13 11    right?

10:13 12        A.    No, not me.

10:13 13        Q.    What do you mean not me?

10:13 14        A.    I -- I didn't personally do that, no.

10:13 15        Q.    The -- the entity Matthew Brown Companies, LLC

10:13 16    has been converted to a sole proprietorship; is that

10:13 17    right?

10:13 18        A.    I believe so, yes.

10:13 19        Q.    You -- you -- you filed a filing to that

10:13 20    effect, correct, in this case?

10:13 21        A.    Correct.

10:13 22        Q.    Throughout the existence of Matthew Brown

10:13 23    Companies, LLC, have you been the owner, the sole owner

10:13 24    of the company?

10:13 25        A.    I believe so.

                                                                14

```
10:13   1        Q.    No other members of -- of the company?
10:13   2        A.    No members.
10:13   3        Q.    Any other officers or directors of the
10:13   4   company?
10:13   5        A.    No, sir.
10:13   6        Q.    Does Matthew Brown Companies, has it ever had
10:14   7   any employees?
10:14   8        A.    Going back to your original question, is there
10:14   9   something that I would change, I would add employees.
10:14  10        Q.    Okay.
10:14  11        A.    That's the first part of the answer.  The
10:14  12   second part is I would ask you to rephrase or provide
10:14  13   the definition of employee by your standard.
10:14  14        Q.    Well, I mean, did -- did it issue W-2s to any
10:14  15   employees?
10:14  16        A.    W-2s, I don't believe we did.
10:14  17        Q.    Okay.  Within any definition you want to use
10:14  18   of employee, does Matthew Brown Companies, LLC currently
10:14  19   have any employees other than yourself?
10:14  20        A.    Yes.
10:14  21        Q.    Okay.  How many employees?
10:14  22        A.    I don't know the exact number.
10:15  23        Q.    You are the sole owner and manager of the
10:15  24   company, correct?
10:15  25        A.    I am, yes.
```

15

10:27  1          Q.   You said you spoke with Dan Hart.  Did you

10:27  2     meet with him personally?

10:27  3          A.   Yes.

10:27  4          Q.   Was it a one-on-one meeting or was anybody

10:27  5     else there?

10:27  6          A.   No, there were -- there were other people

10:27  7     there, plenty of people.

10:27  8          Q.   Was it -- how many other people?

10:27  9          A.   Pure speculation.

10:27 10          Q.   Was he meeting with you specifically or was he

10:27 11     meeting with a group of people?

10:27 12          A.   It was not specifically, no.

10:27 13          Q.   Okay.  What --

10:27 14          A.   We did -- I think I'll make this a little bit

10:27 15     easier for -- for both of us.  It was in passing.

10:27 16          Q.   Got it.  So this -- this one time you spoke

10:27 17     with him in passing in 2022, aside from that, was there

10:27 18     any other communications that you had had with Dan Hart,

10:28 19     written or oral, prior to this March 18th, 2023?

10:28 20          A.   Not that I can recall.

10:28 21          Q.   Okay.  What prompted you to contact Dan Hart?

10:28 22          A.   I don't recall the exact set of circumstances

10:28 23     but I do recall circumstances.  I had -- or we had

10:28 24     received --

10:28 25                    THE WITNESS:  Bless you.

24

| | | |
|---|---|---|
| 10:32 | 1 | A.   He writes that. |
| 10:32 | 2 | Q.   And then you say, "I am.  I spoke to Stephen |
| 10:33 | 3 | Zhang this morning and he said he would connect with |
| 10:33 | 4 | you." |
| 10:33 | 5 | Correct? |
| 10:33 | 6 | A.   It's my name, and yeah, that is what it says. |
| 10:33 | 7 | Q.   Who's Stephen Zhang? |
| 10:33 | 8 | A.   He was the -- |
| 10:33 | 9 | Q.   Can I help you out? |
| 10:33 | 10 | A.   Yeah, please.  Business development I think. |
| 10:33 | 11 | Q.   Investor relations? |
| 10:33 | 12 | A.   Yeah, the same thing. |
| 10:33 | 13 | Q.   He's with Virgin Orbit, right, Stephen Zhang? |
| 10:33 | 14 | A.   Yes, sir. |
| 10:33 | 15 | Q.   And so -- |
| 10:33 | 16 | A.   Or was with. |
| 10:33 | 17 | Q.   Did you have a call with Mr. Zhang the morning |
| 10:33 | 18 | of March 8 -- March 19th, 2023? |
| 10:33 | 19 | A.   I don't recall when the call was.  I do recall |
| 10:33 | 20 | speaking with Stephen Zhang multiple times. |
| 10:33 | 21 | Q.   Okay.  The next thing you wrote was:  "I'm |
| 10:33 | 22 | quite familiar with Virgin Orbit and certainly well |
| 10:34 | 23 | acquainted in the space vertical." |
| 10:34 | 24 | Do you see that? |
| 10:34 | 25 | A.   I do. |

28

11:04  1   true statement, yes.

11:04  2        Q.   Then you were asked:  "Okay.  And so then what

11:04  3   would -- right now, what -- just estimate as far as your

11:04  4   net worth."

11:04  5             To which you responded, "It's I would say

11:04  6   negative if you look at my -- I wouldn't have a -- it

11:04  7   would be negative."

11:04  8             Correct?

11:04  9             Did I read that correctly?

11:04  10       A.   You read it correctly.

11:04  11       Q.   Is that true testimony?  The -- the sworn

11:04  12  testimony you gave then, was those true statements that

11:04  13  you made?

11:04  14       A.   This is one of the things that we talked about

11:04  15  earlier that I would love to -- to expand or revise

11:04  16  based on the complaint.

11:04  17             I preface that answer by saying it's a

11:05  18  very difficult question, and I say here it's -- I

11:05  19  address the difficulty of -- of -- of answering these

11:05  20  questions.

11:05  21             Is it true that my net worth is negative?

11:05  22  It depends on if you're using GAAP, it depends on if

11:05  23  you're using ordinary finance, ordinary accounting.  But

11:05  24  to -- to suggest that my net worth is negative, I would

11:05  25  have chosen a different word or referred to the

41

11:05  1    accountants to calculate net worth.

11:05  2        Q.    I understand that.  But my question is just is

11:05  3    this testimony that you gave under oath, is it true or

11:05  4    is it false?

11:06  5        A.    It was what I believed to be true at the time.

11:06  6        Q.    We -- so you can set that aside for a minute.

11:06  7    We'll probably come back and revisit it.

11:06  8                    After we were looking at an e-mail that

11:06  9    you -- or LinkedIn messages that you had with -- with

11:06 10    Dan Hart, correct?

11:06 11        A.    Yes, sir.

11:06 12        Q.    Within that -- which exhibit is that?

11:06 13        A.    14.

11:06 14        Q.    Within Exhibit 14, again, you said, I -- I

11:06 15    spoke with Stephen Zhang this morning, correct?

11:06 16                    Do you recall that we talked about that?

11:06 17        A.    I see that, yes.

11:06 18        Q.    And you had a phone call with Stephen Zhang at

11:06 19    Virgin Orbit in the morning of March 19th, 2023?

11:07 20        A.    Again, per the testimony I just gave, I don't

11:07 21    know when the phone call was, but I had a series of

11:07 22    phone calls with Mr. Zhang.

11:07 23        Q.    You referenced it there and I'm just asking --

11:07 24        A.    In the morning?  I don't -- sorry, yes, I see

11:07 25    the -- this -- this M -- yeah, my shorthand MRNG.

                                                                42

11:07  1          Q.    Okay.

11:07  2          A.    That would be accurate.  Again, I don't know

11:07  3   where in the world I was at this time, not that that's

11:07  4   relevant or irrelevant.

11:07  5               MR. DISBENNETT:  Okay.  I'm going to see

11:07  6   if I can refresh your recollection on this.  I'm going

11:08  7   to hand you what's been marked as Exhibit 15.

11:08  8               (Plaintiff's Exhibit 15 marked)

11:08  9          Q.    (BY MR. DISBENNETT)   Do you have that?

11:08 10          A.    I do.

11:08 11          Q.    I understand that you're not on this, you

11:08 12   didn't receive it, but -- but I'm asking you because we

11:08 13   talked about a phone call and this e-mail here on the

11:08 14   top is from Stephen Zhang and that -- that's who you

11:08 15   referenced in your prior e-mail speaking with, correct?

11:08 16          A.    One would assume that they're the same Stephen

11:08 17   Zhang.

11:08 18          Q.    Okay.  And this is March 20th, 2023.  And he

11:08 19   says, "For everyone's awareness" -- do you see it bolded

11:08 20   there?  It says, "Here's a brief background our" -- "on

11:08 21   our encounter."

11:08 22               Right?

11:08 23               Do you see that, where it says it there?

11:08 24          A.    I see that.

11:09 25          Q.    Okay.  He says, "Matthew Brown e-mailed me

                                                                    43

11:10  1    and walkthrough our situation per the 8k."

11:10  2                    So yesterday, based on the date of this

11:10  3    e-mail, would have been March 19th, right?

11:10  4        A.    March, sorry?

11:10  5        Q.    March 19th would have been yesterday based on

11:10  6    the date of this e-mail?

11:10  7        A.    According to these two exhibits.

11:10  8        Q.    And that's consistent with you saying you had

11:10  9    spoken with Mr. Zhang on the 19th, right?

11:10  10       A.    Yes.   The only hesitancy that I have is,

11:10  11   again, I don't know the time zone differences on these,

11:10  12   so...

11:10  13       Q.    Understood.   But -- but you did speak with him

11:10  14   on the 19th in a phone call, right?

11:10  15       A.    Yes.

11:10  16       Q.    Okay.   I'm just asking.

11:10  17                    I understand you didn't send this e-mail,

11:10  18   but he writes in here, to see if this refreshes your

11:10  19   recollection, it says, "He voiced his interest and

11:10  20   disclosed his private wealth.   Few comments below on our

11:11  21   conversation," and then there's some bullet points?

11:11  22                    Do you see those there?

11:11  23       A.    I do.

11:11  24       Q.    He says among those bullet points, "Investor

11:11  25   in SpaceX in the past as well as recent funding around a

45

11:15  1  to your investigative testimony.

11:15  2              (Plaintiff's Exhibit 10 marked)

11:15  3      Q.   (BY MR. DISBENNETT)  Do you have that in front

11:15  4  of you?

11:15  5      A.   I do.

11:15  6              I prefer to supplement an answer.  We can

11:15  7  get back to that at some point.

11:15  8      Q.   Sure.  You can -- we can -- we can deal with

11:15  9  that later.

11:15 10      A.   Yeah.

11:15 11      Q.   But let's look at Exhibit 10.

11:15 12              So this, if you go to the second page, you

11:15 13  see it says to Stephen Zhang up there at the top of that

11:15 14  page?

11:15 15              Do you see that there?

11:15 16      A.   Yes.

11:15 17      Q.   And it says, Subject:  "Can you call me

11:15 18  regarding financing."

11:15 19              Right?

11:15 20      A.   It says that, yes.

11:15 21      Q.   And then it has your -- your signature line

11:15 22  there with your personal cell -- is that your personal

11:16 23  cell number?

11:16 24      A.   It is.

11:16 25      Q.   Okay.  And you sent this to Mr. Zhang on March

                                                              49

11:16  1    18th, 2023; is that correct?

11:16  2         A.    It looks like it came from my e-mail, yes.

11:16  3         Q.    All right.  And that's your e-mail, right,

11:16  4    Matthew.Brown@NRGNT.com?  Is that -- was that your

11:16  5    e-mail address -- one of your e-mail's address at the

11:16  6    time?

11:16  7         A.    It's one of many.

11:16  8         Q.    And he responds to you the next day.  He says,

11:16  9    "Hi.  Free to chat today."

11:16 10              Correct?

11:16 11              Do you see that there at the next --

11:16 12         A.    Yeah, I don't know the order -- I don't know

11:16 13    when --

11:16 14         Q.    Yeah, yeah.  Going forward.

11:16 15         A.    Yeah, okay.

11:16 16         Q.    On the next -- on the first page, do you see

11:16 17    it?

11:16 18         A.    Yes.

11:16 19         Q.    And then we talked about you did discuss --

11:16 20    you had a phone call with Mr. Zhang, correct?

11:16 21         A.    One of many, yes.

11:16 22         Q.    And then your top message, do you see that

11:16 23    there?  It's -- the top message is from Matthew Brown

11:17 24    personal, so mbrown@.kapolei@yahoo.com, right?

11:17 25         A.    Yes, sir.  Kapolei.

50

11:17  1        Q.    That's your -- your e-mail address, right?

11:17  2        A.    Personal, yes.

11:17  3        Q.    And it -- it says, "I hope this can get the

11:17  4  ball rolling.  I do not have access to my JPM brokerage

11:17  5  account."

11:17  6              Is that JPMorgan?

11:17  7        A.    Yes, it likely would be the...

11:17  8        Q.    It says, "But this should hopefully paint a

11:17  9  decent picture until we get further down the road."

11:17  10             Right?

11:17  11       A.    That's what it says.

11:17  12       Q.    And you wrote this e-mail?

11:17  13       A.    I reserve the right to be wrong, but I have no

11:17  14  reason to -- to doubt that I did.

11:17  15       Q.    Okay.  And it has an attachment screenshot

11:17  16  there, correct?

11:17  17             And then if we can turn to the screenshot.

11:17  18  Do you see that on the third page?

11:17  19       A.    I do.

11:17  20       Q.    It's a screenshot of -- and it has Cross Fit

11:17  21  Bank there.

11:18  22             Do you see that?

11:18  23       A.    I saw -- yes, CrossFirst Bank, yes.

11:18  24       Q.    And Matthew Brown Companies, LLC MMKT 05225.

11:18  25             Do you see that there, where it says that?

51

11:18  1       A.    Yes, sir, I see that.

11:18  2       Q.    Does Matthew Brown Companies, LLC have a money

11:18  3   market account at Cross Fit Bank with that account

11:18  4   number?

11:18  5       A.    After reviewing production from the

11:18  6   Commission, I believe at the time, there was.

11:18  7       Q.    All right.  And it says -- this is last

11:18  8   updated.  There's a date there of March 19th, 2023,

11:18  9   correct?

11:18 10       A.    Yes, that's what it says.

11:18 11       Q.    And it says, Accessible balance, bill balance,

11:18 12   they're both the same, right?  $182 million -- a little

11:19 13   over $182 million, correct?

11:19 14       A.    Fair, yes.

11:19 15       Q.    And it says that under current balance,

11:19 16   available balance as well, right?

11:19 17       A.    Repeat that.  Sorry.  I didn't hear.

11:19 18       Q.    It says under -- so there's both -- there's

11:19 19   the current balance, there's an available balance,

11:19 20   there's the accessible balance, there's available

11:19 21   balance at the top.

11:19 22             All of those are the same number of a 100

11:19 23   -- a little over 182 million --

11:19 24       A.    Yes, sir.  Sorry.  I wasn't trying to play

11:19 25   games.  I just didn't hear you.

52

11:19  1        Q.    Got it.    This is a screenshot that you sent

11:19  2    Virgin Orbit, Mr. Stephen Zhang on March 19, 2023,

11:19  3    correct?

11:19  4        A.    It came from my account, yes.

11:19  5        Q.    And --

11:19  6        A.    It looks like it came from my account.

11:19  7        Q.    And it purports to show that this Matthew

11:19  8    Brown Companies, LLC money market account had a 100 -- a

11:19  9    little over $182 million, correct?

11:20  10       A.    I can see how it looks that way, yes.

11:20  11       Q.    That account did not have $182 million, did

11:20  12   it?

11:20  13       A.    I -- I'm not sure.

11:20  14       Q.    Okay.

11:20  15       A.    Speaking today.

11:20  16       Q.    Speaking today, you can't recall if it had

11:20  17   $182 million?

11:20  18       A.    No, sir.

11:20  19       Q.    Do you recall that account ever having $182

11:20  20   million?

11:20  21       A.    I don't -- I don't -- I -- I -- I haven't

11:20  22   looked at a bank statement from that account.   I

11:20  23   haven't -- other than when I was with the Commission, I

11:20  24   haven't ever logged into that account to the best of my

11:20  25   knowledge, so I don't -- I don't know.

                                                              53

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

11:20  1          Q.   Well, you -- you -- I think you -- you said
11:20  2    during your -- your prior sworn testimony, you said you
11:20  3    did log into that account at that time?
11:20  4          A.   I said -- yeah, as I said, other than logging
11:20  5    into that account.
11:20  6          Q.   I mean, you certainly had access to that
11:21  7    account, correct?
11:21  8          A.   I had to get it.
11:21  9          Q.   Is there any other signer on that account
11:21 10    who's authorized to access that account, at least
11:21 11    according to the records of the bank?
11:21 12          A.   I'm not sure.  I don't -- I -- again, I don't
11:21 13    review statements.
11:21 14          Q.   Did you -- did you give out your password to
11:21 15    anybody to -- else to have access to the bank, online
11:21 16    banking?
11:21 17          A.   Nearly all our banking accounts have custodial
11:21 18    access.
11:21 19          Q.   Can you tell me the name of a specific person
11:21 20    at this time who would have had access to your Cross --
11:21 21    Cross Fit Bank money market account for Matthew Brown
11:21 22    Companies?
11:21 23          A.   No.
11:21 24                 MR. DISBENNETT:  I'm going to hand you
11:21 25    what's been marked as Exhibit 16.

                                                              54

**APP297**

11:21  1                    (Plaintiff's Exhibit 16 marked)

11:21  2                    THE WITNESS:  Yes, sir.

11:22  3                    MR. DISBENNETT:  And keep that screenshot

11:22  4   that you have in Exhibit 10 open, please.

11:22  5        A.   (Witness complies.)

11:22  6                    MR. DISBENNETT:  Okay.  Exhibit 16 is a

11:22  7   series of bank account statements that we received from

11:22  8   Cross Fit Bank for Matthew Brown Companies, LLC.

11:22  9                    Do you see that there?

11:22  10       A.   I do.

11:22  11       Q.   (BY MR. DISBENNETT)  And the -- it has an

11:22  12   account number.  You can see on that first page some of

11:22  13   its account numbers are crossed out but -- but it does

11:22  14   say a money market account with the last four digits of

11:22  15   5225, right?

11:22  16       A.   I see that.

