IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 4:24-cv-558-O |
| MATTHEW BROWN, ET AL., | § § § | |
| Defendants. | § | |

## ORDER

Before the Court are Defendants' Motion for Summary Judgment and Brief in Support (ECF No. 53), filed April 23, 2025; Plaintiff's Response and Brief in Support (ECF Nos. 73–74), filed May 30, 2025; and Defendants' Reply (ECF No. 76), filed May 31, 2025. Also before the Court are Plaintiff's Motion for Partial Summary Judgment, Brief, and Appendices in Support (ECF Nos. 66–72), filed May 30, 2025; Defendants' Response and Supplemental Response (ECF Nos. 75, 78), filed May 31, 2025; and Plaintiff's Reply (ECF No. 79), filed June 13, 2025. After considering the briefing and relevant case law, the Court **DENIES** Defendants' Motion for Summary Judgment and **GRANTS** Plaintiff's Motion for Partial Summary Judgment.

**I.    BACKGROUND**[1]

This suit arises out of an alleged fraudulent scheme concerning Virgin Orbit Holdings, Inc. ("Virgin Orbit"). In 2017, Virgin Galactic Holdings, Inc. formed and spun off Virgin Orbit, which provided "commercial satellite launch services."[2] Although many of Virgin Orbit's missions were successful, it suffered a failed launch in January of 2023. Shortly after, Virgin Orbit "filed a

---

[1] Unless otherwise cited, the Court's recitation of the facts is taken from Plaintiff's Complaint. *See* Pl.'s Compl., ECF No. 1.
[2] *Id.* ¶ 14.

1

Form 8-K with the Securities and Exchange Commission ("SEC" or "Plaintiff"), disclosing that it would immediately initiate a company-wide operational pause to conserve capital, pursue additional funding, and explore strategic opportunities."[3] The next day, Virgin Orbit's stock price decreased from $1.01 per share to $0.71 per share.

Here enters Defendant Matthew Brown, the sole owner and proprietor of Defendant Matthew Brown Companies, LLC ("Brown Companies") (collectively, "Defendants"). On March 19, 2023, Brown messaged Virgin Orbit's CEO on LinkedIn to discuss a potential "capital injection."[4] Upon the CEO's response, Brown wrote "I have invested over $750mm of my personal capital, largely in this [space] vertical, and largely in stealth mode . . . I have the bandwidth to write the $200 mm."[5]

Later that day, Brown reached out to Virgin Orbit's Vice President of Investor Relations, Stephen Zhang, to discuss financing his investment. After a series of correspondences, Brown emailed Mr. Zhang a screenshot of a bank account in the name of Brown Companies. This screenshot "purport[ed] to show a 'current' and 'accessible' balance . . . of $182,383,991.26."[6] Plaintiff maintains, however, that this screenshot "was fabricated and contained materially false and misleading representations."[7] Specifically, Plaintiff alleges that "as of March 19, 2023, the actual balance of the [bank account] that Brown identified to support his offer was less than $1, which Defendants never disclosed to Virgin Orbit."[8]

---

[3] *Id.* ¶ 17.
[4] *Id.* ¶ 19.
[5] *Id.* (alterations in original).
[6] *Id.* at ¶ 21; *see* Pl.'s App. Supp. Mot. Partial Summ. J. Ex. 10 (Email to Mr. Zhang), App. 369, ECF No. 71.
[7] Pl.'s Compl. ¶ 22, ECF No. 1.
[8] *Id.*

Unaware of this discrepancy with reality, Virgin Orbit began negotiations with Brown. On or around March 20, 2023, both sides executed a non-disclosure agreement ("NDA") that "require[ed] each side to safeguard and not disclose any confidential information exchanged during discussions surrounding Defendants' proposed investment."[9] "At Defendants' request, Virgin Orbit also prepared and sent Defendants a term sheet for the proposed $200 million investment on or around March 19 or 20, 2023."[10] The term sheet provided that Brown would receive $200 million of Virgin Orbit stock in exchange for his $200 million investment.

On March 22, 2023, Virgin Orbit filed a Form 8-K with the SEC announcing that it would "immediately resume operations to prepare for its next mission while it sought new funding."[11] Despite the NDA, however, Reuters obtained the term sheet and publicly reported in an article that "Virgin Orbit was near a deal to raise $200 million from Matthew Brown Companies."[12] According to Plaintiff, the Form 8-K filing and this article caused Virgin Orbit's stock price to rise 33.1 percent, from $0.44 per share to $0.59 per share.