11:22  17       Q.   And that is the same account that's reflected

11:22  18   in that screen shot that we saw on Exhibit 10, right?

11:22  19       A.   I have no reason to doubt.

11:22  20       Q.   This -- this first statement here is from,

11:23  21   let's see, April 30th, 2020, and then these run all the

11:23  22   way through till August 31st, 2023.

11:23  23                    And if you -- you're free to look at it,

11:23  24   but...

11:23  25       A.   I trust you.

55

11:25  1          A.   Yes, sir.

11:25  2          Q.   It -- and it shows in here, throughout the

11:25  3     month, you had a total additions of 19 cents and then

11:25  4     subtractions of 19 cents, but throughout the month, the

11:25  5     balance -- throughout the month of March 2021, the

11:25  6     balance on this account was -- was less than a dollar,

11:25  7     correct?

11:25  8          A.   Yes, that's what it says.

11:25  9          Q.   At no point during the month of March 2021

11:25 10     does this account ever have $182 million, correct?

11:25 11          A.   The document that you presented as Exhibit 16

11:25 12     would suggest that -- that this particular account did

11:26 13     not have a 120 -- excuse me, 182 and change.

11:26 14          Q.   Well, this particular account is the same

11:26 15     account that's referenced in the screenshot in Exhibit

11:26 16     10, correct?

11:26 17          A.   Yeah.  I believe I just answered that, yes.

11:26 18          Q.   And that account in the screenshot is shown to

11:26 19     have over $182 million, correct, as of March 19th, 2021?

11:26 20          A.   The last five digits are the same, yes.

11:26 21          Q.   The bank statements show that, in fact, it had

11:26 22     less -- that account had less than one dollar, correct?

11:26 23          A.   The last five digits of the bank statement

11:26 24     says -- yeah.

11:26 25          Q.   Would you agree with me that that -- that --

                                                                    57

11:26 1      A.    Please, go ahead.

11:26 2      Q.    You said last five digits.  Let -- let me ask

11:26 3  you this:  The screenshot that you -- that was sent in

11:26 4  Exhibit 10 shows, for a money market account, Matthew

11:27 5  Brown Companies as of March 19, 2021, that shows over

11:27 6  $182 million in there, correct?

11:27 7      A.    I would agree with that.

11:27 8      Q.    The same account shown in these -- these

11:27 9  statements from the bank, shows that in March 2021, in

11:27 10  fact, that account never had more than a dollar in it,

11:27 11  correct?

11:27 12      A.    I'm making the assumption that these are both

11:27 13  one in the same, so the answer would be correct to your

11:27 14  question.

11:27 15      Q.    Would you agree then that that screenshot is

11:27 16  not accurate?  The screenshot that was sent to Virgin

11:27 17  Orbit was not accurate?

11:27 18      A.    I don't think it's within my purview to be

11:27 19  able to determine one way or the other.

11:27 20      Q.    It's -- it's -- it's an account that is owned

11:27 21  by a company that you're the sole owner and controller

11:28 22  of, and you're saying that you can't tell whether or not

11:28 23  the screenshot that you sent was accurate or not?

11:28 24      A.    I don't handle accounting.  I told you -- I've

11:28 25  made it very clear that were other people that do this.

58

11:43  1   like I said on line 19, metadata doesn't lie or it's

11:43  2   very tough to.  Nowadays it's a little bit easier.

11:44  3        Q.   Right.  Line 19, you say, "The metadata

11:44  4   doesn't lie, so it will tell me if indeed I was in

11:44  5   London and I was at work and I was drinking.  Then I can

11:44  6   confirm."

11:44  7             Correct?

11:44  8        A.   Yes.  That was a hypothetical scenario.

11:44  9        Q.   Can you, sitting here today, tell us who

11:44  10  created that screenshot that was attached to Exhibit 10?

11:44  11       A.   No, and I've answered that now several times,

11:44  12  and you can mark that.

11:44  13       Q.   It certainly came from your -- so -- so just

11:44  14  to be clear, you don't know one way or the other who

11:44  15  created it; is that right?

11:44  16       A.   That is my testimony, again.

11:44  17       Q.   Could it have been you who created it?

11:44  18       A.   No, I don't think so.

11:44  19       Q.   Okay.  You testified previously that it could

11:44  20  have been you who created it, correct?

11:44  21       A.   And per the beginning of this deposition, I

11:44  22  mentioned that this is one of the things I'd like to

11:44  23  clarify.

11:44  24       Q.   Who else could have possibly created this fake

11:44  25  screenshot that was attached to the e-mail you sent to

71

11:45  1  Virgin Orbit?

11:45  2          A.    Millions of people.

11:45  3          Q.    Okay.  Who?  Give me one name of a person.

11:45  4          A.    One name.  Anybody on start-up sites, like

11:45  5  Upwork or vWork or any virtual assistants, any graphic

11:45  6  artist, any -- any document artist.  I mean, the -- the

11:45  7  list goes on.

11:45  8          Q.    This screenshot came from your e-mail account,

11:45  9  correct?

11:45 10          A.    We've established that.

11:45 11          Q.    You -- you sent the e-mail, right?

11:45 12          A.    I believe so, yes.

11:45 13          Q.    You would have reviewed what you were sending

11:45 14  to Virgin Orbit before you sent it, correct?

11:45 15          A.    At least peripherally.

11:45 16          Q.    Right.  So you would have reviewed the

11:45 17  screenshot before you attached it to your e-mail that

11:45 18  you sent to Virgin Orbit, correct?

11:45 19          A.    Unless it was already attached, but yes.

11:46 20                Again, it's important to note I don't

11:46 21  write the majority of my responses or e-mails.

11:46 22          Q.    But you sent the e-mail, correct?  You just

11:46 23  said that.

11:46 24          A.    Correct.  I clicked send, but that doesn't

11:46 25  mean that I write everything, just like I've testified

72

```
11:46   1   previously in -- with LinkedIn.  I didn't necessarily
11:46   2   write everything in Exhibit 14.
11:46   3       Q.   Okay.  Who -- give us a name then of the
11:46   4   person who would have written this e-mail for you?
11:46   5       A.   I've testified that I don't know the person.
11:46   6   This is -- we're -- we're talking now 700 -- almost 7 --
11:46   7   693 days ago.
11:46   8       Q.   You -- you gave this testimony in September
11:46   9   2023.  You said you were going to look into it and get
11:46  10   back to us, so you've -- you've looked into it now,
11:46  11   right, of who created this?
11:46  12       A.   I made best efforts, yes.
11:46  13       Q.   This was attached to your e-mail.  Do you know
11:46  14   how you got ahold of this screenshot?
11:46  15       A.   No.
11:46  16       Q.   Can you give us a name of anybody else, any
11:46  17   other person, anybody who may have possibly created this
11:47  18   screenshot if it wasn't you?
11:47  19       A.   No.
11:47  20       Q.   Have you found any e-mail from anybody else or
11:47  21   text message, communication sending you this screenshot
11:47  22   before you sent it to Virgin?
11:47  23       A.   No.
11:47  24       Q.   The screenshot didn't magically appear on your
11:47  25   computer, did it?
```

73

12:36  1   the -- or the den.

12:36  2        Q.   And where was that?

12:36  3        A.   Dallas.

12:36  4        Q.   And tell me again.  They contacted you first,

12:37  5   you didn't contact them; is that correct?

12:37  6        A.   That is correct.

12:37  7        Q.   Did they tell you anything beforehand going in

12:37  8   besides setting up, you know, your equipment to -- to --

12:37  9   the equipment to be able to be on screen?  Was there any

12:37 10   other discussions you had about what would be discussed

12:37 11   in the interview?

12:37 12        A.   No.  Well, excuse me.  No to the latter

12:37 13   question.  To the former question, it was -- from what I

12:37 14   recall, we received, you know, the article.  Is this

12:37 15   accurate and true, and it's like I testified just

12:37 16   previous to this, that's when I called Dan and when I

12:37 17   called Stephen and said we have a problem.  And that's

12:37 18   also when I texted them.

12:37 19        Q.   This inter -- this interview, would you agree,

12:37 20   was -- it was broadcasted on national TV on CNBC,

12:37 21   correct?

12:37 22        A.   I would agree to that.

12:37 23        Q.   I believe you said in one of your filings that

12:38 24   you thought it was a dress rehearsal; is that true?

12:38 25        A.   Absolutely.

                                                              88

12:41  1  would be the aired version, I became pretty pissed at

12:41  2  Stephen and then -- or not Stephen, but pretty pissed at

12:41  3  CNBC and so took a nap afterwards.

12:41  4      Q.   The second page says Thursday, March 23rd,

12:41  5  2023, 7:02 a.m.  Would that make sense to you?

12:41  6            Then you would have done the interview the

12:41  7  22nd, the night before?

12:41  8      A.   Or the early morning of.

12:41  9            MR. DISBENNETT:  Just so we're on the

12:41 10  same page about what it was, I have on here a USB that

12:41 11  I'll give the report afterwards that I'm going to mark

12:41 12  as Exhibit 19, just so we -- we can play the video and

12:41 13  -- parts of it at least.

12:42 14            Okay.  Okay.  So I'm showing you this

12:42 15  video.  This is going to be marked on a USB as Exhibit

12:42 16  19.

12:42 17            (Plaintiff's Exhibit 19 marked)

12:42 18            MR. DISBENNETT:  I'm going to just play

12:42 19  the first I guess 30 seconds or so, but you have the

12:42 20  video in front of you.

12:42 21      Q.   (BY MR. DISBENNETT)  Is that -- can you

12:42 22  confirm that's -- that's you on the screen?

12:43 23      A.   Yes, sir, that's me.

12:43 24      Q.   And who -- who was -- do you recall who the

12:43 25  host is?

91

12:43 1          A.    I don't, and I will clarify I didn't see him.

12:43 2          Q.    Okay.

12:43 3          A.    It was a -- it was a blue screen, so I only

12:43 4    heard questions or I only heard what he was saying.

12:43 5                    MR. DISBENNETT:  I'm going to turn this

12:43 6    up so to make sure you can hear it.

12:43 7                    Okay.  So I'm going to play about the

12:43 8    first 30 seconds.

12:44 9                    (Video presented)

12:44 10                   MR. DISBENNETT:  Okay.  I stopped it

12:44 11   there after, let's see, we're at --

12:44 12                   THE WITNESS:  33.

12:44 13                   MR. DISBENNETT:  -- 33 seconds in.

12:44 14         Q.    (BY MR. DISBENNETT)  Just to make sure we're

12:44 15   on the same page, he asked you whether you were

12:44 16   investing 200 million -- making a $200 million

12:44 17   investment in Virgin Orbit.

12:44 18                   Is that one of the things he asked you,

12:44 19   correct?

12:44 20         A.    He did ask.

12:44 21         Q.    And you responded saying, yes, you're in final

12:44 22   discussions and -- and the companies fully plans on

12:44 23   transacting in the next 24 hours, among other things,

12:44 24   but that -- that's part of what you said, correct?

12:45 25         A.    Yes, uncomfortably so.

92

12:45  1                    (Video presented)

12:45  2                    MR. DISBENNETT:  Okay.  We're stopping

12:45  3    again.  So that was between 33 seconds.

12:45  4                    Do you see where it says --

12:45  5                    THE WITNESS:  48.

12:45  6                    MR. DISBENNETT:  48 seconds.

12:45  7        Q.    (BY MR. DISBENNETT)  Asked you again about the

12:45  8    investment and you said you were making an investment

12:45  9    that would make the company cash flow positive, right?

12:45 10        A.    That was the idea.

12:45 11                    MR. DISBENNETT:  Okay.  I'm going to play

12:45 12    it one -- one more time.

12:46 13                    (Video presented)

12:46 14                    MR. DISBENNETT:  I'm going to stop it

12:46 15    there.  We're at 1:42.

12:46 16        Q.    (BY MR. DISBENNETT)  So if I heard correctly,

12:46 17    you said -- one of the things you said in the clip we

12:46 18    just played was that -- that you have over 13 positions

12:46 19    or positions in over 13 space companies; is that right?

12:46 20        A.    That's what was said.

12:46 21        Q.    What do you mean by -- what did you mean by

12:46 22    positions?

12:46 23        A.    Many things.  Again, as you can see, I was a

12:46 24    little bit flustered there by just not even knowing what

12:47 25    the question would be.  That aside, I would even say

                                                                    93

```
01:36  1        Q.   Okay.
01:36  2        A.   So nothing was final.  Everything was just
01:36  3   conversations.
01:36  4        Q.   So Alex Miner, did -- did he give you that
01:36  5   commitment before or after you -- you made the -- the
01:36  6   offer?
01:36  7        A.   Before I made the offer?
01:36  8        Q.   Yes.
01:36  9        A.   Or after?  It was after.
01:37 10        Q.   Okay.  Is there any other specific person you
01:37 11   can tell me that you had a commitment from to fund the
01:37 12   $200 million offer?
01:37 13        A.   No.  I was waiting until we got the diligence
01:37 14   room before I started soliciting my network to fulfill
01:37 15   the offer.
01:37 16        Q.   Okay.  So I'm going to want Alex Miner's
01:37 17   contact information.  I think I actually have that.  Let
01:37 18   me see.
01:37 19        A.   Yeah, I -- excuse me.  Sorry.  Yes, I believe
01:37 20   I --
01:37 21        Q.   Yes, what?
01:37 22        A.   I believe I produced that.
01:37 23        Q.   Yeah.  You produced what?  His contact?
01:37 24        A.   His contact.
01:37 25        Q.   Okay.  Well --
```

                                                                    118

01:38  1        A.   Okay.  Largely irrelevant to this, but I'll

01:38  2   produce what's relevant.

01:38  3        Q.   I don't want anything irrelevant.  I only want

01:38  4   things that would --

01:38  5        A.   Yes, sir.

01:38  6        Q.   -- that would be relevant.

01:38  7             So going back then, was there any other

01:38  8   message that you produced that you were referring to in

01:39  9   your reference to the Interrogatory No. 1 for -- for

01:39 10   Alex Miner, other than this Exhibit 24 or was that --

01:39 11   that the message you were talking about?

01:39 12        A.   I believe that was, but again, I will go back.

01:39 13        Q.   Okay.  So I have this one, and then you said a

01:39 14   funding source document.

01:39 15             Is there any other documents that -- the

01:39 16   you're -- you're pointing to here?

01:39 17        A.   That -- that should be -- that should be it.

01:39 18        Q.   Okay.

01:39 19        A.   And then whoever was in the -- the IDs.

01:39 20        Q.   What's the IDs?

01:39 21        A.   Sorry.  In the initial disclosure.

01:39 22        Q.   Okay.  Those people, you had -- any of those

01:39 23   people had made commitments to you?

01:39 24        A.   No, not commitments.

01:39 25             Those would be people that would be

                                                                  120

01:39  1   potential funding partners that I've worked with and
01:39  2   have transacted within the past.
01:39  3       Q.   Okay.  Did you have -- there's a bunch of
01:39  4   people mentioned.
01:39  5               Do you have any written communications
01:40  6   with those people about providing funding for this $200
01:40  7   million?
01:40  8       A.   No.
01:40  9       Q.   Interrogatory No. 2, again, I'm not going to
01:40 10   read it all for the record, but your answer was:
01:40 11   "Defendants will provide evidence supporting the
01:40 12   statement as necessary."
01:40 13               And, again, I'm just asking what's --
01:40 14   where can I -- what evidence you're referring to.
01:40 15       A.   Yes.  Yes, Counsel, we submitted I believe in
01:40 16   production number 6, Harmonics, which I was an advisor
01:40 17   to, their space investments; DCVC, their space
01:40 18   investments; Argonautics, their space investments.
01:40 19   Again, all of which at some point I was either an
01:40 20   advisor or a liaison.
01:40 21               And I think there were a couple of others,
01:41 22   but I will -- my aim, Counsel, is to get back to you and
01:41 23   actually spell this out to make our -- our -- both of
01:41 24   our lives a little bit easier.
01:41 25       Q.   And that's all I'm trying to do.  I'm not --

121

01:41 1   I'm not trying to put you on the spot.  I'm just saying,

01:41 2   as I told you in that e-mail, I'm just trying to figure

01:41 3   out one way or the other what the evidence is and

01:41 4   whether, be it me asking you now or -- or you providing

01:41 5   it later.  I just want to know what it is so I can go

01:41 6   look at it, okay?

01:41 7       A.   Yes, sir.

01:41 8       Q.   But I understand you said Harmonics, DC,

01:41 9   Argonautics and then maybe some others, but -- but I'd

01:41 10  like to have just some specificity on what I need to

01:41 11  look at to see that, okay?

01:41 12      A.   Yes, sir.

01:41 13      Q.   Aside from -- from that, is there anything

01:41 14  else I should look at that --

01:41 15      A.   I think -- I think that will be plenty.

01:41 16      Q.   Interrogatory No. 5, if you've got that.

01:41 17           Do you have that one?

01:41 18      A.   Oh, sorry.  All right.

01:41 19      Q.   So this asks for you to identify all bank

01:41 20  accounts defendants owned or controlled as of March

01:41 21  2023, and -- and there's no response.

01:42 22           What I want to ask, because I don't want

01:42 23  to have to fight you about it, but is it your contention

01:42 24  that you could fund the $200 million offer through bank

01:42 25  accounts that you owned or controlled or defendants

                                                          122

01:42 1  owned or controlled as of March 2023?

01:42 2       A.    No, because that's not how it works.  That's

01:42 3  not how it's funded.

01:42 4       Q.    That's fine.

01:42 5             I just want to get a clear answer to make

01:42 6  sure I'm clear because I'm not going to fight you about

01:42 7  -- about providing this information as long as I

01:42 8  understand it's not your contention that defendants

01:42 9  could have funded the $200 million offer -- offer solely

01:42 10 using funds from bank accounts that defendants owned or

01:42 11 controlled?

01:42 12      A.    Understood.

01:42 13      Q.    Is that -- is that fair?

01:42 14      A.    That's clear.

01:42 15      Q.    You said that's clear.

01:42 16            Is that a correct statement?

01:42 17      A.    Yes.

01:43 18      Q.    Interrogatory No. 6 is going to overlap then

01:43 19 with -- really with No. 1 or -- yeah, with No. 1 in

01:43 20 terms of I just need to know, you said we'll provide

01:43 21 documentation of legitimate funding sources.