The following day, Brown participated in a live, nationally televised interview with CNBC. During the interview, Brown confirmed the validity of the reported $200 million investment offer to Virgin Orbit, stated that Defendants were in "final discussions" with Virgin Orbit, and explained that Defendants "fully plan[ned]" on closing a transaction "in the next 24 hours."[13] Brown further maintained that his investment "would 'make [Virgin Orbit] cash flow positive' and that he would 'basically be the owner' [of Virgin Orbit]" after the transaction closed.[14] Aside from the specifics of the transaction, Plaintiff alleges Brown "portrayed himself . . . as [a] successful, experienced

---

[9] *Id.* ¶ 23.
[10] *Id.*
[11] *Id.* ¶ 26.
[12] *Id.*
[13] *Id.* ¶ 29.
[14] *Id.* (alterations in original).

3

venture capitalist[] within the space industry."[15] According to Plaintiff, however, Brown never held any investments or positions in any space companies. Additionally, Plaintiff maintains Brown lacked the capital and resources to solidify his touted $200 million investment.

On March 24, 2023, Brown proposed to Virgin Orbit that it should agree to pay Brown a three percent break-up fee should the transaction fall through. Virgin Orbit refused Brown's proposed break-up fee and explained that "Brown needed to first place the necessary funds in escrow and respond to Virgin Orbit's basic due diligence requests."[16] Brown did not comply with Virgin Orbit's requests and, as a result, negotiations between the parties quickly fell apart. On March 25, 2023, counsel for Virgin Orbit "sent Brown a cease-and-desist letter, demanding that he stop disclosing confidential information and communications in violation of the NDA."[17]

On March 27, 2023, CNBC reported that Virgin Orbit was unable to access new funding, observing that Brown's investment offer did not manifest. The next day, Virgin Orbit's stock price fell from $0.54 per share to $0.38 per share—a 28.4 percent decrease. Virgin Orbit filed for bankruptcy on April 4, 2023.

The SEC brought this action on June 17, 2024, alleging Defendants participated in securities fraud and violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder. Defendants, proceeding pro se, moved to dismiss Plaintiff's Complaint under Federal Rule of Civil Procedure 12(b)(6). On December 18, 2024, this Court denied Defendants' Motion to Dismiss.[18]

---

[15] *Id.* ¶ 30.
[16] *Id.* ¶ 30.
[17] *Id.* ¶ 35.
[18] *See* Order, ECF No. 23.

Now, Defendants move for summary judgment.[19] Plaintiff moves for partial summary judgment against Defendants, arguing Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.[20] The parties concede there are no genuine disputes of material facts and that summary judgment is warranted.[21]

## II.    LEGAL STANDARD

A movant is entitled to summary judgment if by the pleadings and evidence it can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must view the evidence in the light most favorable to the nonmovant. *Ion v. Chevron USA, Inc.*, 731 F.3d 379, 389 (5th Cir. 2013). "Moreover, a court must draw all reasonable inferences in favor of the nonmoving party and may not make credibility determinations or weigh the evidence." *Id.*

A party seeking summary judgment must inform a court of the basis for its motion and identify those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party opposing summary judgment must then set forth specific facts showing that there is a genuine issue for trial. *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968).

---

[19] *See* Defs.' Mot. Summ. J., ECF No. 53.
[20] Pl.'s Br. Supp. Mot. Partial Summ. J. 1, ECF No. 67.
[21] *See id*. at 12 ("Because there is no genuine issue of material fact as to these elements, the Court should grant summary judgment in the SEC's favor."); *see* Defs.' Mot. Summ. J. 4, ECF No. 53 ("Yet now, with dozens of evidentiary submissions before the Court, the SEC offers no rebuttal evidence of its own . . . [t]his is the precise scenario Rule 56 is designed to resolve.")