01:43 22            So first of all, when you say legitimate

01:43 23 funding sources, you mean you -- you told me -- you --

01:43 24 you referred me to your initial disclosures, people

01:43 25 identified there, correct?

123

01:43  1      A.   Yes.

01:43  2      Q.   And those would be -- I'll look at them in a

01:43  3  second, but aside from the people listed there and then

01:43  4  you've mentioned an Alex Miner, is there anybody else

01:43  5  who you're referencing when you say legitimate funding

01:43  6  sources?

01:43  7      A.   Yes, sir.  The funding -- funding partners,

01:43  8  which I believe, again, was produced in -- in production

01:43  9  6, and it's an Excel spreadsheet of -- of firms,

01:43 10  individuals, people that we've worked with, both

01:43 11  primary, secondary and third connections.  Those would

01:44 12  be people that we would work with to fund this

01:44 13  transaction.

01:44 14            And there are -- I must warn you, there

01:44 15  are about 25,000 of them.  It is a depository of -- of

01:44 16  contacts that we work with or, again, as I've said

01:44 17  before from -- from our data management system.

01:44 18      Q.   And if I -- I -- I recall the spreadsheet.  It

01:44 19  has people's names.  It has contact information on

01:44 20  there.

01:44 21            Is that what's on there?

01:44 22      A.   Yes, sir.

01:44 23      Q.   It -- I just want to be clear.

01:44 24            Those are -- those are people listed, but

01:44 25  none of those people, you don't have written

                                                              124

01:44  1    documentation of specific commitments they made to help

01:44  2    you with funding this $200 million offer; is that

01:44  3    correct?

01:44  4        A.   Correct.  And I want to re -- I just want

01:44  5    reemphasize.  We weren't at the stage of a commitment.

01:44  6        Q.   Understood.  But -- but there were no written

01:44  7    documentations of offers, commitments, agreements from

01:44  8    any of these funding partners to help you fund the $200

01:45  9    million offer, correct?

01:45  10        A.   Correct.

01:45  11                THE WITNESS:  If I may.

01:45  12                MR. DISBENNETT:  Yeah.

01:45  13                THE WITNESS:  So right now, I owe you --

01:45  14                MR. DISBENNETT:  Let's do that at -- we

01:45  15    can --

01:45  16                THE WITNESS:  After?

01:45  17                MR. DISBENNETT:  Yeah, I'm -- I'm

01:45  18    doing -- I'm going to do your initial disclosures too,

01:45  19    so we can --

01:45  20                THE WITNESS:  Okay.

01:45  21                MR. DISBENNETT:  -- knock it all out, but

01:45  22    we'll -- we'll do a summary real fast at the end.

01:45  23                THE WITNESS:  I just want to make sure.

01:45  24                MR. DISBENNETT:  And we can do it off the

01:45  25    record, too.  It doesn't matter one way or the other.

                                                              125

```
 1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF TEXAS
 2                 FORT WORTH DIVISION
                                      )
 3    SECURITIES AND EXCHANGE         )
      COMMISSION,                     )
 4                                    )
                                      )
 5          Plaintiff,                ) CIVIL ACTION
                                      )
 6    V.                              ) NO.:  4:24-cv-00558
                                      )
 7    MATTHEW BROWN and               )
      MATTHEW BROWN COMPANIES,        )
 8    LLC                             )
                                      )
 9          Defendants.               )

10

11    -----------------------------------------------------

12                  REPORTER'S CERTIFICATION
                 DEPOSITION OF MATTHEW BROWN
13                   FEBRUARY 13, 2025
      -----------------------------------------------------

14

15        I, Kelly Bryant, Certified Shorthand Reporter in

16    and for the State of Texas, hereby certify to the

17    following:

18        That the foregoing deposition of MATTHEW BROWN, the

19    witness, hereinbefore named was, at the time named,

20    taken by me in stenograph on FEBRUARY 13, 2025 having

21    been first duly cautioned and sworn to tell the truth,

22    the whole truth, and nothing but the truth, and the same

23    were thereafter reduced to typewriting by me or under my

24    direction.

25      I further certify that pursuant to FRCP Rule
```

1  30(f)(1) that the signature of the deponent:

2       _____ was requested by the deponent or a party

3  before the completion of the deposition and is to be

4  returned within 30 days from date of receipt of the

5  transcript.  If returned, the attached Changes and

6  Signature Page contains any changes and the reasons

7  Therefor;

8       __XXX__ was not requested by the deponent or a

9  party before the completion of the deposition.

10

11      I further certify that I am neither counsel for,

12  related to, nor employed by any of the parties in the

13  action in which this proceeding was taken, and further

14  that I am not financially or otherwise interested in the

15  outcome of the action.

16

17      GIVEN UNDER my hand of office on February 19, 2025.

18

19

21

22      _____

23      KELLY BRYANT
        Texas CSR No. 5772
24      Expiration Date:  07/31/25

25

1

```
1    THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION

2

3    In the Matter of:              )

4                                   )  File No. FW-04582-A

5    MATTHEW BROWN COMPANIES        )

6

7    WITNESS:  Matthew Brown

8    PAGES:    1 Through 173

9    PLACE:    Securities and Exchange Commission

10             Fort Worth Regional Office

11             801 Cherry Street, Suite 1900, Unit 18

12             Fort Worth, TX 76102

13   DATE:     Thursday, September 7, 2023

14

15

16       The above entitled matter came on for hearing,

17   pursuant to notice, at 12:59 p.m.

18

19

20

21

22

23

24             Diversified Reporting Services, Inc.

25                    (202) 467-9200
```

19

1      A    No.

2      Q    Wayne Brown?

3      A    No.

4      Q    Clyde Brown?

5      A    No.

6      Q    Tyler Brown?

7      A    No.

8      Q    Scott Brown?

9      A    No.

10     Q    So you're not related to anyone by those

11  names?

12     A    Correct; I am not.

13     Q    Okay.  So I want to go over your education.

14  I believe, in Exhibit 4 that we're looking at, if you

15  go to Item 35, which covered education, you listed

16  that you attended R.L.  Paschal High School from 2004

17  to 2008; is that correct?

18     A    I believe those are the dates, yes.  And I

19  did attend R.L.  Paschal High School.

20     Q    And then it says here that you went to TCU,

21  or Texas Christian University, 2008 and 2009?

22     A    I believe those are the dates.  And I did

23  go to TCU, yes.

24     Q    Okay.  So did you not finish your degree

25  there?

20

| 1 | A | No, ma'am. |

2    Q    No?  Okay.

3         What was your major?

4    A    I started out as entrepreneurial

5    management, and then I was moved over to history and,

6    I believe, sociology.

7    Q    Okay.  What caused you to not finish?

8    A    I was working during the time, and left

9    with about six hours of credit.

10   Q    Okay.

11   A    I was politely asked to leave.

12   Q    Where were you working at that time?

13   A    Largely self-employed.

14   Q    Okay.  What were you doing when you were

15   self-employed?

16   A    Renewable energy investments.  I was also

17   trying to, at this time, raise an infrastructure

18   fund.

19   Q    How old were you at this point in time?

20   A    18.

21   Q    18?

22   A    18, 19.

23   Q    Okay.  How did you get involved in raising

24   money in that particular type of industry?

25   A    I started my entrepreneurial career, I

41

1    working with him and his team.  It was largely public

2    policy.  It wasn't -- it was not a private company --

3    well, it may have been a private company, but it was

4    not meant to make a profit.  It was more meant for

5    educational awareness.

6              And then I slowly got involved into the --

7    I would call it the public sector, meeting with

8    governors, local counsel, cities, homeowners -- or

9    homeowner associations, to educate them on the

10   benefits of the program, which is now, I believe, in

11   all 50 states in some way or fashion.

12        Q    So when you were working with Mr. Woods,

13   how were you compensated?

14        A    I took a deferred compensation structure.

15   I took -- I took largely -- no, not even largely --

16   outside of travel expenses and housing expenses and

17   per diem, I took equity in these investments that we

18   made in all these SPVs.  So all these projects that

19   we worked on, both renewable and not, I decided to

20   take equity.  And I am -- I am a benefactor in -- I

21   don't know the specifics of it.  I haven't even

22   pulled it up in about ten years.  But I'm a

23   benefactor in the trust and, I believe, the -- I

24   could again be wrong on this, but I believe the

25   specifics of that trust are that my -- my

 1    remuneration would be at the earlier of his death or

 2    when I turn 40.

 3          Q     Yeah, what trust are you referring to?

 4          A     His -- or something he set up for me.

 5          Q     Okay.  So he set up a trust for you

 6    specifically?

 7          A     I don't know if he -- again, I haven't

 8    looked at the documents in ten years.  I'd have to

 9    find them.  But I believe I'm in his trust.  I

10    believe that's how it's structured, as --

11          Q     So you're a beneficiary?

12          A     Correct.  And it's a -- it's a significant

13    amount, from what I recall.  And one that left me

14    confidence to not worry about life after 40 in terms

15    of me being able to do the things that I actually

16    want to do in life.

17          Q     Okay.  Well, around this time -- so you've

18    left TCU and you were working with Mr. Woods for a

19    while.  What was your net worth at this point in

20    time, aside from any trusts that you might be a

21    beneficiary of?

22          A     I've been asked that many times over the

23    course of my life.  With regard to that date, I would

24    probably say zero.

25          Q     Okay.

67

1    year.  So what about currently?  How are you making

2    an income right now?

3        A    I have no -- I have no income.

4        Q    Okay.  And so then what would -- right now

5    what -- just estimate as far as your net worth?

6        A    It's, I would say, negative.  If you look

7    at my -- I wouldn't have a -- it would be negative.

8        Q    Okay.  Do you -- have you made any personal

9    investments?

10       A    Ever?

11       Q    Uh-huh.

12       A    Yes, many.

13       Q    Okay.  What about personal investments in

14   public companies or private companies?

15       A    Never in public.

16       Q    Okay.

17       A    Never.

18            BY MR. ETRI:

19       Q    Sorry.  What was Mr. Burton's full name?

20       A    Mitch, M-i-t-c-h.

21       Q    And last name?

22       A    Burton, B-u-r-t-o-n.

23       Q    Where is he located?

24       A    I believe in Provo, Utah.

25       Q    Do you have contact information for Mr.

1          A     Yep.

2          Q     It's probably easier to go -- it starts on

3    Bates 118, goes to 119 and 120.

4               If you go to 119, the top there, you say,

5    Likewise, Dan, I have general counsel for personal

6    investments.  So unless the doc is over my honorary,

7    AKA barely-passed, SMU JD, then we can involve them.

8    I look forward to working with you and the team.

9               Do you see that?

10         A     Uh-huh.  I do, yes.

11         Q     Okay.  So you say, Barely-Passed SMU JD.

12   So, I mean, what do you mean by that?

13         A     It was a running joke, as you can see on

14   Bates 118. You know, the honorary should work, I

15   mean, with an exclamation point.  It was a running

16   joke within the -- within not only Virgin Orbit but

17   others.

18         Q     Okay.  So you think that this was a joke

19   and that they knew that you, in fact, had not

20   finished college and that you had never attended law

21   school?

22         A     I don't know if they knew that I did not

23   finish TCU.  I definitely know that they knew that I

24   never went to SMU.

25         Q     I mean, you would agree with me that there

117

1    have that.  I assume that they called some of the

2    people in the industry and know that they've worked

3    with me in trying to raise funding or find funding.

4         Q     Well, let me ask you, have you ever made

5    investments in SpaceX?

6         A     Me personally, no.

7         Q     Okay.  Any companies associated with you,

8    have they made investments in SpaceX?

9         A     No.

10        Q     No?  Okay.

11              What about OpenAI?

12        A     No.

13        Q     What about Astra?

14        A     No.

15        Q     Okay.  What about SpinLaunch?

16        A     Not me personally.  I, again, advised quite

17   a few people on whether or not to invest in that.

18        Q     And when you're saying no, you're not only

19   saying no personally but no to Matthew Brown

20   Companies --

21        A     Or any affiliate of mine that would have

22   my -- to be of my benefit.

23        Q     Okay.  What about Rocket Lab?

24        A     No.  I did recommend people invest in that,

25   though.

1    Companies?

2        A    No.

3        Q    Okay.  Well, you said, We have positions in

4    over 13 space companies.

5            So what -- what companies were you -- were

6    you talking about?

7        A    That question caught me entirely off guard.

8    And I think that the best answer for that is probably

9    my involvement in advising investors in the space

10   industry for the past five, six years.

11       Q    Okay.  So but --

12       A    There was not any company owned by me.  I

13   did not have any direct interest in it.  I did not

14   have any direct ownership in it.  I do not have any

15   direct stock in it or indirect on any of that.

16       Q    Okay.  So Matthew Brown Companies doesn't

17   have positions in 13 space companies, is what you're

18   saying?

19       A    Confirmed.

20       Q    And you do not have personally any

21   positions in 13 different space companies?

22       A    Confirmed, yes, ma'am.

23           BY MR. ETRI:

24       Q    So who is the "we?"

25       A    Again, people I've advised; dozens of

 1    Hey, you know, we don't -- we don't do that.  We'll

 2    do that on the -- on the Zoom.

 3           So I was thinking of the questions that

 4    they were asking, and then I was going to -- I was

 5    going to perfect the answers once the original.

 6       Q    So when you said, We have positions in 13

 7    companies, were you trying to mislead the CNBC

 8    interviewer?

 9       A    Certainly not.  Nor anyone else.

10           BY MS. GOOD:

11       Q    Within the space industry -- how much money

12    would you say have you invested personally in any

13    space industry companies?

14       A    Personally?

15       Q    Uh-huh.

16       A    Or through an affiliate?  I would say

17    relatively -- relatively none personally.  It's more

18    just been advising -- advising people.

19       Q    Okay.

20       A    I would say -- it -- yeah, none.  I would

21    say none.  Now, that means -- I may have had a

22    thousand-dollar investment here or there or loaned

23    somebody.

24       Q    And I believe -- and we can go back -- I

25    think it's Exhibit 4 that is your background

123

1    questionnaire.  If you could, just get that real

2    quick.

3        A    Yes, ma'am, I have it.

4        Q    Okay.  Items -- I'm not sure -- I think

5    it's 21 through 23.  No, I'm sorry.  Items 23 through

6    25, which if you -- if you look at the testimony

7    subpoena you'll be able to see which questions those

8    were, which I think is Exhibit 3.

9            But it was asking you whether you had

10   securities brokerage accounts.  And, you know,

11   there's different questions with regard to whether

12   you have direct ownership or indirect or if you were

13   managing or controlling a securities brokerage

14   account on behalf of someone else.

15           And so I believe for each of those items

16   you responded "None," correct?  Is that correct?

17       A    That's -- that is correct.  I --

18       Q    Now, this is within the past five years.

19       A    Correct.

20       Q    That was, you know, the scope of the

21   questionnaire.  But -- so is that accurate?

22       A    It is completely accurate.

23       Q    Okay.  So I know you've been saying that

24   you advise others.  But you've never managed anyone's

25   brokerage account for them when it comes to

[9/7/2023 12:59 PM] Brown, Matthew - 09-07-2023

127

1    A    I can see how someone would see that, yes.

2    Q    Okay.

3         BY MR. ETRI:

4    Q    You write, I have invested over $750

5    million of my personal capital, largely in this

6    vertical.

7         Is that accurate?

8    A    Of my personal capital, no, that's not

9    accurate.

10   Q    Okay.  You also write, "I have the

11   bandwidth to write the $200 million."  Is that

12   accurate?

13   A    Yes.

14   Q    Okay.  How is that accurate?

15   A    Through my investor network that I

16   mentioned previously.

17   Q    Okay.

18        BY MS. GOOD:

19   Q    And so then why did you write after that, I

20   want to reiterate, This is my capital, not anyone

21   else's?

22   A    Because when -- and I feel this same way

23   when I do investments.  When you get cold calls like

24   this, or cold outreach, generally it's from brokers

25   that want to charge a fee or charge a commission.

1          A     Uh-huh.

2          Q     You write, I want to reiterate, this is my

3     capital -- I'm adding the word "is."

4                I want to reiterate this my capital, not

5     Energent's nor anyone else's.

6                Is that an accurate statement?

7          A     It is not accurate, no.

8          Q     What is inaccurate about it?

9          A     The phrase "my capital" is very poorly

10    written.  "Not Energent's" is accurate.  "Nor anyone

11    else's," the most important part of that, statement

12    is inaccurate.

13         Q     Okay.  So --

14         A     Because it would be someone else's.

15         Q     So not your capital not anyone else's.  Two

16    of three are inaccurate?

17         A     Yes, sir.

18         Q     So why did you tell him that?

19         A     Poor choice of wording.

20         Q     Any other reason?

21         A     I don't think so.

22         Q     At any point during your discussions with

23    Dan did you tell him that the $200 million was going

24    to be your capital, not anyone else's?

25         A     Well, right here.

1      Q      Besides what's written in Exhibit 9?

2      A      I'm not certain.

3      Q      Did Mr. Hart ever ask you, "Is this your

4    capital?"

5      A      I'm not certain.

6      Q      Did you ever give Mr. Hart the impression

7    that it was your money?

8      A      I gave him the impression it would be

9    coming from me.

10      Q      Okay.  Why would you do that?

11      A      Because that's how this would have been

12    structured.

13      Q      And was the money coming from you?

14      A      It would have been coming through an

15    affiliate company that would have been through me.  I

16    would have been the liaison -- I would have been the

17    point person behind it.

18      Q      What's the affiliate company?

19      A      Well, that was to be determined.  That's

20    why I worded it like that.

21      Q      So when you say "affiliate," you mean

22    getting money from other people, routing it through a

23    company that you formed?

24      A      Correct.

25      Q      So it's not your company or an affiliate of

1    your company, it was someone else's money that you're

2    getting to invest?

3         A    Correct.  And I would be managing Virgin.

4         Q    So just to be clear, as of March of 2023

5    you didn't have $200 million yourself to invest in

6    Virgin?

7         A    I'd say I had access to it.

8         Q    But not your money?

9         A    That's correct.

10        Q    Okay.  So when I say "you have access," you

11   didn't have $200 million in liquid funds, correct?

12        A    I know we moved some funds around for some.

13        Q    You -- you personally.  I'm not talking

14   about other people that you might being managing

15   money on behalf of.

16             Did you personally have $200 million in

17   liquid assets in March of 2023?

18        A    No, not me personally.

19        Q    Okay.  Did you even have a bank account or

20   brokerage account in 2023?