## III. ANALYSIS

Section 10(b) of the Exchange Act and Rule 10b-5 thereunder prohibit fraud in connection with the purchase or sale of any security. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. To prevail on its securities-fraud claim, Plaintiff must establish by a preponderance of the evidence that Defendants: (1) by the use of any means or instrumentality of interstate commerce; (2) employed any device, scheme, or artifice to defraud, or made a material misrepresentation or misleading omission, or engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit upon any person; (3) in connection with the purchase or sale of a security; (4) with scienter. 17 C.F.R. § 240.10b-5; *see also SEC. v. Gann*, 565 F.3d 932, 936 (5th Cir. 2009). The Court addresses each element in turn below and concludes Plaintiff has demonstrated by a preponderance of the evidence that Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

### A. Defendants' fraud occurred by use of instrumentalities of interstate commerce.

Plaintiff contends "there is no genuine dispute that Defendants' misrepresentations, omissions, and fraud occurred through a nationally televised interview, phone calls, emails, and LinkedIn messages transmitted using the internet, which constitute instrumentalities of interstate commerce."[22] In doing so, Plaintiff correctly explains the Fifth Circuit has classified "phone and internet service" as "instrumentalities of interstate commerce." *Taylor v. HD & Assocs., L.L.C.*, 45 F.4th 833, 838 (5th Cir. 2022). Plaintiff has identified evidence[23] that demonstrates the absence of a genuine issue of material fact, and Defendants fail to challenge Plaintiff's contentions

---

[22] Pl.'s Br. Supp. Mot. Partial Summ. J. 20, ECF No. 67.
[23] *See* Pl.'s App. Supp. Mot. Partial Summ. J. Ex. 10 (Email to Mr. Zhang), App. 367–69, ECF No. 71.

concerning this element of its claim.[24] The Court thus determines that Defendants made use of the instrumentalities of interstate commerce as a matter of law.

**B. Defendants made material misrepresentations or misleading omissions.**

Plaintiff argues Defendants made "several material misrepresentations and omissions to Virgin Orbit and the investing public."[25] In response, Defendants argue that the "SEC has failed to identify a single materially false or misleading public statement—and cannot show that investors relied on any such statement or suffered harm."[26] Plaintiff is correct.

"To satisfy this requirement, the SEC, unlike private litigants, need not prove the elements of reliance, proximate causation, or harm[.]" *SEC v. Couch*, No. 3:14-CV-1747-D, 2014 WL 7404127, at *7 (N.D. Tex. Dec. 31, 2014) (alteration in original) (internal quotation marks and citation omitted). The Fifth Circuit agrees, having said "the SEC [is] not required to prove that any investor *actually relied* on Defendants' misrepresentations." *SEC v. World Tree Fin., L.L.C.*, 43 F.4th 448, 465 (5th Cir. 2022) (emphasis added). So, Defendants' argument that "the SEC must show that an investor or market participant relied on a specific misstatement by a defendant"[27] is incorrect.

Second, Plaintiff has identified false or misleading statements made by Defendants. On March 19, 2023, Brown emailed Virgin Orbit's Vice President of Investor Relations, Mr. Zhang, with a screenshot of a bank account in the name of Matthew Brown Companies.[28] This screenshot "purport[ed] to show a 'current' and 'accessible' balance . . . of $182,383,991.26," despite the

---

[24] *See* Pl.'s Reply 3 n.6, ECF No. 79 ("Defendants never challenge or mention the 'interstate commerce' element of the SEC's claim, which is established as a matter of law.").
[25] Pl.'s Br. Supp. Mot. Partial Summ. J. 12, ECF No. 67.
[26] Defs.' Mot. Summ. J. 12, ECF No. 53.
[27] *Id.* at 18.
[28] Pl.'s Br. Supp. Mot. Partial Summ. J. 5, ECF No. 67; Pl.'s App. Supp. Mot. Partial Summ. J. Ex. 10 (Email to Mr. Zhang), App. 369, ECF No. 71.

account actually holding less than $1 at the time of the screenshot.[29] Brown later admitted that "the screenshot [was] false."[30] Additionally, Plaintiff provides screenshots of Brown touting to have "invested over $750mm of [his] personal capital, largely in this [space] vertical, and largely in stealth mode . . . [he] ha[d] the bandwidth to write the $200 mm."[31] This, of course, directly contradicts the fact that as of March 2023, "Brown estimated that the sum total value of his cash and other assets was somewhere between $10,000 and $50,0000, and that he had a 'negative' net worth."[32]