21        A    I have bank accounts, yes.

22        Q    Okay.  Where do you have bank accounts in

23   2023?

24        A    I believe at JP Morgan.

25        Q    Where else?

1       A       CrossFirst.

2       Q       Where else?

3       A       I don't know if USAA was still.

4       Q       Okay.

5       A       And I've got a Capital One.

6       Q       Okay.  I didn't take notes.  I apologize.

7       A       It's on the background sheets, if that

8    helps you.

9       Q       Okay.  JP Morgan?

10      A       Yes, I believe so.

11      Q       Approximately how much money was in your JP

12   Morgan account in March of 2023?

13      A       Almost nothing.  I kept nothing in any of

14   these bank accounts.  Let's just say less than a

15   hundred grand in each one.

16      Q       Less than 50 grand?

17      A       Probably, yes.

18      Q       Less than 10 grand?

19      A       No, I don't think so.

20      Q       So somewhere between 10 and 50 grand?

21      A       Thereabouts.

22      Q       Thereabouts?

23      A       And again, that's just a ballpark.

24      Q       And so did you have between 10 and 50 grand

25   at Cross -- I'm sorry.  What was the name of the

1    company?

2        A    First.

3        Q    Did you have between 10 to 50 grand in

4    CrossFirst?

5        A    I know money went through there, but the

6    rolling balance was not that, I don't believe so, no.

7        Q    Okay.  Was the rolling balance less than

8    $10,000?

9        A    I'm not certain.  I can get that

10   information for you.

11       Q    Okay.  So JP Morgan, CrossFirst.  You told

12   me -- I apologize, It's written down but I don't have

13   that handy.  What was the other one?

14       A    USAA.

15       Q    Did you have between $10- and $50,000,

16   we'll call it rolling balance, in March of 2023?

17       A    No.

18       Q    How much?  Less than $10,000?

19       A    Yes.

20       Q    Okay.  And what was the fourth bank?

21       A    I believe I had -- I believe I had a

22   Capital One bank.

23       Q    Okay.  And how much was in the Capital One

24   bank in March of 2023?

25       A    Nothing meaningful.  A hundred bucks; a

134

1    thousand bucks.

2        Q    Okay.  So less than $1,000?

3        A    Sure.

4        Q    Okay.  So between the four bank accounts

5    that you had at the time, one of which was JP Morgan,

6    you might have had between 10 and 50 grand; is that

7    correct?

8        A    That could be so, yes.

9        Q    Okay.  And then the other three are --

10   using your words -- not meaningful?

11       A    Not meaningful, yes.

12       Q    Okay.  Did you have a brokerage account in

13   March of 2023?

14       A    No, I have never had a brokerage account.

15       Q    Any other investment accounts in March of

16   2023?

17       A    No.

18       Q    So the four banking institutions you had

19   access to funds were JP Morgan, CrossFirst, USAA and

20   maybe Capital One?

21       A    Maybe USAA and maybe Capital One, yes.

22       Q    Any others?

23       A    No.

24       Q    Okay.  What other liquid assets did you

25   have in March of 2023?

1        A      That would be it.   Maybe Venmo or something

2    like that.

3        Q      Okay.   Would you say that you would have

4    had not --

5        A      If you're looking --

6        Q      -- meaningful amounts in Venmo in March of

7    2023?

8        A      There would be relatively no balance.   If

9    you're looking for north of a million dollars, you're

10   not going to find it.   It never existed.

11       Q      Okay.   North of $50,000?

12       A      Yes, probably.

13       Q      Which one?

14       A      I think that may have been the JP Morgan

15   one.

16       Q      Okay.   Besides that?

17       A      I don't think so.

18       Q      What other assets did you have in March of

19   2023?

20       A      Physical assets included?

21       Q      Sure; anything.

22       A      Relatively nothing.

23       Q      When you say "relatively nothing," what do

24   you mean?   What did you have?   Did you own any

25   property?

1      A      No, I don't own any property.

2      Q      When I say "property," I mean land, houses,

3    apartments, condos.

4      A      No.

5      Q      Okay.  Any kind of antiques?

6      A      No.

7      Q      Artwork?

8      A      No.

9      Q      Rare jewelry or coins?

10     A      No.

11     Q      Any other type of assets that you owned in

12   March of 2023?

13     A      No.

14     Q      Okay.  So the sum total -- and tell me if

15   I'm wrong -- is you've got somewhere between 10 and

16   50 grand in March of 2023; is that fair?

17     A      Fair.

18     Q      And do you have any cars, any jets, any

19   yachts, anything like that that you own?

20     A      No, but I frequently -- as I said before --

21     Q      You travel --

22     A      Yes.

23     Q      -- on other people's --

24     A      Correct.

25     Q      -- planes and yachts, correct?

137

1      A    Not yachts, no.

2      Q    Not yachts.  Do you own any planes, yacht

3  or cars in 2023?

4      A    No.

5      Q    Okay.

6           BY MS. GOOD:

7      Q    If you go to Exhibit 4, I think it was --

8  Item 26 was asking you to list bank accounts.  And

9  you listed some CrossFirst Bank accounts, and then

10  USAA, JP Morgan and Capital One, right?

11      A    I did.

12      Q    Okay.  I notice there was one CrossFirst

13  Bank you list as a business account?

14      A    Yes.

15      Q    What business is that for?

16      A    I believe it's for Matthew Brown Companies.

17      Q    Okay.  And do you remember how much money

18  in March of 2023 you had in that account?

19      A    No.

20      Q    Okay.  But it was probably $50,000 or less?

21      A    Like I was saying earlier, I moved a lot --

22  I think it was through CrossFirst -- moved -- moved a

23  lot of money around for these other investments.  I'm

24  not sure how much was in there.

25      Q    Well, for other investments, what do you

1    banker, sure.

2          Q    Okay.  So you did not access this account

3    screen right here?

4          A    I don't remember doing that.

5          Q    Okay.  So this was someone else who did

6    this for you and, what, sent you a screenshot for you

7    then to attach to an e-mail?

8          A    Yeah, I don't -- I don't remember

9    sending -- I don't remember sending this at all, but

10   I have no reason to doubt that I did.  It's obviously

11   in the chain.

12               BY MR. ETRI:

13         Q    Who has access to the Matthew Brown

14   Companies' money market account ending in 05225?

15         A    I believe there's just one login.

16         Q    And who has possession to that login?

17         A    I think investors did at var- -- various

18   times.

19         Q    All right.  So investors have access to the

20   Matthew Brown money market account?

21         A    They don't have.  They had, I believe.

22         Q    They had.  When did they have access to it?

23         A    At various times.  I can -- I'll be happy

24   to -- I'll be happy to -- if you want to put that on

25   your list too.

144

1          Q    Okay.   Who else had access to the money

2    market account?

3          A    I'm not certain anybody else did.

4          Q    You had access to it?

5          A    I believe I do, yes.

6          Q    Okay.   Did you set up the account?

7          A    I believe so.

8          Q    All right.   So is -- the money market

9    account ending in 05225, is that a legitimate

10   account?

11         A    Yes.

12         Q    Did Matthew Brown Companies have 18- -- is

13   that 182 or 183?  I can't --

14              MS. GOOD:   182.

15         Q    (

16              BY MR. ETRI)   Sorry -- $182 million and

17   change as of March of 2023?

18         A    It was not our money --

19         Q    Okay.  Was --

20         A    -- if we did.

21         Q    But was the money sitting in the account at

22   that time?

23         A    According to this statement, yes.

24         Q    And you have control of the account,

25   correct?

1       A    I have -- I believe I have access to it,

2  yes.  Well, I believe I have Internet access to it.

3       Q    Okay.

4       A    Like an app.

5       Q    It's your company, right?

6       A    Yes.

7       Q    It's your account, you set it up?

8       A    Yes.

9       Q    Okay.  You're sending a screenshot showing

10  $182 million to the Virgin team, correct?

11       A    Yes.

12       Q    Okay.  And I just want to be clear.  The

13  account had $182 million at the time that you sent

14  the screenshot?

15       A    That's what this says, yes.

16       Q    I'm not asking you what it says.  I'm

17  asking you to confirm that, yes, in fact, the account

18  had that money.

19       A    I -- I just -- as I said earlier, I'll get

20  back to you.  I mean, that's what it says.  So I'll

21  be happy to get back to you.  And I'm certain that

22  you guys will be able to get those records yourself

23  too.

24       Q    That's true.

25            Is this bogus screenshot?

163

1    Ed Christian was involved in a lot of this.  I had no

2    intention of -- of jerking anybody around.

3            Now, I will also add that it's unfortunate,

4    even though I do not -- even though I do believe that

5    a deal could have consummated, it's unfortunate for

6    the shareholders, the employees, and certainly Sir

7    Richard himself, and I wish I could have done better

8    myself.

9        Q    I appreciate that statement.

10           Can you pull Exhibit 10, please?

11       A    Yes, sir.

12       Q    So Exhibit 10 attaches a copy of the

13   Matthew Brown money market account statement that

14   shows $182 million, correct?

15       A    Correct.

16       Q    All right.  So just so we're kind of coming

17   full circle, during the break you pulled up your

18   monthly account statement for Matthew Brown's money

19   market account 05225, and you confirmed that there

20   was never more than $5,000 in the account during

21   March of 2023; is that correct?

22       A    Yes, sir.

23       Q    Okay.  Can you tell us, then, how you got

24   ahold of the screenshot that shows $182,000 (sic) in

25   that account?

164

1      A    I will figure that out, and I will

2    certainly make you aware.  I do have a technical

3    background.  I'm certainly capable of doing something

4    like this.

5      Q    When you say "doing something like this,"

6    what do you mean?

7      A    I -- this is -- it's clearly -- I mean,

8    there was not $182 million in there.

9      Q    Let me ask the question as directly as I

10   can.

11          Did you manipulate the screenshot to show

12   the account falsely showing $182 million?

13     A    Not to my knowledge, no.  Now --

14     Q    Let me follow up with that.  You say, "Not

15   to my knowledge."  I'm asking you if you manipulated

16   a screenshot to show $182 million.  That's something

17   that me, sitting here today, would expect you to

18   either say, I did not, or I did --

19     A    Right.

20     Q    -- not, to the best of my knowledge.  So

21   which is it?  Did you manipulate a screenshot or did

22   you not?

23     A    I'm not trying to skirt the question.

24          I'm trying to be direct here, in that I

25   will get back to you on that.  And the reason being

165

1    and the timing of this -- I believe I was overseas

2    and I may have -- I may have consumed alcohol and

3    quite possibly have -- I could have done this.

4          Q    Okay.

5          A    I could have done this and I could not have

6    done this, yes.

7          Q    Okay.  So you think that you may have been

8    under the influence, doctored a bank account

9    statement, sent it over to Virgin Atlantic -- I keep

10   saying Virgin Atlantic -- Virgin Orbit, to make them

11   think that you had $182 million?

12         A    It is a possibility, yes.

13         Q    Okay.  Why would you do that?

14         A    To get in the door, I would assume, if I.

15         Q    Can we get past the "I don't think so," or

16   "it's possible?"

17         A    Well, to -- yeah, to get in the door.

18         Q    Okay.  You sent them a screenshot that was

19   false, right?  You're trying to get in the door?

20         A    The screenshot is false, yes.

21         Q    Okay.  And you're trying to get their

22   attention and you're trying to get in the door,

23   right?

24         A    Yes.

25         Q    And that's why you sent them the false

1                    PROOFREADER'S CERTIFICATE

2

3  In The Matter of:    MATTHEW BROWN COMPANIES

4  Witness:             Matthew Brown

5  File No.             FW-04582-A

6  Date:                Thursday, September 7, 2023

7  Location:            Fort Worth, Texas

8

9          This is to certify that I, Carol E. Amato,

10  (the undersigned), do hereby certify that the foregoing

11  transcript is a complete, true, and accurate

12  transcription of all matters contained on the recorded

13  proceedings of the investigative testimony.

14

15

16  *Carol E. Amato*           9/14/2023

17  Carol E. Amato             Date

18

19

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2        I, Monique Mason, Certified Shorthand Reporter

3  in and for the State of Texas, hereby certify to the

4  following:  That the transcript of the interview of

5  Matthew Brown is a true record of the testimony given by

6  the witness; That the amount of time used by each party

7  at the testimony is as follows:

8        Melanie Good and Jim Etri -- 3 hours, 27 minutes;

9        That pursuant to information given to the officer

10  at the time said testimony was taken, the following

11  includes counsel for all parties of record:  Melanie

12  Good and Jim Etri, Officers for The Securities and

13  Exchange Commission; I further certify that I am neither

14  counsel for, related to, nor employed by any of the

15  parties or attorneys in the action in which this

16  proceeding was taken, and further that I am not

17  financially or otherwise interested in the outcome of

18  the action.  Certified to by me September 07, 2023.

19                    _Monique Mason_

20                    Monique Mason, CSR No. 5699
                      Expiration Date:  7-31-2024

21                    QUEST RECORDS AND REPORTING
                      Firm Registration No. 564
22                    10100 N. Central Expressway
                      Suite 150
23                    Dallas, Texas 75231
                      (866) 415-8838  Phone
24                    (866) 415-8839 Fax

25

APP345



FW-04582 MatthewBrownCo
**EXHIBIT**
**5**

| | |
|---|---|
| **Date:** | Sunday, March 19 2023 08:33 PM |
| **Subject:** | NDA with Virgin Orbit |
| **From:** | Susan Nelson (Virgin Orbit) <m-wjxh2dqoqhba3lfjviewruijuiyioszflseavymm5p2glhxtz3gq@mail.app1.congacontracts.com > |
| **To:** | mbrown.kapole[ ] |
| **CC:** | Susan Nelson <Susan.Nelson@virginorbit.com>; Stephen Zhang <Stephen.Zhang@virginorbit.com>; |
| **Attachments:** | ATT00001.png; 2023-MAT-NDA-04122-Virgin Orbit Holdings Inc_Investor NDA.doc |

**Caution:** This is an external email and may have suspicious subject or content. Please take caution when clicking links or opening attachments. When in doubt, contact help.it@virginorbit.com

## Contracts System Message

# NDA with Virgin Orbit

Hi Matthew.

Attached is our NDA for your review.   Please let me know if you have any questions or requested changes.

If all is okay, let me know and I will send you a copy for electronic signature.

Thank you,

Susan

SUSAN NELSON
SENIOR MANAGER, LEGAL OPERATIONS
4022 E CONANT STREET
LONG BEACH CA 90808
C +1 562 708 5089
F +1 562 683 2853
E SUSAN.NELSON@VIRGINORBIT.COM
W VIRGINORBIT.COM

This message and any attached documents may contain proprietary, confidential and/or privileged information. If you are not the intended recipient, you may not read, copy, distribute, or use any of this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message. Thank you.

EXPORT CONTROLLED - This email may contain technical data whose export is restricted by the Arms Export Control Act (Title 22, U.S.C., Sec 2751, et seq.) or the Export Administration Act of 1979, as amended (Title 50, U.S.C., App. 2401 et seq.). Transfer of this data by any means outside the United States without export authorization or to a foreign person whether in the US or not, is prohibited. Authorized transfer of this technical data to foreign persons must receive a data review prior to transmission.

# Matthew Brown Companies LLC

**2023-MAT-NDA-04122**

NDA potential investment

CONFIDENTIAL FOIA TREATMENT REQUESTED

| Message Subject | NDA with Virgin Orbit |
| Contract Number | 2023-MAT-NDA-04122 |

View email attachment to download file: 2023-MAT-NDA-04122-Virgin Orbit Holdings Inc_Investor NDA.doc

**Go To Company »**

**Go To Contract »**

**Go To Message »**

CONFIDENTIAL FOIA TREATMENT REQUESTED

**APP347**

## NONDISCLOSURE AGREEMENT

**THIS AGREEMENT** is entered into as of March 19, 2023 (this "Agreement"), by and between Virgin Orbit Holdings, Inc., a Delaware corporation ("Virgin" or "Discloser") and Matthew Brown Companies LLC, a company organized under the laws of Delaware (the "Recipient"; each of Virgin and the Recipient, a "Party", and together, the "Parties"), for the purposes of evaluating a potential investment by Recipient or an affiliate of Recipient into Virgin or a subsidiary of Virgin (the "Transaction"), and governs the terms and conditions under which Virgin agrees to disclose Confidential Information (defined below) to the Recipient.

1.      **Confidential Information.** "Confidential Information" means all, or any part of, and originals or copies of, any information (in any form or media, whether electronic, paper or oral) which (i) would reasonably be expected to be confidential or proprietary in nature, or (ii) is marked "confidential" or "proprietary", in either case, received from Discloser or its Representatives (as defined below) in connection with the Transaction, including, but not limited to, (a) the fact that any discussions are taking place concerning a Transaction, that Confidential Information has been made available by Discloser or its Representatives or any of the terms, conditions or other facts with respect to any such possible Transaction, (b) information concerning Discloser's and its Affiliates' (as defined below) past, current, and planned products, business plans, services, fees, concepts, methodologies, research, services, business activities, marketing plans, trade secrets, data, information relating to customers, suppliers, employees, development programs, costs, trading, investment, sales activities, promotions, credit and financial data, profits, financing methods, plans, product specifications, computer software, programs, engineering, documentation, applications, source code, designs, know-how, processes, machines, inventions, research projects, notes, blueprints, and all other proprietary information, and (c) any information in any form to the extent it contains, reflects or is based upon, in whole or in part, the foregoing, but excludes: (i) information that at the time of disclosure was, or thereafter becomes, part of the public domain (through a source other than Recipient or a Representative of Recipient) other than as a result of a breach of this Agreement by Recipient or its Representatives; (ii) information lawfully obtained from a source other than the Discloser or its Representatives that was not under, and did not impose, an obligation of confidentiality with respect to such information; (iii) information that is independently developed by Recipient without violating any of its obligations under this Agreement; and (iv) information that was known by Recipient prior to disclosure by Discloser (as evidenced by written records), provided that such information was not known by Recipient to be subject to any legal, fiduciary or contractual obligation of confidentiality owed to Discloser.  "Representatives" of a Party include a Party, its Affiliates, and its and their respective directors, members, officers, employees, agents and advisors (including, without limitation, attorneys, accountants, consultants and financial advisors). "Affiliates" of a Party shall mean any other entity that, directly or indirectly through one or more intermediaries, controls, is controlled by or under common control of such Party.