Third, these misrepresentations and omissions were material. "A misstatement or omission is material if 'there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'" *SEC v. Felton*, No. 3:20-CV-0822-G, 2021 WL 2376722, at *10 (N.D. Tex. June 10, 2021) (citation modified) (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)). Here, a reasonable investor would have viewed Brown's statements about his plans to invest $200 million into Virgin Orbit as having "significantly altered the 'total mix' of information made available." *Id.* (quoting *Basic, Inc.*, 485 U.S. at 232). The materiality of Brown's misrepresentations and omissions is supported by the fact that "[f]ollowing Virgin Orbit's 8-K filing and the publication of the Reuters article, Virgin Orbit's stock price rose 33.1%."[33] And after Brown's offer collapsed, Virgin Orbit's stock price "dropped approximately 28.4%."[34] Thus,

---

[29] Pl.'s Br. Supp. Mot. Partial Summ. J. 5, ECF No. 67.
[30] Pl.'s App. Supp. Mot. Partial Summ. J., App. 343, ECF No. 71.
[31] *Id.* at Ex. 14 (Brown LinkedIn Messages), at App. 372.
[32] Pl.'s Br. Supp. Mot. Partial Summ. J. 4, ECF No. 67 (quoting Pl.'s App. Supp. Mot. Partial Summ. J., App. 322, ECF No. 71).
[33] *Id.* at 9.
[34] *Id.* at 11.

investors' conduct in the aggregate was affected by the possibility of a large investment from Brown.

In sum, Plaintiff has shown by a preponderance of the evidence that Defendants made material misrepresentations or misleading omissions.

### C. Defendants' misrepresentations and omissions occurred "in connection with" the purchase or sale of Virgin Orbit securities.

To violate Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, Defendants' alleged fraud must also have been perpetrated "in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5; *see also Gann*, 565 F.3d at 936. Plaintiff contends that this is a "flexible standard" under which "[i]t is not necessary for a specific trade or a specific purchaser or seller to be identified."[35] Defendants argue that "reliance is a fundamental element of a Rule 10b-5(b) claim" and that "[Plaintiff] must show that an investor or market participant relied on a specific misstatement by a defendant in making investment decisions."[36] Once again, Plaintiff is correct.

The Supreme Court has held that "[t]o effectuate its remedial purposes, [Section 10(b)] should be construed flexibly, not technically and restrictively. The SEC has consistently adopted a broad reading of 'in connection with the purchase or sale of any security.'" *SEC v. Zandford*, 535 U.S. 813, 813 (2002). To that end, the Fifth Circuit has held that "[t]o satisfy the in-connection-with element, the fraudulent scheme and sale of securities need only 'coincide.'" *World Tree Fin., L.L.C.*, 43 F.4th at 459 (quoting *Zandford*, 535 U.S. at 822). Further, contrary to Defendants' contentions, the Fifth Circuit went on to clarify "[i]t is not necessary for a specific trade or a

---

[35] *Id.* at 19 (alteration in original) (quoting *World Tree Fin., L.L.C.*, 43 F.4th at 461).
[36] Defs.' Mot. Summ. J. 18, ECF No. 53.

specific purchaser or seller to be identified to satisfy the in-connection-with element." *Id.* at 461 (citing *Merril Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006)).

Based on the record, this Court determines Defendants' alleged fraudulent scheme coincided with the sale of securities. As Plaintiff explains, "Defendants' misstatements, omissions, and deceptive conduct led to a term sheet to purchase Virgin Orbit securities, which leaked to the public and impacted the sale and purchase of Virgin Orbit securities in the public market."[37] The Court agrees with Plaintiff that "the transaction fraudulently proposed by Defendants—and their misstatements, omission, and misconduct in connection therewith—coincided, touched upon, and had some nexus with transactions in Virgin Orbit stock."[38] Accordingly, there is no genuine dispute that Defendants' misrepresentations and omissions occurred "in connection with the purchase or sale of" Virgin Orbit securities. 17 C.F.R. § 240.10b-5.