2.      **Treatment of Confidential Information.** (a)      Recipient shall (i) use Confidential Information only for the purpose of evaluating the Transaction ("the Purpose") and shall not use the Confidential Information for any other purpose; (ii) not disclose Confidential Information to any person other than its Representatives, subject to (iii) below, except as expressly permitted in writing by Discloser; (iii) limit dissemination of Confidential Information to its Representatives that have a "need to know" the information to accomplish the Purpose, but only to the extent necessary to accomplish the Purpose (and Recipient shall be responsible for any breach of this Agreement by its Representatives); (iv) not remove or obscure proprietary rights notices that appear on Confidential Information and copies thereof; and (v) advise Discloser immediately orally and promptly in writing

of any unauthorized disclosure or use of Confidential Information by Recipient or its Representatives of which it is aware. Neither Recipient nor its Representatives shall retain or use for its account at any time any trade names, trademark or other proprietary business designation used or owned in connection with the business of the Discloser. As used in this Agreement, the term "person" will be interpreted broadly to include the media and any corporation, company, group, partnership or other entity or Recipient.

(b)      Recipient shall safeguard the confidentiality of the Confidential Information using the same standard it employs to safeguard its own confidential information of like kind, but in no event less than a commercially reasonable standard of care. Recipient agrees that it will obtain written confirmation from any other person to whom it discloses Confidential Information (in each case to persons other than its Representatives, with the prior written consent of Discloser) that such person will comply with all obligations set forth in this Agreement. If Recipient or any of its Representatives becomes legally compelled (including by deposition, interrogatory, request for documents, subpoena, civil investigative demand or similar process) to disclose any of the Confidential Information, Recipient shall (to the extent legally permitted) provide Discloser with prompt prior written notice of such requirement so that Discloser may seek a protective order or other appropriate remedy. If such protective order or other remedy is not obtained, Recipient and its Representatives will disclose only that portion of the Confidential Information which Recipient is advised in writing by counsel is legally required to be disclosed and will take all reasonable steps to preserve the confidentiality of the Confidential Information (including cooperating with the Discloser's efforts to obtain an appropriate protective order or other reliable assurance that confidential treatment will be accorded the Confidential Information). In addition, Recipient and its Representatives will not oppose any action (and will, if and to the extent requested by Discloser, cooperate with, assist and join with Discloser in any reasonable action) by Discloser to obtain an appropriate protective order or other reliable assurance that confidential treatment will be accorded the Confidential Information.

(c)      Upon Discloser's written request, Recipient and its Representatives will promptly return to Discloser or destroy all Confidential Information and all copies thereof furnished to Recipient or its Representatives by or on behalf of Discloser pursuant hereto and will expunge, to the extent practicable, all such Confidential Information from any computer, word processor or other device containing such information. Compliance by Recipient and its Representatives with any election by Discloser pursuant to this section to return or destroy Confidential Information shall, at the request of Discloser, be certified in writing to Discloser by Recipient's authorized officer supervising such destruction. Notwithstanding the foregoing, Recipient may retain one copy of Confidential Information for bona fide legal and compliance purposes. Any Confidential Information that is not returned or destroyed, including, without limitation, oral Confidential Information, will remain subject to the confidentiality obligations set forth in this Agreement, notwithstanding the termination of this Agreement.

3.      **No representations or warranties.** Neither Virgin nor any of its Representatives is making any representation or warranty, express or implied, as to the accuracy or completeness of the Confidential Information, and neither Virgin nor any of its Representatives will have any liability to the Recipient, its Representatives or any other person relating to or resulting from their use of the Confidential Information or any errors therein or omissions therefrom. Only those representations or warranties that are made in a final, legally binding definitive agreement executed by Virgin or a subsidiary of Virgin regarding a Transaction (a "Definitive Agreement") when, as, and if it is

2

executed, and subject to such limitations and restrictions as may be specified in such Definitive Agreement, will have any legal effect.

**4.    Definitive agreement.**  No contract or agreement providing for a Transaction shall be deemed to exist unless and until a Definitive Agreement has been executed and delivered by the Parties and/or their respective affiliates, and the Recipient hereby waives, in advance, any claims (including breach of contract) in connection with a transaction unless and until a Definitive Agreement has been executed and delivered by the Parties.  The Recipient agrees that unless and until a Definitive Agreement between the Parties and/or their respective affiliates with respect to a Transaction has been executed and delivered, neither Virgin nor any of its Representatives has any legal obligation of any kind whatsoever with respect to such Transaction by virtue of this Agreement or any other written or oral expression with respect to such Transaction except, in the case of this Agreement, for the matters specifically agreed to herein.

**5.    No license or conveyance.**  Nothing in this Agreement shall convey to Recipient or its Representatives any right, title, interest or license in or to any Confidential Information, materials, other information received from Discloser or its Representatives, or any trademark, trade name, or any other intellectual property rights of Discloser or its Affiliates.

**6.    Injunctive relief.**  Recipient agrees that the conditions in this Agreement and the Confidential Information disclosed pursuant to this Agreement are of a special, unique, and extraordinary character, that Discloser may be irreparably harmed by any disclosure of the Confidential Information in violation of this Agreement, and that the use of the Confidential Information for the business purposes of Recipient other than in connection with a Transaction or any third party, would enable Recipient or a third party to compete unfairly with the Discloser.  For these reasons, Recipient waives any claim or defense that Discloser has an adequate remedy at law and Recipient agrees that the Discloser shall be entitled to seek equitable relief to prevent further use and/or disclosure in addition to all other remedies available to Discloser in law or in equity for any breach of this Agreement.

**7.    Assignment.**  This Agreement shall be binding upon the Parties and their respective Representatives, successors and permitted assigns and shall inure to the benefit of the Parties and the Parties' respective successors and permitted assigns; provided, however, that Recipient shall not assign this Agreement, nor any of its obligations hereunder, to any third party without the prior written consent of Discloser.

**8.    Export Control Laws.**  Recipient understands and acknowledges that certain Confidential Information may be subject to the export regulations of various governments, including but not limited to the U.S. government, relating to the export of arms and/or other technical data and products ("Export Control Regulations").  Prior to Discloser or its Representatives providing any Confidential Information that is subject to Export Control Regulations to Recipient or its Representatives, Discloser shall provide Recipient notice that such Confidential Information is subject to Export Control Regulations, as well as a general description of the nature of such Confidential Information, and Recipient can elect to receive such Confidential Information or to decline to receive such Confidential Information, in Recipient's sole discretion.   In the event that Recipient elects to receive such Confidential Information, Recipient will (and will cause any of its Representatives with whom it shares such Confidential Information to) comply with all applicable Export Control Regulations with respect to such Confidential Information.

3

CONFIDENTIAL FOIA TREATMENT REQUESTED

**9.     Governing law.** This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York.   Recipient hereby irrevocably consents to the exclusive jurisdiction of the state and federal courts sitting in the county of New York over any and all disputes arising out of or relating to this Agreement. EACH PARTY HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY SUIT, ACTION, PROCEEDING OR CLAIM (WHETHER BASED UPON CONTRACT, TORT, EQUITY OR OTHERWISE) ARISING OUT OF OR IN ANY WAY RELATING TO THIS AGREEMENT AND ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO THE OTHER PARTY'S ENTERING INTO THIS AGREEMENT.

**10.     Miscellaneous.** If any provision of this Agreement is declared void or unenforceable, such provision shall be severed from this Agreement which shall otherwise remain in full force and effect, but only to the extent that the original intent of this Agreement would not be altered in any material respect.   This Agreement may be amended only by a writing executed by both Parties.   This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior agreements with respect thereto.   No delay or failure of either Party to exercise any right or remedy available to it pursuant to this Agreement shall operate as a waiver of such right or remedy.

**11.     Executed copies.** This Agreement may be executed as facsimile originals and each copy of this Agreement bearing the facsimile transmitted signature of either Party's authorized representative shall be deemed to be an original.

**12.     Term.** This Agreement shall terminate three (3) years after the date first written above.

*[Remainder of page intentionally left blank: signature page follows]*

4

CONFIDENTIAL FOIA TREATMENT REQUESTED

**EXECUTED** by Virgin and the Recipient as of the date first above written.

*Virgin:*
VIRGIN ORBIT HOLDINGS, INC.


By: _____
Name: Derrick Boston
Title: Chief Legal Officer



*Recipient:*
MATTHEW BROWN COMPANIES LLC


By: _____
Name:
Title:

5

CONFIDENTIAL FOIA TREATMENT REQUESTED

VIRGINORBIT_SEC00000261

MM 9-6-23
FW-04582 MatthewBrownCo

**EXHIBIT**

**6**

| | |
|---|---|
| Date: | Monday, March 20 2023 03:51 PM |
| Subject: | RE: Matthew Brown/Potential Investment |
| From: | Derrick Boston |
| To: | Christian, Edward <edwardchristian@eversheds- sutherland.com>; |
| Attachments: | 230320 VORB Term Sheet - Matthew Brown - DRAFT.docx; image001.png; image003.png |

Hi Edward,

Thanks for responding. I'm going to call you back right after sending this email. Matthew asked us to prepare a term sheet for the proposed investment, which is attached to this email. In the interest of time, I'm sharing it with you while our principals are reviewing it, so I must reserve their right to make further changes. Speak with you soon.

Regards,

Derrick



**DERRICK BOSTON**
**VIRGIN ORBIT**
**CHIEF LEGAL OFFICER**
4022 E. CONANT STREET, LONG BEACH, CA 90808
C +1 562.706.7108
E derrick.boston@virginorbit.com

*This message and any attached documents may contain proprietary, confidential, export-controlled and/or privileged information. If you are not the intended recipient, you may not read, copy, distribute, or use any of this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message. Thank you.*

**From:** Christian, Edward <edwardchristian@eversheds- sutherland.com>
**Sent:** Monday, March 20, 2023 2:50 PM
**To:** Derrick Boston <Derrick.Boston@virginorbit.com>
**Subject:** Matthew Brown/Potential Investment

**Caution:** This is an external email and may have suspicious subject or content. Please take caution when clicking links or opening attachments. When in doubt, contact help.it@virginorbit.com

Derrick:

I called and left a voice mail message that I spoke to Matthew Brown about an investment into Virgin Orbit. Please give me a call back at your convenience. I am generally available the rest of the evening.

Sincerely,

Edward Christian | Senior Counsel

*New York*:
Eversheds Sutherland (US) LLP
The Grace Building, 40th Floor, 1114 Avenue of the Americas, New York, NY 10036-7703, US
T: +1.212.389.5089
M: +1.562.234.5849

*and*

*Atlanta*:
Eversheds Sutherland (US) LLP

CONFIDENTIAL FOIA TREATMENT REQUESTED                    VIRGINORBIT_SEC00000079

**APP353**

999 Peachtree Street, NE, Suite 2300, Atlanta, GA 30309-3996, US
T: +1.404.853.8096
M: +1.562.234.5849
Email   Biography   vCard
www.eversheds-sutherland.com

**\*Admitted in California, the District of Columbia, & New York.  Practicing under the supervision of State Bar of Georgia members.**

Eversheds Sutherland (US) LLP is part of a global legal practice, operating through various separate and distinct legal entities, under Eversheds Sutherland. For a full description of the structure and a list of offices, please visit **www.eversheds-sutherland.com**.

This e-mail message, together with any attachments, is intended only for the above named recipient(s) and may contain privileged and/or confidential information. If you are not an intended recipient, you must not review, copy or show the message and any attachments to anyone. Please reply to this e-mail and highlight the mistaken transmission to the sender, and then immediately delete the message.

CONFIDENTIAL FOIA TREATMENT REQUESTED

**VIRGIN ORBIT HOLDINGS, INC.**
**PREFERRED STOCK ISSUANCE**
**TERM SHEET**

Virgin Orbit Holdings, Inc., a Delaware corporation (the "*Company*") is pleased to submit this non-binding, indicative term sheet dated as of March 20, 2023 (the "*Term Sheet*") for your consideration. We look forward to your consideration of this proposal. Please feel free to contact us with any questions.

The following is a summary of indicative terms and conditions to be used as a basis for continued discussions and is subject to contract. It does not constitute an agreement or offer or a solicitation of an offer. This Term Sheet does not include all terms and conditions. An agreement or a commitment can be made only in writing following agreement on final terms and conditions in form and substance satisfactory to both parties, and is subject to applicable compliance, internal approval processes and satisfaction of other customary conditions.

| | |
|---|---|
| **Company** | Virgin Orbit Holdings, Inc. (Nasdaq : VORB) |
| **Investor** | [Matthew Brown] (the "*Investor*") |
| **Initial Securities** | $200,000,000 of preferred stock, par value $0.0001 per share, of the Company (the "*Shares*"). |
| **Underlying Securities** | Common stock, par value $0.0001 per share (the "*Common Stock*"), of the Company (the "*Underlying Shares*") |
| **Transaction Structure** | A private placement transaction exempt from the registration requirements of the Securities Act of 1933, as amended, with a grant of certain registration rights relating to the resale of the Underlying Shares and a covenant from the Company to file one or more registration statements in connection therewith (collectively, the "*Transaction*") |
| **Issue Price per Share** | $[1,000] per Share. |
| **Conversion Price per Share** | $[●] shares of Common Stock per Share, to be adjusted proportionally for stock dividends, splits and combinations prior to conversion of the Shares. |
| **Limitation on Conversion** | The Shares will not be convertible into Underlying Shares until (i) the Company has obtained the stockholder approval contemplated by NASDAQ Listing Standard Rule 5635 (and if such approval has been obtained by stockholder written consent, following the requisite waiting period following the mailing of an information statement to the Company's stockholders) and (ii) such other regulatory approvals to be determined by the Company and the Investor (including pursuant to the Hart-Scott-Rodino Act) are obtained ((i) and (ii) together being the "*Requisite Approvals*"). |

CONFIDENTIAL FOIA TREATMENT REQUESTED

| | |
|---|---|
| **Automatic Conversion** | Upon receipt of the Requisite Approvals, the Shares will convert into Underlying Shares at the applicable conversion price. [Cash will be paid in lieu of issuing any fractional Underlying Shares.] |
| **No Voting Rights** | The Shares will not confer any voting rights. Underlying Shares, once issued, will possess the same voting rights as the Common Stock. |
| **Registration** | The resale of all of the Underlying Shares shall be registered pursuant to a registration statement. The Company shall use commercially reasonable efforts to file such registration statement within thirty (30) days of the closing of this Transaction and shall use commercially reasonable efforts to have such registration statement declared effective within ninety (90) days of the closing. The Company shall use commercially reasonable efforts to continuously maintain the effectiveness of the registration statement until all the Underlying Shares have been sold or may be sold without restriction pursuant to Rule 144. The Company shall pay all offering expenses in connection with the registration and listing of the Underlying Shares. |
| **Conditions to Closing** | Satisfactory completion of due diligence review by the Investor, [approval of the Investor's investment committee], execution and delivery of definitive documentation, and the receipt by the Company of all applicable approvals, including approval of the Company's board of directors. |
| **Confidentiality** | This Term Sheet and the terms contained herein are "Confidential Information" as defined in that certain NonDisclosure Agreement dated as of March 19, 2023 by and between the Company and Investor, and all such information is subject to the terms of such agreement. |
| **Documentation** | Initial drafts of legal documentation to be prepared by the Company's counsel. |
| **Governing Law** | This Term Sheet shall be governed by the internal laws of the State of New York. |

Notwithstanding the fact that the above summary of indicative terms and conditions is non-binding and does not constitute an agreement, an offer, a solicitation of an offer, or any advice or recommendation to conclude any agreement with Investor, the Confidentiality clause above shall be binding on both parties.

**PERSONAL AND CONFIDENTIAL**

CONFIDENTIAL FOIA TREATMENT REQUESTED        VIRGINORBIT_SEC00000082

**APP356**

If the terms and conditions contained herein are satisfactory, please sign as indicated below. We look forward to an expeditious and successful closing of this Transaction.

Sincerely,

**VIRGIN ORBIT HOLDINGS, INC.**

By:_____
Name:_____
Title:_____

**AGREED TO AND ACCEPTED:**

**[Matthew Brown]**

By:_____
Name:__Dan Hart_____

Dated: March ____, 2023

**PERSONAL AND CONFIDENTIAL**

3

CONFIDENTIAL FOIA TREATMENT REQUESTED

VIRGINORBIT_SEC00000083



EXHIBIT

7

| | |
|---|---|
| **Date:** | Monday, March 20 2023 05:41 PM |
| **Subject:** | Re: Virgin Orbit - Presentation / Video |
| **From:** | Matthew Brown (Personal) <mbrown.kapolei@ ▮▮▮▮ |
| **To:** | Derrick Boston <Derrick.Boston@virginorbit.com>; |
| **Attachments:** | image003.png |

> **Caution:** This is an external email and may have suspicious subject or content. Please take caution when clicking links or opening attachments. When in doubt, contact help.it@virginorbit.com

I sent you a msg (apologies) prior to seeing this one. In the interest of time, let us both work together outside counsel until definitive agreements. (aka let us get the TS executed and then we can run the race - I would prefer to do the TS tonight or within the next 24hr.)

You are the only party on this msg.

On Monday, March 20, 2023 at 07:20:29 PM CDT, Derrick Boston <derrick.boston@virginorbit.com> wrote:

Hi Matthew,

Attached please find a draft term sheet for a proposed investment in Virgin Orbit Holdings, Inc. In the interest of time, I'm sharing it with you and your counsel while it is still being reviewed by our principals, so I must reserve their right to make further changes. Please let me know if you have any questions.
Regards,

Derrick

**DERRICK BOSTON**
**VIRGIN ORBIT**
**CHIEF LEGAL OFFICER**
4022 E. CONANT STREET, LONG BEACH, CA 90808
C +1 562.706.7108
E derrick.boston@virginorbit.com

*This message and any attached documents may contain proprietary, confidential, export-controlled and/or privileged information. If you are not the intended recipient, you may not read, copy, distribute, or use any of this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message. Thank you*

**From:** Dan Hart <Dan.Hart@virginorbit.com>
**Sent:** Monday, March 20, 2023 11:44 AM
**To:** Matthew Brown (Personal) <mbrown.kapolei ▮▮▮▮ ; Stephen Zhang <Stephen.Zhang@virginorbit.com>
**Cc:** Derrick Boston <Derrick.Boston@virginorbit.com>
**Subject:** RE: Virgin Orbit - Presentation / Video

"honorary" should work!   Sounds good.