### D. Defendants acted with scienter.

Finally, to violate Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, Defendants must have acted with scienter. In the Fifth Circuit, scienter may be established by showing that the Defendants acted with either (1) "intent to deceive, manipulate, or defraud," or (2) "'severe recklessness' in which the 'danger of misleading buyers or sellers . . . is either known to the defendant or is so obvious that the defendant must have been aware of it.'" *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 366 (5th Cir. 2004) (alteration in original) (quoting *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961–62 (5th Cir. 1981)). "It is well established . . . that scienter may be established by circumstantial evidence." *SEC v. Fox*, 855 F.2d 247, 253 (5th Cir. 1988). Though "summary judgment is uncommon on a question of intent, it is appropriate

---

[37] Pl.'s Br. Supp. Mot. Partial Summ. J. 20, ECF No. 67.
[38] *Id.*

when the undisputed evidence removes any doubt on that issue." *SEC v. Blackburn*, 15 F.4th 676, 681 (5th Cir. 2021) (citing *SEC v. Sethi*, 910 F.3d 198, 206–07 (5th Cir. 2018)).

Here, the evidentiary record dispels any doubt that Brown acted with scienter as a matter of law. Brown sent Virgin Orbit an edited screenshot of his company's bank account that purported to show the account had over $182 million when, in reality, it held less than $1.[39] Accompanying the screenshot was Brown's email message, stating "I hope this can get the ball rolling. I do not have access to my [JPMorgan] brokerage acct but this should hopefully paint a decent picture until we get further down the road."[40] There is no doubt Brown knew, or at least was severely reckless in not knowing, that he was falsely representing his company as holding millions of dollars. These misrepresentations were designed to elicit action on the part of Virgin Orbit. Indeed, Brown testified that he sent the screenshot "[t]o get in the door" with Virgin Orbit.[41]

Other acts from Brown demonstrate either intent to deceive or extreme recklessness. Brown falsely asserted that he: (1) previously invested in multiple space companies,[42] (2) had the "bandwidth" to invest $200 million of his own personal capital,[43] and (3) would close on and fund the $200 million investment "in the next 24 hours"[44] during his CNBC interview. Considering all these statements together, the Court concludes that no genuine dispute exists as to whether Defendants acted with scienter.

---

[39] *Id.* at 5.
[40] Pl.'s App. Supp. Mot. Partial Summ. J. Ex. 10 (Email to Mr. Zhang), App. 367, ECF No. 71.
[41] *Id.* at App. 343.
[42] *Id.* at App. 307.
[43] *Id.* at App. 323.
[44] *Id.* at App. 306.

### E. Defendants' affirmative defenses fail as a matter of law.

Defendants in their Answer to Plaintiff's Complaint raise twenty-three affirmative defenses.[45] Plaintiff contends "each 'defense' fails as a matter of law."[46] Specifically, Plaintiff explains at least five defenses[47] fail as a matter of law because they merely deny the existence of an element of Plaintiff's claim, at least six defenses[48] are contrary to governing law, eight defenses[49] are inapplicable, and Defendants' equitable defenses fail as a matter of law.[50] The Court agrees with Plaintiff and concludes none of Defendants' defenses has merit. Accordingly, Plaintiff is entitled to summary judgment on its securities-fraud claim against Defendants.

## IV.  CONCLUSION

Based on the foregoing, the Court **DENIES** Defendants' Motion for Summary Judgment (ECF No. 53) and Court **GRANTS** Plaintiff's Motion for Partial Summary Judgment (ECF No. 66). The parties **SHALL** submit a joint schedule for remedies briefing by no later than **September 2, 2025**.

**SO ORDERED** on this **19th day** of **August, 2025**.

Reed O'Connor
UNITED STATES DISTRICT JUDGE

---

[45] Defs.' Answer 5–8, ECF No. 25.
[46] Pl.'s Br. Supp. Mot. Partial Summ. J. 21, ECF No. 67.
[47] These defenses are lack of scienter, no material misrepresentation or omissions, compliance with law, good faith, and puffery. Pl.'s Br. Supp. Mot. Partial Summ. J. 21–23, ECF No. 67.
[48] These defenses are reliance and causation, no damage, mitigation, lack of personal benefit, contribution and indemnity, and piercing the corporate veil. Pl.'s Br. Supp. Mot. Partial Summ. J. 23–24, ECF No. 67.
[49] These defenses are failure to state a claim, lack of jurisdiction, no jurisdiction over foreign conduct, statute of limitations, major questions doctrine, lack of due process and fair notice, First Amendment, and standing. Pl.'s Br. Supp. Mot. Partial Summ. J. 24–25, ECF No. 67.
[50] These defenses are abuse of discretion, estoppel, unclean hands, and laches. Pl.'s Br. Supp. Mot. Partial Summ. J. 25, ECF No. 67.