Dan

**From:** Matthew Brown (Personal) <mbrown.kapolei ▮▮▮▮
**Sent:** Monday, March 20, 2023 11:41 AM
**To:** Stephen Zhang <Stephen.Zhang@virginorbit.com>; Dan Hart <Dan.Hart@virginorbit.com>
**Cc:** Derrick Boston <Derrick.Boston@virginorbit.com>
**Subject:** Re: Virgin Orbit - Presentation / Video

CONFIDENTIAL FOIA TREATMENT REQUESTED

**APP358**

 **Caution: This is an external email and may have suspicious subject or content. Please take caution when clicking links or opening attachments. When in doubt, contact help.it@virginorbit.com**

Likewise, Dan.

I have General Council for personal investments so unless the doc is over my "honorary" (aka barely passed) SMU J.D., then we can involve them.

I look forward to working with you and the team!

Matthew
Sent via my iPad Pro

On Monday, March 20, 2023 at 01:28:36 PM CDT, Dan Hart <dan.hart@virginorbit.com > wrote:

Matthew,
   It was good chatting.   The team is active and should have a TS later today.   I see that Steve has you set up with a key video and is working the data room.   Derrick, our legal lead, was asking whether it would help for someone from Latham to make contact with your person at Skadden.   If so, just let us know who.

Best,
Dan

**From:** Matthew Brown (Personal) <mbrown.kapolei███████
**Sent:** Monday, March 20, 2023 11:21 AM
**To:** Stephen Zhang <Stephen.Zhang@virginorbit.com >
**Cc:** Dan Hart <Dan.Hart@virginorbit.com >; Derrick Boston <Derrick.Boston@virginorbit.com >
**Subject:** Re: Virgin Orbit - Presentation / Video

 **Caution: This is an external email and may have suspicious subject or content. Please take caution when clicking links or opening attachments. When in doubt, contact help.it@virginorbit.com**

I appreciate the assistance and attentiveness, Stephen! Thx for facilitating.

On Monday, March 20, 2023 at 01:09:08 PM CDT, Stephen Zhang <stephen.zhang@virginorbit.com > wrote:

Hi Matthew,

As discussed, and following our call / NDA, please see the attached presentation as well as video below for review:

- Ash Carter video: https://youtu.be/yfDLhvSywSA

Separately, I will get you access to our data room via datasite.com   please be on the look out for a separate note there.

Lastly, a term sheet will be handled via Derrick from our Legal team.

Please feel free to email/call/text if you have any questions. Happy to assist and expedite where needed.

Thanks,
Steve

CONFIDENTIAL FOIA TREATMENT REQUESTED                    VIRGINORBIT_SEC00000119

**STEPHEN ZHANG | Vice President, Investor Relations**
4022 E Conant Street, Long Beach, CA 90808
E: Stephen.Zhang@virginorbit.com
M: 1.562.708.0909

CONFIDENTIAL FOIA TREATMENT REQUESTED

**APP360**



EXHIBIT
8

| Date: | Sunday, March 19 2023 09:09 PM |
|---|---|
| Subject: | Re: NDA with Virgin Orbit |
| From: | Matthew Brown (Personal) <mbrown.kapolei▮▮▮▮▮ |
| To: | Susan Nelson (Virgin Orbit) <m-cnpt54arbpyzwagiirsvgqrrigusedp35sezm34vrpme7ovfnsvq@mail.app1.congacontracts.com >; Susan Nelson <Susan.Nelson@virginorbit.com>; |
| CC: | Stephen Zhang <Stephen.Zhang@virginorbit.com >; |
| Attachments: | image001.png |

> **Caution:** This is an external email and may have suspicious subject or content. Please take caution when clicking links or opening attachments. When in doubt, contact help.it@virginorbit.com

Many thanks for the attention, on a weekend, at night. :) Thx.

On Sunday, March 19, 2023 at 10:55:59 PM CDT, Susan Nelson <susan.nelson@virginorbit.com> wrote:

Sounds good.    I'll send the NDA to you in the next few minutes for electronic signature.

Susan

**From:** Matthew Brown (Personal) <mbrown.kapolei▮▮▮▮▮
**Sent:** Sunday, March 19, 2023 8:55 PM
**To:** Susan Nelson (Virgin Orbit) <m-cnpt54arbpyzwagiirsvgqrrigusedp35sezm34vrpme7ovfnsvq@mail.app1.congacontracts.com >
**Cc:** Susan Nelson <Susan.Nelson@virginorbit.com >; Stephen Zhang <Stephen.Zhang@virginorbit.com >
**Subject:** Re: NDA with Virgin Orbit

> **Caution:** This is an external email and may have suspicious subject or content. Please take caution when clicking links or opening attachments. When in doubt, contact help.it@virginorbit.com

Thanks, Susan! The non-practicing JD in me wants to show cards face up to protect us all, which you have done.

Ready to sign.
On Sunday, March 19, 2023 at 10:51:56 PM CDT, Susan Nelson (Virgin Orbit) <m-cnpt54arbpyzwagiirsvgqrrigusedp35sezm34vrpme7ovfnsvq@mail.app1.congacontracts.com > wrote:

## Contracts System Message

# RE: Re: NDA with Virgin Orbit

Hi Matthew.

The first paragraph includes language that covers the investment may come from an affiliate of the Recipient. I have added the trusts in Section 1, identifying them as your Affiliates.

As long as you share the information with your Representatives or your Affiliates, they are

CONFIDENTIAL FOIA TREATMENT REQUESTED

covered under this NDA.

Let me know if this is acceptable and I'll send a clean copy for signature.

SUSAN NELSON
CONTRACTS ADMINISTRATOR
4022 E CONANT STREET
LONG BEACH CA 90808
C +1 562 708 5089
F +1 562 683 2853
E SUSAN.NELSON@VIRGINORBIT.COM
W VIRGINORBIT.COM

This message and any attached documents may contain proprietary, confidential and/or privileged information. If you are not the intended recipient, you may not read, copy, distribute, or use any of this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message. Thank you.

EXPORT CONTROLLED - This email may contain technical data whose export is restricted by the Arms Export Control Act (Title 22, U.S.C., Sec 2751, et seq.) or the Export Administration Act of 1979, as amended (Title 50, U.S.C., App. 2401 et seq.). Transfer of this data by any means outside the United States without export authorization or to a foreign person whether in the US or not, is prohibited. Authorized transfer of this technical data to foreign persons must receive a data review prior to transmission.

----- Original Message -----
From: mbrown.kapolei███████ (Brown, Matthew)
Sent: Sun Mar 19 2023 20:41:06 GMT-0700 (Pacific Daylight Time)
To: susan.nelson@virginorbit.com (Nelson, Susan); mbrown.kapolei@yahoo.com (Brown, Matthew)
Cc: stephen.zhang@virginorbit.com (Zhang, Stephen)
Subject: Re: NDA with Virgin Orbit

Thank you for organizing. The only change I would suggest which should would benefit both parties:
"Matthew Brown Companies, Matthew R. Brown Idaho Irrevocable Trust, Matthew R. Brown Wyoming Irrevocable Trust and any and all affiliated companies (collectively, including affiliates, "Recipient" …)"

I just want to make known I will share information between my trusts.

On Sunday, March 19, 2023 at 10:33:09 PM CDT, Susan Nelson (Virgin Orbit) <m-wjxh2dgoqhba3lfjviewruijuiyioszflseavymm5p2glhxtz3gq@mail.app1.congacontracts.com > wrote:

Contracts System Message#yiv4193593486 #yiv4193593486outlook a{padding:0;}#yiv4193593486 body{width:100% !important;}#yiv4193593486 .yiv4193593486ReadMsgBody{width:100%;}#yiv4193593486 .yiv4193593486ExternalClass{width:100%;}#yiv4193593486 body{}#yiv4193593486 body{margin:0;padding:0;}#yiv4193593486 img{border:0;height:auto;line-height:100%;outline:none;text-decoration:none;}#yiv4193593486 table td{border-collapse:collapse;}#yiv4193593486 #yiv4193593486backgroundTable{min- height:100% !important;margin:0;padding:0;width:100% !important;}

|
|
Contracts System Message |

|

CONFIDENTIAL FOIA TREATMENT REQUESTED

APP362

|
|
|
NDA with Virgin Orbit

Hi Matthew.

Attached is our NDA for your review.   Please let me know if you have any questions or requested changes.

If all is okay, let me know and I will send you a copy for electronic signature.

Thank you,

Susan

SUSAN NELSON
SENIOR MANAGER, LEGAL OPERATIONS
4022 E CONANT STREET
LONG BEACH CA 90808
C +1 562 708 5089
F +1 562 683 2853
E SUSAN.NELSON@VIRGINORBIT.COM
W VIRGINORBIT.COM

This message and any attached documents may contain proprietary, confidential and/or privileged information. If you are not the intended recipient, you may not read, copy, distribute, or use any of this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message. Thank you.

EXPORT CONTROLLED - This email may contain technical data whose export is restricted by the Arms Export Control Act (Title 22, U.S.C., Sec 2751, et seq.) or the Export Administration Act of 1979, as amended (Title 50, U.S.C., App. 2401 et seq.). Transfer of this data by any means outside the United States without export authorization or to a foreign person whether in the US or not, is prohibited. Authorized transfer of this technical data to foreign persons must receive a data review prior to transmission.

Matthew Brown Companies LLC

2023-MAT-NDA-04122
NDA potential investment |
| |
| Message Subject | NDA with Virgin Orbit |
| Contract Number | 2023-MAT-NDA-04122 |
| View email attachment to download file: 2023-MAT-NDA-04122-Virgin Orbit Holdings Inc_Investor NDA.doc |

|

| Go To Company » |
| Go To Contract » |
| Go To Message » |

|

|

CONFIDENTIAL FOIA TREATMENT REQUESTED

# Matthew Brown Companies LLC

**2023-MAT- NDA-04122**

NDA potential investment

| | |
|---|---|
| Message Subject | RE: Re: NDA with Virgin Orbit |
| Contract Number | 2023-MAT- NDA-04122 |

View email attachment to download file: 2023-MAT-NDA-04122-Virgin Orbit Holdings Inc  Investor NDA.doc

Go To Company »

Go To Contract »

Go To Message »

CONFIDENTIAL FOIA TREATMENT REQUESTED



| | |
|---|---|
| **From:** | Dan Hart |
| **Sent:** | Sunday, March 19, 2023 7:50 PM |
| **To:** | Rayhan Arif; Evan Lovell; matthew.kovner@bofa.com; George Mattson; Derrick Boston |
| **Subject:** | RE: Screenshot 2023-03-19 at 7.20.44 PM |

Just chatted with him and Steve Zhang  did some background.   He seems real and says he is very interested, had a professional, tone and said that he wants to move fast.

Sending an NDA tonight.

Matt?

Dan

**From:** Rayhan Arif <Rayhan.Arif@virgin.com>
**Sent:** Sunday, March 19, 2023 7:28 PM
**To:** Dan Hart <Dan.Hart@virginorbit.com>; Evan Lovell <Evan.Lovell@virgin.com>
**Subject:** Re: Screenshot 2023-03-19 at 7.20.44 PM

> **Caution:** This is an external email and may have suspicious subject or content. Please take caution when clicking
> links or opening attachments. When in doubt, contact help.it@virginorbit.com

I'm not familiar with this individual. I'd suggest sending this lead to Kovner at BofA to see if it has legs.

**From:** Dan Hart <Dan.Hart@virginorbit.com>
**Sent:** Sunday, March 19, 2023 7:23:11 PM
**To:** Rayhan Arif <Rayhan.Arif@virgin.com>; Evan Lovell <Evan.Lovell@virgin.com>
**Subject:** FW: Screenshot 2023-03-19 at 7.20.44 PM

Thoughts?

**From:** Dan Hart <sdmjhart@gmail.com>
**Sent:** Sunday, March 19, 2023 7:22 PM
**To:** Dan Hart <Dan.Hart@virginorbit.com>
**Subject:** Screenshot 2023-03-19 at 7.20.44 PM

Caution: This is an external email and may have suspicious subject or content. Please take caution when clicking links or opening attachments. When in doubt, contact help.it@virginorbit.com<mailto:help.it@virginorbit.com>

1

CONFIDENTIAL FOIA TREATMENT REQUESTED

**APP365**

7:20 PM  Sun Mar 19                                                                                 🛜 50% ◼

← **Matthew Brown**                                                                                ···  ▣
  o  M··b·· ··  ··  ·g·

📱 **Matthew Brown** · ···1···
   Have a few mins Re: Cap injection from me?
                              TODAY

🌐 **Dan Hart** · 5·16 ···
   Are you familiar with us?  thoughts?   Dan

📱 **Matthew Brown** · ··5·7 ···
   I am. I spoke to Stephen Zhang this mrng and he said he
   would connect with you.

📱 **Matthew Brown** · ···02···
   I am quite familiar with Virgin Orbit and certainly well
   acquainted in the "space vertical" - I have invested over
   $750mm of my personal capital, largely in this vertical, and
   largely in stealth mode (aside from a leaked semi-cap table
   of my positions). I have the bandwidth to write the
   $200mm.

   I want to reiterate this my capital, not Energent's nor
   anyone elses.

   I am happy to chat abt it. Stephen has my personal cell: ±1
   ▓▓▓▓▓▓8480
                                                              ⤺

🌐 **Dan Hart** · ···7···
   ··· ···· ··· ··· ···· ·· ···· ·· ···· ··· ··

✐  Write a message...                                                                               ⚲

**Sent from my iPad**

·····························································································

This email and any files transmitted with it are confidential and
intended solely for the use of the individual or entity to whom they
are addressed. If you have received this email in error please notify
the IT Team.
Please be aware that the contents of any e-mails sent to Virgin
Management Ltd may be periodically monitored and reviewed in
accordance with lawful business practice.
This footnote also confirms that this email message has been
swept for the presence of computer viruses.
Virgin Management Limited
Registered in England & Wales No 1568894
Registered Office: 66 Porchester Road, London, W2 6ET

·····························································································

CONFIDENTIAL FOIA TREATMENT REQUESTED                                  VIRGINORBIT_SEC00000225

**APP366**



FW-04582 MatthewBrownCo
**EXHIBIT**
**10**

| | |
|---|---|
| **Date:** | Sunday, March 19 2023 05:31 PM |
| **Subject:** | Re: Can you call me Re: financing |
| **From:** | Matthew Brown (Personal) <mbrown.kapolei ████████ |
| **To:** | Stephen Zhang <Stephen.Zhang@virginorbit.com >; |
| **Attachments:** | Screen Shot 2023-03-19 at 7.29.57 PM.png |

> **Caution:** This is an external email and may have suspicious subject or content. Please take caution when clicking links or opening attachments. When in doubt, contact help.it@virginorbit.com

I hope this can get the ball rolling. I do not have access to my J.P. M brokerage acct but this should hopefully paint a decent picture until we get further down the road.

On Sunday, March 19, 2023 at 11:00:20 AM CDT, Stephen Zhang <stephen.zhang@virginorbit.com> wrote:

Just tried the number a couple times.

Let me know if there's a better time to ring.

**From:** Matthew Brown (Personal) <mbrown.kapolei@ ████████
**Sent:** Sunday, March 19, 2023 11:04:26 AM
**To:** Stephen Zhang <Stephen.Zhang@virginorbit.com >
**Subject:** Re: Can you call me Re: financing

> **Caution:** This is an external email and may have suspicious subject or content. Please take caution when clicking links or opening attachments. When in doubt, contact help.it@virginorbit.com

Do you have availability now? (Sending this from my personal acct in the event the other msg did not get to you.)

I am international right now but if you are avail pls call: + ████████ /8480

On Sunday, March 19, 2023 at 10:02:14 AM CDT, Matthew Brown <matthew.brown@nrgnt.com> wrote:

------- Original Message -------
From: Stephen Zhang <Stephen.Zhang@virginorbit.com >
To: Matthew Brown <matthew.brown@nrgnt.com >
Date: 03/19/2023 9:12 AM CDT
Subject: Re: Can you call me Re: financing

Hi Matthew,

Free to chat today?

Thanks,
Steve

**From:** Matthew Brown <matthew.brown@nrgnt.com>
**Sent:** Saturday, March 18, 2023 4:07:11 PM

CONFIDENTIAL FOIA TREATMENT REQUESTED

**To:** Stephen Zhang <Stephen.Zhang@virginorbit.com>
**Subject:** Can you call me Re: financing

 **Caution:** This is an external email and may have suspicious subject or content. Please take caution when clicking links or opening attachments. When in doubt, contact help.it@virginorbit.com

Personal #: ▓▓▓▓.8480

**MATTHEW R. BROWN**
EXECUTIVE PARTNER

matthew.brown@nrgnt.com

nrgnt.com

1 World Trade Center, New York, New York 10007

**MATTHEW R. BROWN**
EXECUTIVE PARTNER

matthew.brown@nrgnt.com

nrgnt.com

1 World Trade Center, New York, New York 10007

CONFIDENTIAL FOIA TREATMENT REQUESTED

**APP368**

VIRGINORBIT_SEC00000292



CONFIDENTIAL FOIA TREATMENT REQUESTED

VIRGINORBIT_SEC00000292



MatthewBrownCo

EXHIBIT

11

| | |
|---|---|
| Date: | Thursday, March 23 2023 09:35 AM |
| Subject: | RE: Deal |
| From: | Derrick Boston |
| To: | Christian, Edward <edwardchristian@eversheds- sutherland.com>; |
| Attachments: | image001.png |

Edward,

As just discussed, our board of directors is requesting that the following actions be taken by or on behalf of Matthew Brown, by no later than the close of the markets today:

1.  Provide me with a list of names and contact information for individuals at: (a) SpaceX, OpenAI and SpinLaunch who can confirm that he or his affiliated companies hold or have made investments in these companies, and (b) the Department of Energy and the Department of Defense who can confirm that he worked at those agencies and in what capacity;
2.  Provide evidence to verify the sources of funds that he would invest in Virgin Orbit; and
3.  Deposit $200,000,000 into an escrow account and provide verification of the deposit, bank and account details and the bank's form of escrow agreement for our review.

As I mentioned in our conversation, our board is extremely uncomfortable about the public statements being made about the discussions and potential transaction with Virgin Orbit, which constitute a breach of our signed NDA, and we strongly urge Mr. Brown not to make any additional public statements, in any form or forum (whether online, on television or in print) about his discussions with Virgin Orbit or the possibility of a transaction with Virgin Orbit. Please note that the board will need the information requested above in order to assess the situation and determine a path forward, which it intends to do at a meeting scheduled for this afternoon at 4:30 pm Eastern time.

I look forward to your prompt response on these matters. Thanks very much.

Regards,

Derrick



**Derrick Boston | Chief Legal Officer|** derrick.boston@virginorbit.com
4022 E Conant St. | Long Beach, CA 90808 | **(562) 706-7108** | www.virginorbit.com

*This message and any attached documents may contain proprietary, confidential, export-controlled and/or privileged information. If you are not the intended recipient, you may not read, copy, distribute, or use any of this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message. Thank you.*

**From:** Christian, Edward <edwardchristian@eversheds- sutherland.com>
**Sent:** Wednesday, March 22, 2023 3:43 PM
**To:** Derrick Boston <Derrick.Boston@virginorbit.com>
**Subject:** Deal

> **Caution:** This is an external email and may have suspicious subject or content. Please take caution when clicking links or opening attachments. When in doubt, contact help.it@virginorbit.com

CONFIDENTIAL FOIA TREATMENT REQUESTED

VIRGINORBIT_SEC00000103

**APP370**

Derrick:

I just called and left a voice mail message.  I talked to Matthew Brown immediately after our call.

Sincerely,

Edward Christian | Senior Counsel

*New York*:
Eversheds Sutherland (US) LLP
The Grace Building, 40th Floor, 1114 Avenue of the Americas, New York, NY 10036-7703, US
T: +1.212.389.5089
M: +1.562.234.5849

*and*

*Atlanta*:
Eversheds Sutherland (US) LLP
999 Peachtree Street, NE, Suite 2300, Atlanta, GA 30309-3996, US
T: +1.404.853.8096
M: +1.562.234.5849
Email   Biography   vCard
www.eversheds- sutherland.com


**\*Admitted in California, the District of Columbia, & New York.  Practicing under the supervision of State Bar of Georgia members.**
Eversheds Sutherland (US) LLP is part of a global legal practice, operating through various separate and distinct legal entities, under Eversheds Sutherland. For a full description of the structure and a list of offices, please visit **www.eversheds-sutherland.com**

This e-mail message, together with any attachments, is intended only for the above named recipient(s) and may contain privileged and/or confidential information. If you are not an intended recipient, you must not review, copy or show the message and any attachments to anyone. Please reply to this e-mail and highlight the mistaken transmission to the sender, and then immediately delete the message.

CONFIDENTIAL FOIA TREATMENT REQUESTED



**Dan Hart**
Space, Defense and Technology Leader. Member of The National Academy of Engineering Senior Fellow, The Atlantic Council

··· ◻ ☆

You haven't connected with Dan Hart

ⓘ

**Dan Hart** ◻ · 2nd
Space, Defense and Technology Leader. Member of The National Academy of Engineering Senior Fellow, The Atlantic Council

MAR 18, 2023

**Matthew Brown** · 5:11 PM
Have a few mins Re: Cap injection from me?. ✓

MAR 19, 2023

**Dan Hart** ◻ · 5:56 PM
Are you familiar with us? thoughts? Dan

**Matthew Brown** · 5:57 PM
I am. I spoke to Stephen Zhang this mrng and he said he would connect with you. ✓

**Matthew Brown** · 6:52 PM
I am quite familiar with Virgin Orbit and certainly well acquainted in the "space vertical" – I have invested over $750mm of my personal capital, largely in this vertical, and largely in stealth mode (aside from a leaked semi-cap table of my positions). I have the bandwidth to write the $200mm.

I want to reiterate this my capital, not Energent's nor anyone elses. ✓

I am happy to chat abt it. Stephen has my personal cell: ▮▮▮▮▮ 8450

**Dan Hart** ◻ · 7:17 PM
Matt, Where are you located? Happy to chat later, or tomorrow AM. What works for you? Dan

**Matthew Brown** · 7:23 PM
I am presently at my place in the Maldives. I will make myself avail now or can make PT work tmrrw (though I prefer sooner rather than later if you are avail.)

If avail, now pls FT Call so that it goes through. (Or we can set up a Zoom. ✓

**Dan Hart** ◻ · 7:26 PM
Will ring FT

**Matthew Brown** · 7:26 PM
Thx ✓

EXHIBIT
14
PENGAD 800-631-6989

| | |
|---|---|
| Date: | Monday, March 20 2023 07:53 AM |
| Subject: | RE: Matthew Brown Companies - Investments, Portfolio & Company Exits |
| From: | Stephen Zhang |
| To: | Kovner, Matthew - GCIB NY <matthew.kovner@bofa.com >; Dan Hart <Dan.Hart@virginorbit.com >; Evan Lovell <Evan.Lovell@virgin.com >; |
| CC: | Derrick Boston <Derrick.Boston@virginorbit.com >; Brita O'Rear <Brita.O'Rear@virginorbit.com >; George Mattson <gmattson@nextgenacq.com >; Gregory Summe <gsumme@nextgenacq.com >; DG Project Interstellar Full Team <dg.project_interstellar_full_team@bofa.com >; gs-interstellar- classic@ny.email.gs.com; Galbraith, Ginny L - GCIB NY <virginia.galbraith@bofa.com >; |
| Attachments: | Screen Shot 2023-03-19 at 7.29.57 PM.png |

Will continue to do some diligence into Matthew Brown as we go, but I agree, couldn't hurt to at least have the conversation.

Also agree with Matt K. – this could be nothing and we should continue to push the main course of action.

**For everyone's awareness, here is a brief background on our encounter:**

- Matthew Brown emailed me from his Energent & Personal accounts this past weekend
    - Was looking to find the decision makers and go directly to the source
    - Seeking a meeting with management this morning
    - Signed NDA last night
- I conducted an intro call with him yesterday for a quick overview and walked through our situation per the 8K
- He voiced his interest and disclosed his private wealth. A few comments below on our conversation:
    - Investor in SpaceX in the past as well as recent funding round at $127B valuation
    - Investor in Spin Launch
    - JPM – where the majority of his private wealth is held
    - Has used Skadden as attorney before – could we check with them?
    - Would like to be discrete – does not want any investment here getting back to Spin Launch
    - Sounded knowledgeable in the Space Sector
    - Said he has appropriate government clearances
    - Mentioned Marliynn Hewson (ex-CEO of Lockheed) and one of her sons as his best man at his wedding
- To continue the conversation, I pressed if there was a way to verify if I was speaking to the appropriate person
    - He shared his attached bank statement
- Linkedin: https://www.linkedin.com/in/mbrownnyc/
- https://www.crunchbase.com/person/matthew- brown
- https://www.crunchbase.com/organization/matthew- brown-companies/recent_investments

I've done as much public digging as I could to verify his identity. Not much else out there publicly. We should remain skeptical as we continue our talks with him.

Please let me know if you have any questions.

Thanks,
Steve



**From:** Galbraith, Ginny L - GCIB NY <virginia.galbraith@bofa.com >
**Sent:** Monday, March 20, 2023 7:20 AM
**To:** Kovner, Matthew - GCIB NY <matthew.kovner@bofa.com>; Dan Hart <Dan.Hart@virginorbit.com>; Evan Lovell <Evan.Lovell@virgin.com >
**Cc:** Derrick Boston <Derrick.Boston@virginorbit.com >; Brita O'Rear <Brita.O'Rear@virginorbit.com >; George Mattson <gmattson@nextgenacq.com >; Gregory Summe <gsumme@nextgenacq.com >; Stephen Zhang <Stephen.Zhang@virginorbit.com>; DG Project Interstellar Full Team <dg.project_interstellar_full_team@bofa.com >; gs-interstellar-classic@ny.email.gs.com

CONFIDENTIAL FOIA TREATMENT REQUESTED

**Subject:** RE: Matthew Brown Companies - Investments, Portfolio & Company Exits

> **Caution:** This is an external email and may have suspicious subject or content. Please take caution when clicking links or opening attachments. When in doubt, contact help.it@virginorbit.com

Attached is the MP that we sent to Steel Partners last week.

**Ginny Galbraith**
Investment Banking : Global Industrials Group
Bank of America
One Bryant Park | New York, NY 10036
M: 646-841-2891
E: virginia.galbraith@bofa.com

---

**From:** Kovner, Matthew - GCIB NY <matthew.kovner@bofa.com>
**Date:** Monday, Mar 20, 2023 at 10:08 AM
**To:** Dan Hart <Dan.Hart@virginorbit.com>, Evan Lovell <Evan.Lovell@virgin.com>
**Cc:** Derrick Boston <Derrick.Boston@virginorbit.com>, Brita O'Rear <Brita.O'Rear@virginorbit.com>, George Mattson <gmattson@nextgenacq.com>, Gregory Summe <gsumme@nextgenacq.com>, Stephen Zhang <Stephen.Zhang@virginorbit.com>, DG Project Interstellar Full Team <dg.project_interstellar_full_team@bofa.com>, gs-interstellar-classic@ny.email.gs.com <gs-interstellar-classic@ny.email.gs.com>
**Subject:** RE: Matthew Brown Companies - Investments, Portfolio & Company Exits

Dan - yes, adding the banks here.

We have the MP (ex-financials) from last week, was provided to Warren / Steel Partners. We can send that over.

**Matt Kovner**
Mobile (Work): +1 646 284 5618

---

**From:** Dan Hart <Dan.Hart@virginorbit.com>
**Date:** Monday, Mar 20, 2023 at 8:53 AM
**To:** Evan Lovell <Evan.Lovell@virgin.com>
**Cc:** Kovner, Matthew - GCIB NY <matthew.kovner@bofa.com>, Derrick Boston <Derrick.Boston@virginorbit.com>, Brita O'Rear <Brita.O'Rear@virginorbit.com>, George Mattson <gmattson@nextgenacq.com>, Gregory Summe <gsumme@nextgenacq.com>, Stephen Zhang <Stephen.Zhang@virginorbit.com>
**Subject:** Re: Matthew Brown Companies - Investments, Portfolio & Company Exits

Matt,
   Can you have the management presentation dusted off?  Would like to have a small group.   Derrick, Steve, I and you Matt.  We should have the 6 launch scenario handy.   Can someone send out asap so I can refresh on talking points?

Dan

Sent from my iPad

> On Mar 20, 2023, at 6:43 AM, Evan Lovell <Evan.Lovell@virgin.com> wrote:
>
> > **Caution:** This is an external email and may have suspicious subject or content. Please take caution when clicking links or opening attachments. When in doubt, contact help.it@virginorbit.com
>
> I don't see any reason not to have a further discussion. We can do detailed KYc quick if there seems like there is any there; "there".

CONFIDENTIAL FOIA TREATMENT REQUESTED

**From:** Kovner, Matthew - GCIB NY <matthew.kovner@bofa.com >
**Date:** Monday, March 20, 2023 at 9:03 AM
**To:** Dan Hart <Dan.Hart@virginorbit.com >
**Cc:** Derrick Boston <Derrick.Boston@virginorbit.com >, Brita O'Rear <Brita.O'Rear@virginorbit.com >,
Evan Lovell <Evan.Lovell@virgin.com >, George Mattson <gmattson@nextgenacq.com >, Gregory
Summe <gsumme@nextgenacq.com >
**Subject:** RE: Matthew Brown Companies - Investments, Portfolio & Company Exits

Dan — I have asked our capital markets colleagues if they have come across this guy. GS should do the same.

From my quick research, very little available on him, his firm Energent, or his source of wealth. I do not have a way to really vet him, but will revert.

Feels ok to have the next conversation, but defer to the group if people want to tread carefully. Need to keep pushing with C though, as well.

Matt Kovner
Mobile (Work): +1 646 284 5618

---

**From:** Dan Hart <Dan.Hart@virginorbit.com>
**Date:** Monday, Mar 20, 2023 at 7:31 AM
**To:** Kovner, Matthew - GCIB NY <matthew.kovner@bofa.com >
**Cc:** Derrick Boston <Derrick.Boston@virginorbit.com >, Brita O'Rear <Brita.O'Rear@virginorbit.com >, Evan Lovell <
Evan.Lovell@virgin.com >, George Mattson <gmattson@nextgenacq.com >, Gregory Summe <gsumme@nextgenacq.com >
**Subject:** Re: Matthew Brown Companies - Investments, Portfolio & Company Exits

Matt,
  Can BofA do an initial check to see if this is real.. could use by 8:30 PT
  I could not detect anything "off" except for outreach to Steve Zhang and I and speed.    Dan

Sent from my iPhone

> On Mar 20, 2023, at 5:05 AM, Dan Hart <Dan.Hart@virginorbit.com > wrote:
>
> He said:
> High net worth individual
> Investor in SpaceX, Astra
> Knows us and has been following us
> Saw the news
> Heard that we need 200M
> Said Wants to invest
> Can move very fast, asked how quickly we can move
> Sounded somewhat flexible on terms—said does not want to be predatory
> He signed the NDA last night
> Talking with him again at 9
>
> Sent from my iPhone
>
>> On Mar 20, 2023, at 2:27 AM, Kovner, Matthew - GCIB NY <matthew.kovner@bofa.com > wrote:

**Caution:** This is an external email and may have suspicious subject or content. Please take caution when clicking links or opening attachments. When in doubt, contact help.it@virginorbit.com

CONFIDENTIAL FOIA TREATMENT REQUESTED

I have never heard of this person and there is very little available about him online. What did he tell you?

Matt Kovner
Mobile (Work): +1 646 284 5618

**From:** Dan Hart <Dan.Hart@virginorbit.com>
**Date:** Monday, Mar 20, 2023 at 1:39 AM
**To:** Kovner, Matthew - GCIB NY <matthew.kovner@bofa.com>
**Subject:** Fwd: Matthew Brown Companies - Investments, Portfolio & Company Exits

??

Sent from my iPhone
Begin forwarded message:

> **From:** Dan Hart <sdmihart@gmail.com>
> **Date:** March 19, 2023 at 10:35:07 PM PDT
> **To:** Dan Hart <Dan.Hart@virginorbit.com>
> **Subject: Matthew Brown Companies - Investments, Portfolio & Company Exits**
>
> Caution: This is an external email and may have suspicious subject or content. Please take caution when clicking links or opening attachments. When in doubt, contact help.it@virginorbit.com <mailto:help.it@virginorbit.com>
>
> https://www.crunchbase.com/organization/matthew- brown-companies/recent_investments
>
> Sent from my iPad

This message, and any attachments, is for the intended recipient(s) only, may contain information that is privileged, confidential and/or proprietary and subject to important terms and conditions available at http://www.bankofamerica.com/emaildisclaimer . If you are not the intended recipient, please delete this message.

This message, and any attachments, is for the intended recipient(s) only, may contain information that is privileged, confidential and/or proprietary and subject to important terms and conditions available at http://www.bankofamerica.com/emaildisclaimer . If you are not the intended recipient, please delete this message.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the IT Team.
Please be aware that the contents of any e-mails sent to Virgin Management Ltd may be periodically monitored and reviewed in accordance with lawful business practice.
This footnote also confirms that this email message has been swept for the presence of computer viruses.
Virgin Management Limited
Registered in England & Wales No 1568894
Registered Office: 66 Porchester Road, London, W2 6ET

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This message, and any attachments, is for the intended recipient(s) only, may contain information that is privileged, confidential and/or proprietary and subject to important terms and conditions available at http://www.bankofamerica.com/emaildisclaimer . If you are not the intended recipient, please delete this message.

CONFIDENTIAL FOIA TREATMENT REQUESTED



### VIRGIN ORBIT HOLDINGS, INC.
### PREFERRED STOCK ISSUANCE
### TERM SHEET

Virgin Orbit Holdings, Inc., a Delaware corporation (the "*Company*") is pleased to submit this non-binding, indicative term sheet dated as of March 21, 2023 (the "*Term Sheet*") for your consideration. We look forward to your consideration of this proposal. Please feel free to contact us with any questions.

The following is a summary of indicative terms and conditions to be used as a basis for continued discussions and is subject to contract. It does not constitute an agreement or offer or a solicitation of an offer. This Term Sheet does not include all terms and conditions. An agreement or a commitment can be made only in writing following agreement on final terms and conditions in form and substance satisfactory to both parties, and is subject to applicable compliance, internal approval processes and satisfaction of other customary conditions.

| | |
|---|---|
| **Company** | Virgin Orbit Holdings, Inc. (Nasdaq : VORB) |
| **Investor** | Matthew Brown Companies, LLC and Matthew R. Brown Wyoming Irrevocable Trust, or a US affiliate of the foregoing (together, the "*Investor*") |
| **Initial Securities** | $200,000,000 of preferred stock, par value $0.0001 per share, of the Company (the "*Shares*"). |
| **Underlying Securities** | Common stock, par value $0.0001 per share (the "*Common Stock*"), of the Company (the "*Underlying Shares*") |
| **Transaction Structure and Timing** | A private placement transaction of the Shares exempt from the registration requirements of the Securities Act of 1933, as amended, with a grant of certain registration rights relating to the resale of the Underlying Shares and a covenant from the Company to file one or more registration statements in connection therewith (collectively, the "*Transaction*"). The parties intend to work together to sign and close the Transaction on Friday March 24, 2023. To that end, by the close of business on Wednesday March 22, 2023, Investor shall deposit $200,000,000 in cash in an escrow account with a national or major regional bank or escrow agent, which cash shall be released to the Company by wire transfer in immediately available funds upon closing of the Transaction on terms that are reasonably satisfactory to the Company. |
| **Issue Price per Share** | $1,000 per Share. |
| **Conversion Price per Share** | The conversion price shall equal the average of the volume weighted average price of the Common Stock over the thirty (30) trading days prior to signing, which price shall be adjusted proportionately for stock dividends, splits and combinations prior to conversion of the Shares. |



SEC-Brown-M-E-0000021

| | |
|---|---|
| **Limitation on Conversion** | The Shares will not be convertible into Underlying Shares until (i) the Company has obtained the stockholder approval contemplated by NASDAQ Listing Standard Rule 5635 (and if such approval has been obtained by stockholder written consent, following the requisite waiting period following the mailing of an information statement to the Company's stockholders) and (ii) such other regulatory approvals to be determined by the Company and the Investor (including pursuant to the Hart-Scott-Rodino Act) are obtained ((i) and (ii) together being the "***Requisite Approvals***"). |
| **Automatic Conversion** | Upon receipt of the Requisite Approvals, the Shares will convert into Underlying Shares at the applicable conversion price. Cash will be paid in lieu of issuing any fractional Underlying Shares. |
| **No Voting Rights** | The Shares will not confer any voting rights. Underlying Shares, once issued, will possess the same voting rights as the Common Stock. |
| **Registration** | The resale of all of the Underlying Shares shall be registered pursuant to a registration statement. The Company shall use commercially reasonable efforts to file such registration statement within thirty (30) days of the closing of this Transaction and shall use commercially reasonable efforts to have such registration statement declared effective within ninety (90) days of the closing. The Company shall use commercially reasonable efforts to continuously maintain the effectiveness of the registration statement until all the Underlying Shares have been sold or may be sold without restriction pursuant to Rule 144. The Company shall pay all offering expenses in connection with the registration and listing of the Underlying Shares. |
| **Conditions to Closing** | Satisfactory completion of due diligence review by the Investor; approval of the Investor's investment committee, if required; execution and delivery of definitive documentation; satisfactory due diligence by the Company on the beneficial ownership and corporate organization chart of Investor; and the receipt by the Company of all applicable approvals, including approval of the Company's board of directors. |
| **Confidentiality** | This Term Sheet and the terms contained herein are "Confidential Information" as defined in that certain NonDisclosure Agreement dated as of March 19, 2023 by and between the Company and Investor, and all such information is subject to the terms of such agreement. |

SEC-BrownM-E-0000022
APP379

**Documentation**    Initial drafts of legal documentation to be prepared by the
Company's counsel. The parties expect that the documentation
shall consist of a Stock Purchase Agreement, a Registration
Rights Agreement and a Certificate of Designation for the
Shares.

**Governing Law**    This Term Sheet shall be governed by the internal laws of the
State of New York.

Notwithstanding the fact that the above summary of indicative terms and conditions is non-binding and
does not constitute an agreement, an offer, a solicitation of an offer, or any advice or recommendation to
conclude any agreement with Investor, the Confidentiality clause above shall be binding on both parties.

If the terms and conditions contained herein are satisfactory, please sign as indicated below. We look
forward to an expeditious and successful closing of this Transaction.

Sincerely,

**VIRGIN ORBIT HOLDINGS, INC.**

By: _Dan Hart_____

Name: Dan Hart_____

Title: CEO_____

**AGREED TO AND ACCEPTED:**

**Matthew Brown Companies, LLC**

By:_____

Name: Matthew Brown_____

Title: Manager_____

**Matthew R. Brown Wyoming Irrevocable Trust**

By:_____

Name: Matthew Brown_____

Title: Manager_____

3

PERSONAL AND CONFIDENTIAL

SEC-Brown-M-E-0000023
APP380

**Date**: March 21, 2023

PERSONAL AND CONFIDENTIAL

4

SEC-BrownM-E-0000024

Page 1
Venture capitalist talks Virgin Orbit, space investment, AI and Silicon Valley Bank
https://www.cnbc.com/video/2023/03/23/venture-capitalist-talks-virgin-orbit-space-investment-ai-and-silicon-valley-bank.html





WORLDWIDE EXCHANGE                                    SHARE  f  X  in  ✉

# Venture capitalist talks Virgin Orbit, space investment, AI and Silicon Valley Bank

EXHIBIT
18

Captured by FireShot Pro: 17 September 2024, 14:34:53
https://getfireshot.com

SEC-FWRO-497

APP382

Page 2
Venture capitalist talks Virgin Orbit, space investment, AI and Silicon Valley Bank
https://www.cnbc.com/video/2023/03/23/venture-capitalist-talks-virgin-orbit-space-investment-ai-and-silicon-valley-bank.html

Matthew Brown, founder of venture capital firm Matthew Brown Companies, discusses his potential investment in Virgin Orbit, and what he sees as the future role of artificial intelligence.

THU, MAR 23 2023 • 7:02 AM EDT

## RELATED



Venture capitalist talks Virgin Orbit, space investment, AI and Silicon Valley Bank



Wieting: Markets will push the Fed one way or the other



Duff: Bonds will likely perform better as we're entering an easing cycle



Stock futures point to higher open - Two investors weight in



Sethi: CPI could be important in dictating the Fed's messaging



Bill introduced to ensure Black & Hispanic communities are ready for AI



Pourreza: Domestic manufacturing and grid electrification are driving increased energy demand

Captured by FireShot Pro: 17 September 2024, 14:34:53
https://getfireshot.com

Page 3
Venture capitalist talks Virgin Orbit, space investment, AI and Silicon Valley Bank
https://www.cnbc.com/video/2023/03/23/venture-capitalist-talks-virgin-orbit-space-investment-ai-and-silicon-valley-bank.html

## TOP VIDEOS



### Elon Musk's X is a financial 'disaster,' co-authors of new book 'Character Limit' say

AN HOUR AGO



### CNBC Fed Survey: Respondents see soft landing despite weaker economic outlook

AN HOUR AGO



### Chevron CEO on returning to growth, deepwater Anchor project

AN HOUR AGO



### Instagram adds teen protections: Here's what to know

3 HOURS AGO



### Harris vs. Trump on the economy

3 HOURS AGO

LOAD MORE ∨

  f  X  in  ⊙  ▶  ▣  ⁂

SEC-FWRO-499

APP384

Page 4
Venture capitalist talks Virgin Orbit, space investment, AI and Silicon Valley Bank
https://www.cnbc.com/video/2023/03/23/venture-capitalist-talks-virgin-orbit-space-investment-ai-and-silicon-valley-bank.html

| | | |
|---|---|---|
| Subscribe to CNBC PRO | Subscribe to Investing Club | Licensing & Reprints |
| CNBC Councils | Select Personal Finance | CNBC on Peacock |
| Join the CNBC Panel | Supply Chain Values | Select Shopping |
| Closed Captioning | Digital Products | News Releases |
| Internships | Corrections | About CNBC |
| Ad Choices | Site Map | Podcasts |
| Careers | Help | Contact |

### News Tips

Got a confidential news tip? We want to hear from you.

**GET IN TOUCH**

### Advertise With Us

**PLEASE CONTACT US**

### ⊟✉ CNBC Newsletters

Sign up for free newsletters and get more CNBC delivered to your inbox

**SIGN UP NOW**

Get this delivered to your inbox, and more info about our products and services.

Privacy Policy | | CA Notice | Terms of Service

© 2024 CNBC LLC. All Rights Reserved. A Division of NBCUniversal

Data is a real-time snapshot *Data is delayed at least 15 minutes. Global Business and Financial News, Stock Quotes, and Market Data and Analysis.

Market Data Terms of Use and Disclaimers

Data also provided by REFINITIV ⦧

Captured by FireShot Pro: 17 September 2024, 14:34:53
https://getfireshot.com

SEC-FWRO-500

APP385

# Exhibit 19 USB Thumb Drive of

## 3.23.2023 CNBC Video in Article
## Venture capitalist talks Virgin Orbit



12:49

‹ 11                    ⬤

████-8480 ›

iMessage
Mon, Mar 20 at 9:07 AM

Matt,   Joined call.  Steve said
that you have some comm
difficulties.  Let us know if you'd
still like to chat.    Dan

Mon, Mar 20 at 10:28 AM

Joining

Tue, Mar 21 at 8:32 AM

Matthew,   Sent an email.  Would
you have some time to discuss
this morning?   Good board
meeting.  10 min call would be
good.    Dan

Tue, Mar 21 at 11:28 AM

I do. Are you free in a few
minutes? I can call you.

15 min?

Perfect.

See you then

If it works for you, I asked Derrick

⬜  🅐    iMessage                    🎤



PENGAD 800-631-6989     EXHIBIT
20

APP386
SEC-VOH-E-0000007



**12:49**

‹ 11

-8480 ›

If it works for you, I asked Derrick to put out a teams link.   Call also works if VTC not workable

See my email? Teams link did not grant me access. I sent you a new link.

Looking

"Access denied. You are not authorized to join this meeting." Is what I received. I created one and sent it on the thread.

Wed, Mar 22 at 2:39 PM

Matthew,   Are you able to send the KYC info to Derrick?   We are about to be stuck without it. Derrick is getting close with the docs.
Also, is there any update on the escrow?

Wed, Mar 22 at 4:54 PM

It occurred to me after chatting with Steve, let me know if you'd like to meet the board.

iMessage

APP387

SEC-VOH-E-0000008



I would like to.

> What does your schedule look like tomorrow?

Widely free. 24hrs these days.

*Wed, Mar 22 at 8:17 PM*

> I've chatted with a couple of the board members.   They suggested two discussions.
>
> 1.   In the morning we could have 1-2 of the members jump on a call and discuss if helpful
>
> 2.   They asked that before the whole board was convened they would require us to complete the KYC and that the funds be identified in escrow.   I'm thinking we target afternoon some time.
>
> Is that helpful?

*Thu, Mar 23 at 9:27 AM*

2min





12:49

11

8480

2min

Thu, Mar 23 at 11:20 AM

Rang you with Derrick from other phone

5min

Thu, Mar 23 at 12:40 PM

Looks like I have a 1:30 hard stop for an hour so before would be best if possible.

Free in 5?

Ok.   Text me when you're ready

Free

I'll raise Derrick and ring you

Thank you for the time. I did not mean to be combative if it came across that way. I thought we were losing sight of the ball and just want to get back in the lineup.

iMessage

APP389

SEC-VOH-E-0000010



Thank you for the time. I did not mean to be combative if it came across that way. I thought we were losing sight of the ball and just want to get back in the lineup.

I look forward to seeing a line item requirements of me so that we can close as well as a timeline which we can close to.

I appreciate everything. Truly!

Greatly appreciated. Same objectives here.
Team trying to satisfy and close out regulatory needs.
Spoke with key board members.
The JP Morg info will help substantially.

Thu, Mar 23 at 8:37 PM

Good — So do we have a line item to close list? Docs?

How is this?
1.  Derrick Send KYC request to Matthew
2.  Receive KYC data



APP390

SEC-VOH-E-0000011



12:50

-8480

How is this?
1. Derrick Send KYC request to Matthew
2. Receive KYC data
3. Prepare docs
4. Funds verified in escrow
5. Send, Review, Sign docs and close

Fri, Mar 24 at 8:00 AM

I am on a call but will write back right after.

Ok

Fri, Mar 24 at 9:26 AM

Dan:

I hope this message finds you well. I have been on the phone nonstop since this leak as you can imagine.

I love Virgin orbit. I would love to see this go through. I wish my name was never made public — as I have been able to maintain a low profile. (But alas we are here.)

iMessage



Fri, Mar 24 at 9:26 AM

Dan:

I hope this message finds you well. I have been on the phone nonstop since this leak as you can imagine.

I love Virgin orbit. I would love to see this go through. I wish my name was never made public — as I have been able to maintain a low profile. (But alas we are here.)

I know you have acknowledged other interested parties and I know of at least who one is and can see why it would make sense for you to move forward with them — which, obviously, makes me a stocking horse.

I would propose that we both throw all our cards up at once by signing a stalking horse Term Sheet that is binding. It requires me to produce everything to the satisfaction of you and the team (as we discussed and as you have written) and binds you to



SEC-VOH-E-0000013



**12:50**

**1-8480**



I would propose that we both throw all our cards up at once by signing a stalking horse Term Sheet that is binding. It requires me to produce everything to the satisfaction of you and the team (as we discussed and as you have written) and binds you to the sale upon receiving that information and signing definitive documents upon a period of time we can agree on. If I produce everything and you do not close then I would propose a break up fee of 3%. It gives me the confidence that we both are serious and if you find a partner with a better offer (or a more suitable partner) then the only exposure you have is that 3%.

I I have gotten to enjoy speaking with you and think you are a likable guy and again I love Virgin Orbit and I want it to succeed regardless.

If this is palatable please let me know, and if it is not, we can shake hands and walk, but that does not change my opinion and

   iMessage

**APP393**

SEC-VOH-E-0000014



12:50

-8480 >

If this is palatable please let me know, and if it is not, we can shake hands and walk, but that does not change my opinion and my affinity for Virgin Orbit.

Thoughts?

Matthew

Fri, Mar 24 at 11:11 AM

Not interested in stalking horse. only interested in authentic, real, verifiable business.

I would encourage you to reread the msg — I intend (and will) close on the transaction ... I am not asking for something unreasonable given you are talking to other parties.

If you have funds and can place them in a verifiable escrow account with the appropriate agreement and can send to us we can discuss.

If I do this will you agree to a breakup fee if you do not

iMessage

APP394

SEC-VOH-E-0000015



them in a verifiable escrow account with the appropriate agreement and can send to us we can discuss.

If I do this will you agree to a breakup fee if you do not perform on the transaction after I have escrowed and signed all agreements?

I am not being difficult — I want this done but do not want to be the side piece.

(And, Dan, if you have a better offer or a better partner for the Company, my feelings will not be hurt. I want what is best for you and for the Company.)

Fri, Mar 24 at 2:50 PM

Offer stands.

If we can verify KYC and verify funds in escrow and sources of funds to satisfy our regulatory responsibilities we would be willing to continue.   We have stated this several times.

iMessage

APP395

SEC-VOH-E-0000016

## Re: Deal

From: Matthew Brown (Personal) (mbrown.kapole█████████

To:    Derrick.Boston@virginorbit.com

Date:   Friday, March 24, 2023 at 01:12 PM PDT

I appreciate the forward. It hit spam. It looks like the deal will not consummate but my responses are in red below.

On Thursday, March 23, 2023 at 03:37:05 PM CDT, Derrick Boston <derrick.boston@virginorbit.com> wrote:

As discussed, please see the requested KYC information below.

Regards,

Derrick



**Derrick Boston I Chief Legal Officerl** derrick.boston@virginorbit.com

4022 E Conant St. I Long Beach, CA 90808 I **(562) 706-7108** I www.virginorbit.com

*This message and any attached documents may contain proprietary, confidential, export-controlled and/or privileged information. If you are not the intended recipient, you may not read, copy, distribute, or use any of this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message. Thank you.*

**From:** Derrick Boston
**Sent:** Thursday, March 23, 2023 9:36 AM
**To:** Christian, Edward <edwardchristian@eversheds-sutherland.com>
**Subject:** RE: Deal

Edward,

As just discussed, our board of directors is requesting that the following actions be taken by or on behalf of Matthew Brown, by no later than the close of the markets today:



EXHIBIT
21

SEC-BrownM-E-0000095
APP396

1.   Provide me with a list of names and contact information for individuals at: (a) SpaceX, OpenAI and SpinLaunch (I never directly or personally invested in SpinLaunch. I have been to launches and was potential investor.) who can confirm that he or his affiliated companies hold or have made investments in these companies, and (b) the Department of Energy and the Department of Defense who can confirm that he worked at those agencies and in what capacity; (I never represented I "worked" at these agencies. I was an advisor on energy policy and cyber security interests).

2.   Provide evidence to verify the sources of funds that he would invest in Virgin Orbit (I did so to the original "broker" and would happy to do again.); and

3.   Deposit $200,000,000 into an escrow account and provide verification of the deposit, bank and account details and the bank's form of escrow agreement for our review. (I was and would be open to doing this.)

As I mentioned in our conversation, our board is extremely uncomfortable about the public statements being made about the discussions and potential transaction with Virgin Orbit, which constitute a breach of our signed NDA, and we strongly urge Mr. Brown not to make any additional public statements, in any form or forum (whether online, on television or in print) about his discussions with Virgin Orbit or the possibility of a transaction with Virgin Orbit. (There was a leak of the Term Sheet. It did not come from my end. The CEO encouraged and authorized a response to CNBC's call for video comment after I alerted him of it. I have said "no comment" to further inquiries.) Please note that the board will need the information requested above in order to assess the situation and determine a path forward, which it intends to do at a meeting scheduled for this afternoon at 4:30 pm Eastern time.

I want what is best for Virgin Orbit. I have no hard feelings wish Virgin Orbit all the best.

I look forward to your prompt response on these matters. Thanks very much.

Regards,

Derrick



**Derrick Boston I Chief Legal Officer**I derrick.boston@virginorbit.com

4022 E Conant St. I Long Beach, CA 90808 I **(562) 706-7108** I www.virginorbit.com

*This message and any attached documents may contain proprietary, confidential, export-controlled and/or privileged information. If you are not the intended recipient, you may not read, copy, distribute, or use any of this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message. Thank you.*

SEC-BrownM-E-0000096
**APP397**

**From:** Christian, Edward <edwardchristian@eversheds-sutherland.com>
**Sent:** Wednesday, March 22, 2023 3:43 PM
**To:** Derrick Boston <Derrick.Boston@virginorbit.com>
**Subject:** Deal

**Caution:** This is an external email and may have suspicious subject or content. Please take caution when clicking links or opening attachments. When in doubt, contact help.it@virginorbit.com

Derrick:

I just called and left a voice mail message. I talked to Matthew Brown immediately after our call.

Sincerely,

Edward Christian | Senior Counsel

*New York*:
Eversheds Sutherland (US) LLP
The Grace Building, 40th Floor, 1114 Avenue of the Americas, New York, NY 10036-7703, US
T: +1.212.389.5089
M: +1.562.234.5849

*and*

*Atlanta*:

Eversheds Sutherland (US) LLP
999 Peachtree Street, NE, Suite 2300, Atlanta, GA 30309-3996, US
T: +1.404.853.8096
M: +1.562.234.5849

Email | Biography | vCard
www.eversheds-sutherland.com

**Eversheds Sutherland**
Helping our clients, our people and our communities to thrive

*Admitted in California, the District of Columbia, & New York. Practicing under the supervision of State Bar of Georgia members.

Eversheds Sutherland (US) LLP is part of a global legal practice, operating through various separate and distinct legal entities, under Eversheds Sutherland. For a full description of the structure and a list of offices, please visit www.eversheds-sutherland.com.

This e-mail message, together with any attachments, is intended only for the above named recipient(s) and may contain privileged and/or confidential information. If you are not an intended recipient, you must not review, copy or show the message and any attachments to anyone. Please reply to this e-mail and highlight the mistaken transmission to the sender, and then

SEC-BrownM-E-0000097
**APP398**

immediately delete the message.

SEC-BrownM-E-0000098
APP399